UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------
                                      )
IN RE:  APPLICATION OF GORSOAN LTD. )    Civil Action No.

AND GAZPROMBANK                       )    17-cv-5912

                                      )

-------------------------------------)


DEPOSITION OF JANNA BULLOCK

February 6, 2018

10:40 a.m.


        THE VIDEOTAPED EXAMINATION BEFORE TRIAL

of the Respondent, JANNA BULLOCK, taken by the

Petitioner, pursuant to a Subpoena, held at the

offices of FOLEY HOAG, LLP, 1540 Broadway, 23rd

Floor, New York, New York, 10036, before Avery N.

Armstrong, a Notary Public of the State of New

York.

Janna Bullock – February 6, 2018

2 (Pages 2 to 5)

Page 2

```
1
2    A P P E A R A N C E S:
3
     FOLEY HOAG, LLP
4            Attorneys for the Petitioner
             GORSOAN LTD. and GAZPROMBANK OJSC
5            Seaport West
             155 Seaport Boulevard
6            Boston, Massachusetts 02210
7    BY: CAROLINE S. DONOVAN, ESQ.
8
9    SHER TREMONTE, LLP
             Attorneys for the Respondent
10           JANNA BULLOCK
             90 Broad Street, 23rd Floor
11           New York, New York 10004
12   BY: MICHAEL TREMONTE, ESQ.
13       MARK CUCCARO, ESQ.
14
     ALSO PRESENT:
15           STEVE DECANIO, Videographer
             GregoryEdwards, LLC
16
17
18
19        *              *              *
20
21
22
23
24
25
```

Page 3

```
1
2    F E D E R A L   S T I P U L A T I O N S
3
4          IT IS HEREBY STIPULATED AND AGREED by
5    and between the counsel for the respective parties
6    herein that the sealing, filing and certification
7    of the within deposition be waived; that the
8    original of the deposition may be signed and sworn
9    to by the witness before anyone authorized to
10   administer an oath, with the same effect as if
11   signed before a Judge of the Court; that an
12   unsigned copy of the deposition may be used with
13   the same force and effect as if signed by the
14   witness, 30 days after service of the original & 1
15   copy of same upon counsel for the witness.
16
17         IT IS FURTHER STIPULATED AND AGREED that
18   all objections except as to form, are reserved to
19   the time of trial.
20
21        *       *    *    *
22
23
24
25
```

Page 4

```
1              JANNA BULLOCK
2         THE VIDEOGRAPHER:  Here
3    begins Media Unit Number 1, Volume
4    Number 1 in the video deposition
5    of Ms. Janna Bullock in the matter
6    of in re:  Application of Gorsoan
7    Limited and Gazprombank OJSC
8    in the United States District
9    Court, the Southern District of
10   New York CA Action Number:
11   17-cv-5912.
12        Today's date is February 6,
13   2018.  The time is approximately
14   10:41 a.m.
15        This deposition is being
16   taken as Foley Hoag, New York
17   office, 1540 Broadway, New York,
18   New York 10036.
19        My name is Steve DeCanio and
20   I'm the video legal specialist,
21   the court reporter is Avery
22   Armstrong, and we are both from
23   Gregory Edwards LLC.
24        Counsel, please identify
25   yourselves and state whom you
```

Page 5

```
1              JANNA BULLOCK
2    represent, after which, the court
3    reporter will please swear in the
4    witness so we may begin.
5         MS. DONOVAN:  Caroline
6    Donovan here on behalf of Gorsoan
7    and Gazprombank.
8         MR. CUCCARO:  Mark Cuccaro,
9    Sher Tremonte, LLP, here on behalf
10   of the Respondent, Janna Bullock.
11        MR. TREMONTE:  Michael
12   Tremonte, Sher Tremonte LLP, here
13   on behalf of the Respondent, Janna
14   Bullock.
15   J A N N A   B U L L O C K, called as a witness,
16   having been first duly sworn by a Notary Public of
17   the State of New York, was examined and testified
18   as follows:
19        THE REPORTER:  Please state
20   your name for the record.
21        THE WITNESS: Janna Bullock.
22        THE REPORTER:  Please state
23   an address for the record.
24        THE WITNESS:  ███████████
25   ███████ New York, New York █████
```

Page 6

```
1                JANNA BULLOCK
2            THE REPORTER:  Is it an
3    apartment or private home?
4            THE WITNESS:  It's an
5    apartment.
6            THE REPORTER:  The apartment?
7            THE WITNESS:  ███████
8    EXAMINATION BY
9    MS. DONOVAN:
10           MS. DONOVAN:  I'll first put
11   on the record, agreements between
12   counsel.  So we agree to waive all
13   objections except as to form,
14   Ms. Bullock and her counsel have
15   30 days to read and sign the
16   deposition transcript before a
17   notary, and counsel for
18   Ms. Bullock with designate
19   pursuant to the party's protection
20   orders which portions of that
21   deposition transcript will be
22   protected.
23       Q.   Now, Ms. Bullock you've
24   stated your full name in response to
25   the court reporter.
```

Page 7

```
1                JANNA BULLOCK
2       Do you go by any other names?
3       A.   No.
4       Q.   Is Bullock your married name?
5       A.   I've never used my married
6    name.
7       Q.   Okay.  And what was your
8    married name?
9       A.   That's my name, Janna
10   Bullock.
11       Q.  And maiden name is Bullock?
12       A.  Maiden name was -- can I
13   spell is it?
14       Q.  Yes.
15       A.  S-A-M-U-Y-L-I-K.
16       Q.  And your date of birth,
17   Ms. Bullock.
18       A.  ███████
19       Q.  And Ms. Bullock, you're aware
20   you've received a deposition subpoena
21   to testify today?
22       A.  Yes.
23       Q.  Okay.  Can we please mark as
24   Exhibit 1, the subpoena to testify.
25           (Whereupon, a subpoena was
```

Page 8

```
1                JANNA BULLOCK
2    marked as Bullock Exhibit 1 for
3    Identification.)
4       Q.   Ms. Bullock, I'm providing
5    you what's been marked as Bullock
6    Exhibit 1.
7            Is that the subpoena to
8    testify under which you're here today?
9            I'll direct your attention to
10   the part in the middle of the first
11   page where it sets up today's
12   deposition date and the offices of
13   Foley Hoag.
14       A.   Yes.
15       Q.   Ms. Bullock, have you had
16   your deposition taken previously?
17       A.   Yes.
18       Q.   I'll just recap with you some
19   of the basic rules governing the
20   deposition process.  This will allow
21   the court reporter and the videographer
22   to obtain a clear transcript and a
23   recording of what and I say.
24           First, if we could agree to
25   speak one at a time, it will allow for
```

Page 9

```
1                JANNA BULLOCK
2    a clear transcription.
3            Will you agree to that?
4       A.   Yes.
5       Q.   If you don't understand a
6    question that I ask, please say so.
7    Otherwise, I will assume you understood
8    the question asked.
9            Do you agree?
10       A.   Yes.
11       Q.   Earlier, the court reporter
12   swore you in.
13           Do you understand that
14   pursuant to that oath, you swore to
15   provide truthful and accurate
16   testimony?
17       A.   Yes.
18       Q.   And you understand that your
19   testifying under the pains and
20   penalties of perjury?
21       A.   Yes.
22       Q.   And by failing to provide
23   truthful and accurate testimony, you
24   could subject yourself to penalties?
25       A.   Yes.
```

Janna Bullock – February 6, 2018

4 (Pages 10 to 13)

Page 10

```
1              JANNA BULLOCK
2      Q.    Is there anything that would
3  interfere with your ability to provide
4  truthful and accurate testimony today?
5      A.    No.
6      Q.    Are you taking any
7  medications that might interfere with
8  your ability to provide truthful and
9  accurate testimony?
10     A.    No.
11     Q.    Now, Ms. Bullock, you said
12 you've been deposed previously.
13           Do you recall the first time
14 you were deposed?
15     A.    Yes.
16     Q.    Roughly, when was that?
17     A.    I don't recall.
18     Q.    Do you recall what the matter
19 was, what the case concerned?
20     A.    That case concerned my former
21 employer.
22     Q.    And who was that?
23     A.    Emanuel Zeltser.
24     Q.    Can you spell that last name?
25     A.    Z-E-L-T-S-E-R.  His first
```

Page 11

```
1              JANNA BULLOCK
2  name is Emanuel.
3      Q.    Okay.  Thank you.  Was that
4  case pending in New York?
5      A.    To the best of my knowledge.
6      Q.    Were you a defendant in that
7  action?
8      A.    A witness.
9      Q.    A witness, okay.
10           So you were not a party in
11 that case?
12     A.    No.
13     Q.    And what was the issue?
14     A.    I don't remember.
15     Q.    About what topic did you
16 provide testimony?
17     A.    About my former employer.
18     Q.    What in particular about your
19 former employer?
20     A.    I don't remember.  I don't
21 remember details.
22     Q.    Was this over 10 years ago?
23     A.    Yes.
24     Q.    Over 20 years ago?
25     A.    Yes.
```

Page 12

```
1              JANNA BULLOCK
2      Q.    Over 30?
3      A.    No.
4      Q.    Did you provide testimony in
5  court on that matter, so outside of the
6  deposition conference room space?
7      A.    It was in a deposition.
8      Q.    Okay.  Roughly, how many
9  times have you been deposed,
10 Ms. Bullock?
11     A.    Twice.
12     Q.    Twice.  What was the other
13 matter in which you were deposed?
14     A.    I was a plaintiff in a
15 dispute with a party planner.
16     Q.    When did you bring that case
17 as the plaintiff?
18     A.    Ten years ago.  Around 10
19 years ago.
20     Q.    What was the issue in that
21 case?
22     A.    It was a dispute about my
23 daughter's wedding.
24     Q.    Did you provide testimony in
25 court in that matter?
```

Page 13

```
1              JANNA BULLOCK
2      A.    No.
3      Q.    What was the resolution of
4  that case?
5      A.    I don't know.  I don't think
6  it's over.
7      Q.    Did it go to trial?
8      A.    No.
9      Q.    Do you recall what court you
10 brought that suit in?
11     A.    No.
12     Q.    Was it in New York?
13     A.    Yes.
14     Q.    When I say deposition, do you
15 understand me to mean the space like
16 one we're in today where a reporter is
17 present who takes down your answers to
18 a lawyer's questions?
19     A.    Yes.
20     Q.    Okay.  And you've only been
21 deposed two times?
22     A.    Yes.
23     Q.    How many times have you
24 testified in court?
25     A.    None.
```

Janna Bullock - February 6, 2018

5 (Pages 14 to 17)

Page 14

JANNA BULLOCK

1
2   Q.   You've been a party to other
3 cases; is that correct?
4   A.   (Nonverbal gesture).
5   Q.   You're going to need to give
6 verbal answers for the court reporter.
7   A.   Yes.
8   Q.   Now, in other instances, have
9 you been the plaintiff, the person who
10 brought the suit?
11   A.   Yes.
12   Q.   Okay.  What were those other
13 instances?
14   A.   They were business disputes.
15   Q.   Roughly, how many times have
16 you been a plaintiff in a lawsuit?
17   A.   I don't know.
18   Q.   More than 10 times?
19   A.   No.
20   Q.   More than five?
21   A.   No.
22   Q.   Okay.  And when you say,
23 "business disputes," to what are you
24 referring?
25   A.   Architectural matters.

Page 15

JANNA BULLOCK

1
2   Q.   Any other types of disputes
3 in which you've been the plaintiff?
4   A.   I don't recall.
5   Q.   Now, Ms. Bullock, you've been
6 the defendant in other cases; is that
7 correct?
8   A.   Yes.
9   Q.   Roughly, how many times have
10 you been the defendant in a case?
11   A.   Maybe twice.
12   Q.   Do you recall what those
13 matters concerned?
14   A.   Probably the same thing.
15   Q.   So isolate the first time you
16 were a defendant.
17      Who sued you?
18   A.   It was a counter-claim.  It
19 was an architect.
20   Q.   An architect sued you?
21   A.   It was a counter-claim.  I
22 sued him and he sued me.
23   Q.   What was that architect's
24 name?
25   A.   Giancarlo Alhadeff.

Page 16

JANNA BULLOCK

1
2   Q.   Was your deposition taken in
3 that matter?
4   A.   No.
5   Q.   Was your deposition taken in
6 your original suit against Alhadeff?
7 So not the counter claim.
8   A.   No.
9   Q.   What was the resolution of
10 the suit with Alhadeff?
11   A.   I think it's still pending.
12   Q.   Did it go to court?
13   A.   No.
14   Q.   Was it settled?
15   A.   Maybe.
16   Q.   What do you mean by still
17 pending?
18   A.   It wasn't significant issues,
19 so I don't really follow it.  I just --
20 I kind of didn't focus on it.
21   Q.   So when you say, not
22 significant issues, what do you mean?
23   A.   There were emotional issues
24 about this architect.
25   Q.   What were the emotional

Page 17

JANNA BULLOCK

1
2 issues?
3   A.   He was a con artist.
4   Q.   What was the sum of money
5 that was in dispute?
6   A.   That based on a false
7 statements, he collected over a million
8 Euros of his fees in France based on a
9 claim that he built a tent over a
10 five-story structure that had no access
11 to it.
12   Q.   So you were suing him for
13 1 million Euros?
14   A.   I don't remember the amount,
15 but I was suing him out of devastation
16 of his unprofessional and just
17 behavior.
18   Q.   You were suing him because
19 you were upset over the
20 unprofessionalism?
21      MR. TREMONTE:  Objection.
22      MS. DONOVAN:  You can answer.
23   A.   Of his cruelty and
24 dishonesty.
25   Q.   Why were you suing

Janna Bullock - February 6, 2018

6 (Pages 18 to 21)

---

Page 18

```
1              JANNA BULLOCK
2   Mr. Alhadeff?
3            MR. TREMONTE:  Objection.
4            MS. DONOVAN:  You can answer.
5       A.   I was suing Mr. Alhadeff
6   because he collected money based on
7   nothing.
8       Q.   And you were upset because he
9   was dishonest and unprofessional?
10           MR. TREMONTE:  Objection.
11           Asked and answered.
12           MS. DONOVAN:  You can answer.
13      A.   When architect earns a
14  million dollars fee, he needs to build
15  a building.
16      Q.   Now, the other instance in
17  which you were a defendant, when did
18  that occur?
19      A.   I don't remember.
20      Q.   Who sued you in that case?
21      A.   I don't remember.
22      Q.   Was it another professional
23  dispute?
24           MR. TREMONTE:  Objection.
25      A.   I don't remember.
```

Page 19

```
1              JANNA BULLOCK
2       Q.   Do you recall anything at all
3   about the other instance in which you
4   were sued as a defendant?
5       A.   No.
6       Q.   How do you know that you were
7   sued two times then?
8            MR. TREMONTE:  Objection.
9            MS. DONOVAN:  You can answer.
10      A.   I don't know.
11           MR. TREMONTE:  By the way,
12  counsel keeps reminding you that
13  you can answer.
14           Just so the record is clear,
15  I will mark, may makes an
16  objection to the form of a
17  question.
18           That's what we agreed to
19  initially, and it's always the
20  case that you can answer, unless
21  it's for some reason we instruct
22  you not to, okay?
23           THE WITNESS:  Mm hm.
24           MS. DONOVAN:  That's correct.
25           And I won't be asking you to
```

Page 20

```
1              JANNA BULLOCK
2   divulge anything that's privileged
3   with your lawyers.
4            So that will be an instance
5   when your lawyer will object.
6   So -- and you shouldn't answer
7   that question.
8            THE WITNESS:  Okay.
9       Q.   Now, Ms. Bullock, you've
10  testified that you've never given
11  testimony in court; is that correct?
12      A.   To the best of my knowledge.
13      Q.   In answering my previous
14  questions about instances where you
15  were a party to a lawsuit, were you
16  referring to civil cases?
17      A.   Yes.
18      Q.   Okay.  Have you ever been
19  charged with a criminal -- in a
20  criminal matter?
21      A.   No.
22      Q.   You've never been -- excuse
23  me.  Strike that.
24           Have you ever been charged
25  with a crime in the United States?
```

Page 21

```
1              JANNA BULLOCK
2       A.   No.
3       Q.   Have you ever been charged
4   with a crime in Europe?
5       A.   No.
6       Q.   Have you ever been charged
7   with a crime in Russia?
8       A.   That's what I heard recently.
9       Q.   What have you heard recently?
10      A.   That I was tried.
11           MR. TREMONTE:  Objection.
12           I'm just going to caution you
13  to the extent that you had a
14  communication with a lawyer that
15  represents you about legal matters
16  in Russia, those communications,
17  to the extent that they're for the
18  purpose of seeking legal advice
19  are privileged.
20           So I caution you not to
21  answer as to the content of the
22  communications with a lawyer.
23      A.   There was no communication
24  with lawyer about that.
25      Q.   So what did you understand to
```

Page 22

```
1                JANNA BULLOCK
2  be the matter in Russia that is
3  currently pending?
4       A.   It's -- I've been accused of
5  doing inappropriate things that I've
6  never done, or never heard of.
7       Q.   And has there been are
8  resolution or conviction in the case in
9  Russia?
10       A.   I do not know.  I just hired
11  an attorney.
12       Q.   Don't tell me what the
13  attorney told you.
14            But do you understand that
15  there has been a conviction in the case
16  in Russia?
17       A.   My understanding is there is
18  a case in Russia.
19       Q.   Do you know what the status
20  of the case in Russia is?
21            MR. TREMONTE:  Objection.
22       A.   No.
23       Q.   Now, Ms. Bullock, are you a
24  defendant in a matter pending in
25  Cyprus?
```

Page 23

```
1                JANNA BULLOCK
2       A.   I'm one of 30 defendants in a
3  matter in Cyprus.
4       Q.   You understand that the
5  reason we are here in the Southern
6  District of New York is for discovery
7  in aid of that proceeding in Cyprus?
8       A.   Yes.
9       Q.   And do you understand that
10  when the court in the Southern District
11  of New York allowed Gorsoan application
12  for discovery, that you were obligated
13  to produce certain documents in
14  response to a document subpoena?
15       A.   Yes.
16       Q.   Did you receive a subpoena to
17  produce documents?
18       A.   Yes.
19            MS. DONOVAN:  Could we please
20       mark as Exhibit 2, the document
21       that I'm now handing you.
22            (Whereupon, a subpoena was
23       marked as Bullock Exhibit 2 for
24       Identification.)
25       Q.   Ms. Bullock, I'm handing you
```

Page 24

```
1                JANNA BULLOCK
2  what's been marked as Exhibit 2 in the
3  deposition.  Could you please review
4  Exhibit 2.  And you're free to take as
5  much time with it as you need.
6            I'll direct your attention to
7  a Schedule A which is attached to the
8  subpoena, and that includes seven pages
9  listing documents that were requested
10  of you.
11       A.   Okay.
12       Q.   Now, Ms. Bullock, you just
13  reviewed the document carefully; is
14  that right?
15       A.   Yes.
16       Q.   Do you recognize the document
17  that is Exhibit 2?
18       A.   This document?
19       Q.   Yes.
20       A.   Yes.
21       Q.   And what is Exhibit 2?
22       A.   It's a subpoena to produce
23  documents.
24       Q.   And you've received this
25  subpoena in the course of this
```

Page 25

```
1                JANNA BULLOCK
2  litigation; is that correct?
3       A.   Yes.
4       Q.   And you understand that you
5  have a responsibility to produce
6  documents responsive to the subpoena
7  request; is that correct?
8       A.   Yes.
9       Q.   Now, Ms. Bullock, do you own
10  a computer?
11       A.   Do I own a computer?
12       Q.   (Nonverbal gesture).
13       A.   Yes, I do.
14       Q.   More than one computer?
15       A.   No.  I own one computer.
16       Q.   And what is that computer?
17       A.   It's an Apple.
18       Q.   Is it a laptop?
19       A.   Yes.
20       Q.   How long have you had that
21  laptop?
22       A.   I just got it for Christmas.
23       Q.   And before you had that Apple
24  laptop that you received on Christmas
25  2017, did you have a computer?
```

Janna Bullock - February 6, 2018

8 (Pages 26 to 29)

Page 26

JANNA BULLOCK

1
2    A.    Yes.
3    Q.    What was that computer?
4    A.    It was an Apple laptop.
5    Q.    And for how long did you have
6  that other Apple laptop?
7    A.    I don't remember.
8    Q.    What did you do with the
9  older Apple laptop when you received
10 the new one?
11   A.    It deformed.
12   Q.    What do you mean by
13 "deformed"?
14   A.    It just kind of expanded and
15 battery fall off.
16   Q.    Do you still have that old
17 Apple laptop?
18        MR. TREMONTE:  Hold on one
19        second.
20        Did you get that?
21   A.    It just opened up, the back,
22 and kind of deformed.
23        MR. TREMONTE:  Just so the
24        record is clear, I interrupted
25        because I could see that the court

Page 27

JANNA BULLOCK

1
2        reporter didn't catch the last
3        couple of words.
4    Q.    Do you still have that
5  laptop?
6    A.    No.
7    Q.    What did you do with it?
8    A.    I think it was thrown out.
9    Q.    Did you throw it out?
10   A.    Yes.
11   Q.    When?
12   A.    After I got a new one.
13   Q.    What caused the deformity to
14 the laptop that you described?
15        MR. TREMONTE:  Objection.
16        Asked and answered.
17        MS. DONOVAN:  You can answer.
18   A.    It was sitting on the
19 radiator for too long.
20   Q.    Did you use that laptop with
21 any — strike that.
22        How frequently did you use
23 that old Apple laptop?
24   A.    Not often.
25   Q.    Where did you keep your old

Page 28

JANNA BULLOCK

1
2  laptop computer?
3    A.    I kept it in my bedroom.
4    Q.    In your apartment in New
5  York?
6    A.    In the apartment I live in
7  New York.
8    Q.    Do you have any desktop
9  computers?
10   A.    No.
11   Q.    Ms. Bullock, do you have an
12 office?
13   A.    No.
14   Q.    Ms. Bullock, do you
15 have — strike that.
16        Do you have any desktop
17 computers at any other homes that you
18 maintain?
19        MR. TREMONTE:  Objection.
20        MS. DONOVAN:  You can answer.
21   A.    No.
22   Q.    Now, your new Apple laptop,
23 where is that currently?
24   A.    At home.
25   Q.    For what purpose do you use

Page 29

JANNA BULLOCK

1
2  your laptop?
3    A.    I don't use it much.
4    Q.    So when you do use it, why
5  are you using it?
6    A.    I watch movies on it.
7    Q.    You watch movies?
8    A.    (Nonverbal gesture).
9    Q.    What else do you do on your
10 laptop?
11   A.    I search web.
12        MR. TREMONTE:  I'm sorry,
13        this isn't an objection, but I'm
14        just echoing a request by the
15        court reporter.  Jan, if you could
16        just speak up a little bit.
17        THE WITNESS:  Sure.
18   Q.    Any other uses of your
19 laptop?
20   A.    No.
21   Q.    Do you use your laptop for
22 any banking transactions?
23   A.    No.
24        MR. TREMONTE:  Objection.
25   Q.    Do you use your laptop to pay

Page 30

```
1                JANNA BULLOCK
2   bills?
3              MR. TREMONTE:  Objection.
4              MS. DONOVAN:  You can answer.
5       A.   No.
6       Q.   Do you use your laptop to pay
7   invoices?
8              MR. TREMONTE:  Objection.
9       A.   No.
10      Q.   So with respect to the old
11  Apple laptop that was thrown out, was
12  that computer searched for documents in
13  respond to the subpoena that is Exhibit
14  2?
15      A.   Yes.
16      Q.   Who searched it for
17  documents?
18      A.   We hired a professional
19  company.
20      Q.   Okay.
21      A.   My lawyers hired a
22  professional company.
23      Q.   Okay.
24             THE WITNESS:  Can I have a
25  little break?
```

Page 31

```
1                JANNA BULLOCK
2              MR. CUCCARO:  There's not a
3   question pending.
4              Do you mind?
5              MS. DONOVAN:  That's fine.
6              How long do you want?
7              THE VIDEOGRAPHER:  The time
8   is approximately 11:12 a.m. and
9   we're going off the record.
10             (Whereupon, an off-the-record
11  discussion was held at this time.)
12             THE VIDEOGRAPHER:  The time
13  is approximately 11:21 a.m., and
14  we are back on the record.
15      Q.   Ms. Bullock, do you use
16  e-mail?
17      A.   Yes.
18      Q.   How many e-mail accounts do
19  you have currently?
20      A.   One.
21      Q.   And what is that e-mail?
22      A.   It's ██████████████████
23      Q.   Have you used any other
24  e-mail addresses before?
25      A.   Yes.
```

Page 32

```
1                JANNA BULLOCK
2       Q.   And what were those?
3       A.   It was Janna -- I believe
4   JannaBullock@RIGroup.com.
5       Q.   Did you use any other e-mail
6   addresses?
7       A.   No.
8       Q.   What internet service
9   provider do you use?
10      A.   Goggle.
11      Q.   Do you use an internet
12  service provider like Comcast?
13      A.   No.  I never heard of
14  Comcast.
15      Q.   Have you heard of AT&T?
16             MR. TREMONTE:  Objection.
17             MS. DONOVAN:  You can answer.
18      A.   Not as an internet provider.
19      Q.   Okay.  Do you understand how
20  you get internet in your home?
21      A.   Yes.
22      Q.   How do you get internet in
23  your home?
24      A.   We have a cable.
25      Q.   Okay.  And who provides your
```

Page 33

```
1                JANNA BULLOCK
2   cable?
3       A.   Spectrum.
4       Q.   Spectrum?
5       A.   (Nonverbal gesture).
6       Q.   Was the e-mail address
7   ████████████████████ searched for
8   documents in response to the document
9   subpoena that is Exhibit 2?
10      A.   Yes.
11      Q.   And who performed that
12  search?
13      A.   The company that was, I
14  believe, approved by court.
15      Q.   Excuse me?
16      A.   I believe approved by court.
17  It's a professional company.
18      Q.   The e-mail address,
19  JannaBullock@RIGroup.com, was that
20  e-mail address searched for documents
21  in response to this subpoena?
22      A.   I do not have access to this
23  account since 2008.  And I suspect it
24  was searched left and right before.
25      Q.   And how long have you used
```

Janna Bullock – February 6, 2018

10 (Pages 34 to 37)

Page 34

JANNA BULLOCK

1                    JANNA BULLOCK
2  the e-mail address,
3  ████████████████████
4       A.    Ten years.
5       Q.    Ms. Bullock, do you maintain
6  any electronic files on your laptop?
7            MR. TREMONTE:  Objection to
8  form.
9       A.    No.
10      Q.    Ms. Bullock, what is your
11 business?
12      A.    I used to be in real estate
13 development.
14      Q.    Were there any documents
15 generated in the course of that real
16 estate business?
17      A.    Not recently.
18      Q.    So when you were in real
19 estate, were there documents that were
20 generated in connection with that
21 business?
22      A.    Yes.
23      Q.    What types of documents?
24      A.    I don't know.
25      Q.    It was your business,

Page 35

1                    JANNA BULLOCK
2  Ms. Bullock.
3            What types of materials did
4  you rely on in the course of that
5  business?
6            MR. CUCCARO:  Objection.
7            MR. TREMONTE:  Objection.
8            MS. DONOVAN:  You can answer.
9       A.    Architectural drawings,
10 design drawings, specifications of the
11 structures, finishing materials,
12 engineering calculations, approvals,
13 schedules.  That's in general.
14      Q.    When were you last involved
15 in your real estate business?
16            MR. TREMONTE:  Objection to
17 form.
18      A.    I think the last one was
19 2013.
20      Q.    So the materials you listed,
21 drawings, specification, engineering
22 calculations, approvals, schedules, can
23 you tell me in what form you kept those
24 materials?
25            MR. TREMONTE:  Objection to

Page 36

1                    JANNA BULLOCK
2  form.
3       Q.    Ms. Bullock --
4       A.    Sorry.
5            MR. TREMONTE:  There's a
6  question pending, right?
7            MS. DONOVAN:  You can answer.
8       A.    Paper.
9       Q.    Were there any electronic
10 materials that you maintained in the
11 course of your real estate business?
12      A.    I'm not very good with
13 computers.  So I always preferred the
14 paper.
15      Q.    Where do you keep your paper
16 records?
17            MR. TREMONTE:  Objection to
18 form.
19      A.    I'm actually very bad with
20 papers, so I try not to keep it,
21 because if I keep it, I lose it, and it
22 makes me very nervous.
23      Q.    So if you're not good with
24 paper records, who keeps your paper
25 records.

Page 37

1                    JANNA BULLOCK
2            MR. TREMONTE:  Objection to
3  form.
4       A.    Normally, my attorneys would
5  keep certain records.
6       Q.    Can you please list the
7  attorneys that keep your paper records?
8       A.    There was Stuart Smith that
9  kept my records.  Then there were some
10 attorneys in France that kept my
11 records.  Then there was a whole legal
12 department in Russia that kept my
13 records.  Then there was a trustee in
14 Cyprus that kept my records.
15      Q.    Beyond Stuart Smith, were
16 there any other attorneys in the US who
17 kept your records?
18      A.    No, because I'm not doing
19 anything anymore.
20      Q.    Does John Piskora keep
21 records for you?
22      A.    I don't think so.
23      Q.    Now, how did you
24 communicate -- strike that.
25            Did you have employees in

Janna Bullock - February 6, 2018

11 (Pages 38 to 41)

Page 38

JANNA BULLOCK
1
2  your real estate business, Ms. Bullock?
3     A.    No.
4     Q.    Who did you work with in the
5  real estate business?
6        MR. TREMONTE:  Objection to
7     form.
8     A.    I worked with several
9  architects.
10    Q.    Can you describe to me the
11 nature of your real estate business?
12    A.    Well, in Russia I built a lot
13 of different type of real estate.  I've
14 built shopping centers, office
15 building, gated communities, private
16 homes.  I restored a few churches.
17 I've restored a few, let's say
18 historically -- few landmarks.
19 Cemeteries.
20    Q.    And that's work you did in
21 Russia.
22    A.    Mm hm.  Yes.  Yes.
23    Q.    In what time period?
24    A.    As long as I was there.
25    Q.    And when is that?

Page 39

JANNA BULLOCK
1
2     A.    From 1994 to 2008.
3     Q.    Can you tell me about any
4  real estate business that you conducted
5  in the United States?
6     A.    I restored several
7  townhouses.  It mostly involved
8  interior work and structural work and
9  upgrades, when it comes to smart home,
10 plumbing, electric, things of this
11 nature.  Just a typical refurbishing
12 and facelift of the building.
13    Q.    So when you restored
14 townhouses, did you work with
15 contractors?
16    A.    I would normally run a
17 project myself, and hire
18 subcontractors.
19    Q.    And you worked with
20 architects, correct?
21    A.    Yes.
22    Q.    How did you communicate with
23 the architects working on your
24 townhouse projects?
25    A.    I call them, we run a

Page 40

JANNA BULLOCK
1
2  schedule, we have weekly meetings, site
3  meetings.
4     Q.    Did you use e-mail to
5  correspond with the architects?
6     A.    Most likely.
7     Q.    In what circumstances did you
8  use e-mail?
9        MR. TREMONTE:  Objection to
10    form.
11    A.    Just regular communication.
12    Q.    So what is that regular
13 communication?
14    A.    Just work issues.  Any work
15 issues (indicating).  When there's a
16 deadline.  When there's -- what is the
17 due date.  What is the status of the
18 application.  What is the status of the
19 engineer.  Did they provide the work
20 they were supposed to.  What is the
21 status of the approvals.  What is the
22 status of expediters.  Like how is DOB
23 doing.
24    Q.    Ms. Bullock, do you have a
25 personal assistant?

Page 41

JANNA BULLOCK
1
2     A.    No, I don't.
3     Q.    Have you ever had a personal
4  assistant?
5     A.    I have.
6     Q.    When did you have a personal
7  assistant?
8     A.    A while ago.
9     Q.    Roughly when was that?
10    A.    Maybe five years ago.
11    Q.    In 2013?
12    A.    Yes, probably.
13    Q.    Who was your personal
14 assistant?
15    A.    His name was Randall
16 Brockett.
17    Q.    Were you married to
18 Mr. Brockett?
19    A.    Never.  That was probably his
20 fantasy.
21    Q.    Ms. Bullock, you testified to
22 working with some lawyers.
23       Have you worked with any
24 financial professionals?
25       MR. TREMONTE:  Objection to

Janna Bullock - February 6, 2018

Page 42

JANNA BULLOCK

1
2    form.
3        A.    No.   There were few mortgage
4    brokers.
5        Q.    So you worked with mortgage
6    brokers?
7        A.    Really long time ago.
8        Q.    When is this long time ago?
9        A.    2006.
10       Q.    Was that the last time you
11   worked with a mortgage broker?
12       A.    Yes.
13       Q.    Do you have an accountant?
14       A.    My trust -- my tax attorney
15   provided the accountant.
16       Q.    And who is that?
17       A.    Stuart Smith.
18       Q.    Do you have any other
19   accountants?
20       A.    Not at the moment.
21       Q.    Do you currently have any
22   accountant?
23       A.    No.
24       Q.    When is the last time you
25   worked with Mr. Smith as your

Page 43

JANNA BULLOCK

1
2    accountant?
3        A.    He was -- he was tax
4    attorney.   So whatever he -- whoever he
5    provided.
6        Q.    When was the last time you
7    paid Mr. Smith for any service?
8        A.    A couple of years ago.
9        Q.    Did you complete your own
10   taxes last year?
11       A.    Yes.
12       Q.    And what about in 2016.
13             Did you complete your own
14   taxes?
15       A.    Yes.
16       Q.    In 2015, did you complete
17   your own taxes?
18       A.    I believe so.
19       Q.    Were those taxes produced in
20   response to the subpoena?
21       A.    I don't know.
22       Q.    Are you aware what was
23   produced in response to this subpoena?
24             MR. TREMONTE:   Objection to
25       form.

Page 44

JANNA BULLOCK

1
2             MS. DONOVAN:   You can answer.
3             MR. TREMONTE:   Are you asking
4    for an exhaustive list of all the
5    documents?
6             MS. DONOVAN:   First I want to
7    know generally, and then we'll
8    follow up.
9        Q.    Ms. Bullock, are you aware of
10   documents produced in response to this
11   subpoena?
12       A.    I remember a long list of
13   documents that were produced in
14   response to the subpoena.
15       Q.    And can you enumerate the
16   documents that you recall being
17   produced in response to the subpoena?
18       A.    No, I can't.
19             MR. TREMONTE:   Objection to
20       form.
21       Q.    Can you recall any specific
22   document that was produced in response
23   to the subpoena?
24       A.    No.   It was a very exhausting
25   and long process, and I do not

Page 45

JANNA BULLOCK

1
2    remember.   It was --
3             MR. TREMONTE:   I'm going to
4    ask you to wait until a question
5    is pending to speak.
6             THE WITNESS:   Okay.   Sorry.
7        Q.    So you no longer work with an
8    accountant; is that right?
9             MR. TREMONTE:   Objection.
10       A.    Yes.   I don't know what to
11   say.   I don't know.
12       Q.    Does anyone manage
13   investments for you, Ms. Bullock?
14       A.    No.
15       Q.    Do you have any investments?
16       A.    No.
17       Q.    Ms. Bullock, you mentioned
18   lawyers in France who keep records for
19   you.
20             Do they currently keep
21   records for you?
22       A.    I don't know.
23       Q.    Who are those lawyers?
24             MR. TREMONTE:   Objection to
25       form.

Janna Bullock - February 6, 2018

13 (Pages 46 to 49)

Page 46

JANNA BULLOCK
1
2      A.    I don't remember their names.
3  There were quite a few of them.  I was
4  very stressful time.  I don't remember
5  those lawyers.
6      Q.    Did you retain a law firm in
7  France to do work for you?
8      A.    Yes.  There were a few law
9  firms before.
10     Q.    Do you recall which law firms
11  you retained?
12          MR. TREMONTE:  Objection.
13          You can answer.
14          I just made an objection to
15  the form of the question.
16     A.    There were a few of them.  I
17  don't remember their name.
18     Q.    Do you remember any of those
19  law firms in France?
20          MR. TREMONTE:  Objection to
21  form.
22     A.    One was BFM.  One was Salons
23  [phonetic].
24     Q.    You testified earlier that
25  some attorneys in Russia had kept

Page 47

JANNA BULLOCK
1
2  documents for you.
3          Who were those attorneys?
4      A.    That was legal department in
5  RIGroup.
6      Q.    And when you say "RIGroup,"
7  is that RIGroup OOO?
8      A.    Yes.
9      Q.    You also testified that
10  attorneys in Cyprus kept documents for
11  you.
12          Who were those attorneys?
13     A.    A trustee in Cyprus.  I don't
14  know whether he's an attorney or a
15  trustee.
16     Q.    Who is the trustee in Cyprus
17  that you're referring to?
18     A.    His last name is Papas.
19     Q.    Is that Mr. Papas then?
20          MR. TREMONTE:  Objection.
21     Q.    Does Mr. Papas currently keep
22  documents for you?
23     A.    No.  I don't have any
24  communication with Mr. Papas.
25     Q.    What was the last time you

Page 48

JANNA BULLOCK
1
2  communicated with Mr. Papas?
3          MR. TREMONTE:  Objection to
4  form.
5      A.    The only time I communicated
6  with Mr. Papas was 2006.
7      Q.    Tell me about your
8  relationship with Mr. Papas.
9          MR. TREMONTE:  Objection to
10  form.
11     A.    I don't have any relationship
12  Mr. Papas.  I saw him once and I spoke
13  with him once in my life.  I went to
14  Cyprus with my ex-husband's
15  acquaintance, and I met Mr. Papas.
16     Q.    How many times have you
17  travelled to Cyprus?
18     A.    Once.
19     Q.    When was this trip to Cyprus?
20          MR. TREMONTE:  Objection.
21     A.    2006.
22     Q.    And who was the acquaintance
23  of your ex-husband that you travelled
24  with?
25     A.    His name is Sergey Efros,

Page 49

JANNA BULLOCK
1
2  E-F-R-O-S.
3      Q.    What is Mr. Efros's
4  employment.
5      A.    I don't know.
6      Q.    Do you know what he did for
7  work in 2006?
8          MR. TREMONTE:  Objection.
9      A.    No.
10     Q.    In what capacity did you know
11  Mr. Efros?
12          MR. TREMONTE:  Objection.
13     A.    I saw him at my house.
14     Q.    Your house where?
15     A.    My ex-husband's house in
16  Moscow.
17     Q.    And what was the purpose of
18  your trip to Cyprus in 2006?
19     A.    To set up trust for my
20  children.
21     Q.    What was Mr. Papas' company?
22          MR. TREMONTE:  Objection.
23     A.    I don't know.  I was told
24  he's professional trustee.
25     Q.    Who told you about Mr. Papas?

Janna Bullock – February 6, 2018

14 (Pages 50 to 53)

Page 50

1               JANNA BULLOCK
2          MR. TREMONTE:  Objection.
3          I'm just going to caution you
4     to the extent you had a
5     communication with a lawyer that's
6     privileged, don't answer.
7          But if you learned -- if you
8     have an answer to that question
9     and you learned it from somebody
10    who's not a lawyer, it's fine.
11    Just answer it.
12    A.   I don't know.  He was
13    presented as a lawyer.
14    Q.   Excuse me.  Papas was
15    presented as a lawyer?
16    A.   Mm hm.
17    Q.   And who told you about Papas?
18         Taking into account what your
19    lawyer said, don't tell me anything
20    that's protected by an attorney-client
21    privilege.
22         MR. TREMONTE:  Objection to
23    form.
24    A.   Can you repeat your question?
25    Q.   Who told you that Mr. Papas

Page 51

1               JANNA BULLOCK
2     provided trustee services?
3     A.   Efros.
4     Q.   Okay.  Had Efros worked with
5     Papas previously?
6     A.   I would think so.
7     Q.   Can you tell me about the
8     services you engaged Mr. Papas to do
9     for you?
10    A.   I did not engage Mr. Papas to
11    do any services for me.
12    Q.   Did Mr. Papas create trust
13    for you?
14         MR. TREMONTE:  Objection.
15    A.   Mr. Papas created trust for
16    my children.
17    Q.   Okay.  Who engaged Mr. Papas
18    to create trust for your children?
19    A.   Efros.
20    Q.   Does Mr. Papas charge for his
21    services in creating trust?
22    A.   I don't know.
23    Q.   Did you ever pay Mr. Papas
24    for his services in creating trust for
25    your children?

Page 52

1               JANNA BULLOCK
2     A.   No.
3     Q.   Do you know if Efros ever
4     paid Mr. Papas for creating trust for
5     your children?
6     A.   I don't know.
7     Q.   And it's your testimony that
8     you have not spoken with Papas since
9     2006?
10         MR. TREMONTE:  Objection to
11    form.
12         Asked and answered.
13    A.   No.
14    Q.   So what is your testimony?
15         MR. TREMONTE:  Objection.
16    A.   My testimony is that I had
17    one contact with Papas.
18    Q.   And do you mean one in-person
19    meeting with Papas?
20    A.   Yes.
21    Q.   Did you have subsequent
22    e-mail communication with Papas?
23    A.   No.
24    Q.   Did you have any subsequent
25    phone conversations with Papas?

Page 53

1               JANNA BULLOCK
2     A.   I don't recall.
3     Q.   Do you recall interacting
4     with Papas at any point after 2006?
5     A.   I don't recall.
6         MR. TREMONTE:  Don't forget
7     to hydrate.
8         THE WITNESS:  I know.
9     Q.   How many trust did Papas
10    create for you?
11    A.   For my children.
12    Q.   How many trust?
13    A.   Three.
14    Q.   And what are those trust?
15    A.   Azur Trust.
16    Q.   Could you spell that?
17    A.   A-Z-U-R.  Purple Trust, and
18    Gold Ventures.
19    Q.   What assets are held by the
20    Azur Trust?
21    A.   I don't think anything is
22    hold by Azur Trust anymore.  I don't
23    know.
24    Q.   At the time of the creation
25    of Azur Trust, what assets did the Azur

Janna Bullock - February 6, 2018

15  (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|

**Page 54**

JANNA BULLOCK

2  Trust hold?
3            MR. TREMONTE:  Objection to
4      the form.
5         A.    There was an apartment in
6  Paris and a house in Saint-Tropez.
7         Q.    Any other assets held by the
8  Azur Trust other than the apartment in
9  Paris and the house in Saint-Tropez?
10        A.    Not anymore.
11        Q.    At any point since 2006?
12        A.    I don't recall.
13        Q.    What's the address of the
14  apartment in Paris?
15        A.    Seventy-three Quai d'Orsay.
16        Q.    You said that the Azur Trust
17  no longer holds the apartment in Paris.
18            What happened to the
19  apartment?
20        A.    This is not what I said.  I
21  said I don't know.
22        Q.    Do you own the apartment
23  located at 73 Quai d'Orsay?
24        A.    No.
25        Q.    Do you know who does own the

**Page 55**

JANNA BULLOCK

2  apartment at 73 Quai d'Orsay?
3         A.    The apartment in -- at 73
4  Quai d'Orsay was put in a trust at the
5  time of acquisition.
6         Q.    And that's the Azur Trust?
7         A.    At that time it was Azur
8  Trust.
9         Q.    What has happened to the
10  apartment at 73 Quai d'Orsay since the
11  creation of the Azur Trust?
12        A.    I don't know.
13        Q.    Have you followed up at any
14  point in time about the apartment at 73
15  Quai d'Orsay?
16            MR. TREMONTE:  Objection to
17      form.
18            MR. CUCCARO:  Objection.
19        A.    No.
20        Q.    Have you stayed at the
21  apartment at 73 Quai d'Orsay?
22        A.    Not for long time.
23        Q.    When was the last time you
24  stayed at the apartment at 73 Quai
25  d'Orsay?

**Page 56**

JANNA BULLOCK

2         A.    I don't recall.
3         Q.    Is it longer than five years
4  ago?
5         A.    Yes.
6         Q.    When did you acquire the
7  apartment at 73 Quai d'Orsay?
8         A.    I don't remember.
9            MR. TREMONTE:  Objection to
10      form.
11        A.    I don't remember.
12        Q.    At some point in time, did
13  you acquire the apartment at 73 Quai
14  d'Orsay?
15        A.    Yes.
16        Q.    Do you recall when that was?
17        A.    No.
18        Q.    Was it with your ex-husband?
19        A.    No.
20        Q.    Did you acquire the apartment
21  at 73 Quai d'Orsay with anyone else?
22        A.    I acquired the apartment at
23  73 Quai d'Orsay with the help of
24  someone else.
25        Q.    Who was that?

**Page 57**

JANNA BULLOCK

2         A.    That person name was Jeffrey
3  Steiner.
4         Q.    Who is Jeffrey Steiner?
5         A.    He was my close friend and a
6  business partner.
7         Q.    Did you each have shares of
8  the apartment at 73 Quai d'Orsay?
9            MR. TREMONTE:  Objection.
10        A.    I don't remember an exact
11  structure.
12        Q.    What was the arrangement
13  between you and Mr. Steiner concerning
14  the apartment at 73 Quai d'Orsay?
15        A.    He provided the mortgage.
16        Q.    How much was the mortgage on
17  the apartment at 73 Quai d'Orsay at
18  that time?
19        A.    It was acquisition price of
20  the apartment.
21        Q.    What was the acquisition
22  price of the apartment?
23        A.    I don't remember exactly.
24        Q.    Do you recall roughly?
25        A.    No.

Janna Bullock – February 6, 2018

16 (Pages 58 to 61)

Page 58

```
1               JANNA BULLOCK
2      Q.    Do you recall whether it was
3  more than 5 million Euros?
4      A.    I never was involved in the
5  financial transaction, so I really
6  don't remember.
7      Q.    Who was involved in the
8  financial transactions concerning the
9  apartment at 73 Quai d'Orsay?
10      A.    Mr. Steiner.
11      Q.    And who was funding the
12  apartment at 73 Quai d'Orsay?
13      A.    Mr. Steiner.
14      Q.    And what was your ownership
15  interest?
16      MR. TREMONTE:  Objection to
17      form.
18      A.    I put this apartment into the
19  trust to benefit my children.
20      Q.    Did Mr. Steiner gift you the
21  apartment at 73 Quai d'Orsay?
22      MR. TREMONTE:  Objection.
23      Calls for a legal conclusion.
24      MS. DONOVAN:  You can answer.
25      A.    He provided the mortgage.
```

Page 59

```
1               JANNA BULLOCK
2      Q.    What do you mean when you say
3  "he provided a mortgage"?
4      MR. TREMONTE:  Objection.
5      A.    I mean that he provided a
6  mortgage.
7      Q.    Did you make mortgage
8  payments to Mr. Steiner?
9      A.    At some point, the mortgage
10  was satisfied.
11      Q.    Ms. Bullock, did you make
12  mortgage payments to Mr. Steiner for
13  the apartment at 73 Quai d'Orsay?
14      A.    That was trust
15  responsibility.
16      Q.    Did the Azur Trust make
17  mortgage payments to Mr. Steiner?
18      A.    I don't know.
19      Q.    What other responsibility
20  belonged to the Azur Trust?
21      A.    I don't know.
22      Q.    Were there any documents
23  entered into in connection with the
24  creation of the Azur Trust?
25      MR. TREMONTE:  Objection.
```

Page 60

```
1               JANNA BULLOCK
2      A.    I don't know.
3      Q.    Did you sue any document
4  concerning the Azur Trust?
5      A.    I only saw the settling
6  papers (indicating).
7      Q.    You mentioned a home that was
8  held by the Azur Trust in Saint-Tropez.
9      Did you acquire that home at
10  some point in time?
11      A.    Trust acquired that home at a
12  certain time.
13      Q.    So I understand from your
14  prior testimony that the trust held the
15  house in Saint-Tropez and the apartment
16  in Paris.
17      Did the trust acquire the
18  house in Saint-Tropez?
19      MR. TREMONTE:  Objection to
20      form.
21      A.    I don't know.
22      Q.    When was the house in
23  Saint-Tropez acquired?
24      MR. TREMONTE:  Objection to
25      form.
```

Page 61

```
1               JANNA BULLOCK
2      A.    I don't remember.
3      Q.    Roughly when?
4      A.    I don't remember.  In the
5  early 2000s.
6      Q.    Before 2006?
7      MR. TREMONTE:  Objection.
8      A.    I don't remember.
9      Q.    Are there documents that you
10  could look at that would refresh your
11  recollection?
12      A.    I don't have any documents.
13      Q.    Is the Azur Trust still
14  providing any service on
15  behalf -- strike that.
16      Is the Azur Trust still
17  holding assets on behalf of your
18  children?
19      A.    I don't know.
20      Q.    Approximately what's the
21  value of the assets that were held by
22  the Azur Trust in 2006?
23      A.    I don't know.
24      Q.    More than $3 million?
25      MR. TREMONTE:  Objection.
```

Janna Bullock - February 6, 2018

17 (Pages 62 to 65)

Page 62

```
1               JANNA BULLOCK
2      A.   I don't know.
3      Q.   Do you have any sense of the
4  value of the apartment at 73 Quai
5  d'Orsay?
6           MR. TREMONTE:  Objection.
7      A.   No.
8      Q.   Do you have any sense of the
9  value of the home in Saint-Tropez?
10          MR. TREMONTE:  Objection.
11     A.   No.
12     Q.   Do you still use the home in
13 Saint-Tropez?
14     A.   No.
15     Q.   When was the last time you
16 used the home in Saint-Tropez?
17     A.   A really long time ago.
18     Q.   Roughly when?
19     A.   Maybe eight years ago.
20     Q.   Have you been to Saint-Tropez
21 any time in the last eight years?
22     A.   Not recently.
23     Q.   When was the last time you
24 went to Saint-Tropez?
25     A.   I don't remember.  Not
```

Page 63

```
1               JANNA BULLOCK
2  recently.
3      Q.   Have you stayed elsewhere in
4  Saint-Tropez other than the home that
5  was held by the Azur Trust?
6      A.   Yes.
7           MR. TREMONTE:  That's at any
8  time?
9      Q.   So Ms. Bullock, in the last
10 eight years, have you stayed at any
11 other home in Saint-Tropez than the one
12 that is held by the Azur Trust?
13     A.   Yes.
14     Q.   Have those been private
15 homes?
16     A.   Yes.
17     Q.   Did you rent any residences
18 in Saint-Tropez in the last eight
19 years?
20     A.   No.
21          MR. TREMONTE:  Caroline, if
22     you're nearing the end of topic
23     segment, we're right up on noon.
24          I request a break,
25     principally for my benefit.
```

Page 64

```
1               JANNA BULLOCK
2           MS. DONOVAN:  So let's go off
3  the record for a second.
4           THE VIDEOGRAPHER:  The time
5  is approximately 11:59 a.m.
6           This will end Media Unit
7  Number 1, and we're going off the
8  record.
9           (Whereupon, a short break was
10     taken at this time.)
11          THE VIDEOGRAPHER:  The time
12 is approximately 12:11 p.m.
13          This is the start of Media
14 Unit Number 2, and we are back on
15 the record.
16     Q.   Ms. Bullock, I'm going to
17 provide you what I'll have the court
18 reporter mark as Exhibit 3.
19          (Whereupon, Cyprus filings
20     were marked as Bullock Exhibit 3
21     for Identification.)
22     Q.   Ms. Bullock, can you review
23 Exhibit 3.
24          MR. TREMONTE:  Let the record
25     reflect that this is a 17-page
```

Page 65

```
1               JANNA BULLOCK
2      document.  At least five or six
3      pages of which appear to be in
4      modern Greek.
5      Q.   Ms. Bullock, do you recognize
6  the document that is in front of you as
7  Exhibit 3?
8           MR. TREMONTE:  Objection.
9      A.   (Nonverbal gesture).
10          MS. DONOVAN:  You can answer,
11     Ms. Bullock.
12     A.   Yes.
13     Q.   And what is it?
14     A.   It's some filings from Cyprus
15 case.  I assume it's a translation of
16 the filings of the Cyprus Gorsoan and
17 Gazprombank --
18          (Reporter interruption for
19     clarification.)
20     A.   It's the translation of a
21 Cyprus claim of Gazprombank and
22 Gorsoan.  Gorsoan and Gazprombank.
23     Q.   Ms. Bullock, have you ever
24 before seen the document that's before
25 you as Exhibit 3?
```

Janna Bullock – February 6, 2018

18 (Pages 66 to 69)

Page 66

```
1              JANNA BULLOCK
2     A.    I have.
3     Q.    When did you see the document
4  that's before you as Exhibit 3?
5     A.    I don't remember.
6     Q.    Ms. Bullock, are you aware of
7  the fact that the Cyprus court froze
8  your assets in connection with the
9  Cyprus litigation?
10    A.    I don't have any assets.
11    Q.    Are you aware that the Cyprus
12 court issued an order freezing your
13 assets?
14          MR. TREMONTE:  Objection.
15    A.    No, I'm not.
16    Q.    You're not aware?
17    A.    No.
18    Q.    Ms. Bullock, please turn to
19 what's at the top part of the page.
20 You'll see Page 3 of 17.
21    A.    Page 3.  Okay.
22    Q.    All right.  And that
23 paragraph one, about one third of the
24 way down the page, the order states --
25 and I'm reading here, "The order of
```

Page 67

```
1              JANNA BULLOCK
2  paragraph one as has been modified by
3  the court on 14.8.2012, becomes
4  absolute."
5          Did I read that correctly?
6          MR. TREMONTE:  Objection.
7          The document speaks for
8      itself.
9          MS. DONOVAN:  You can answer.
10         MR. TREMONTE:  She's asking
11     you if the words that she's read
12     on the page are the same as the
13     words that you see in front of
14     you.
15         THE WITNESS:  Yes.
16    Q.    Ms. Bullock, are you familiar
17 with an earlier order of the court in
18 Cyprus that was dated August 14, 2012?
19    A.    When was this claim filed?
20    Q.    Ms. Bullock, do you
21 understand that this is an order from
22 the court in Cyprus?
23         MR. TREMONTE:  Objection.
24         Calls for a legal conclusion.
25    A.    I don't know what it is.
```

Page 68

```
1              JANNA BULLOCK
2     Q.    What do you understand a
3  court order to mean?
4          MR. TREMONTE:  Objection.
5          MR. CUCCARO:  Objection.
6          MS. DONOVAN:  You can answer.
7          MR. TREMONTE:  She's asking
8      you in general.
9          Do you have a general
10 understanding of what a court order is?
11         THE WITNESS:  Yes, I do.
12    Q.    And what is that general
13 understanding?
14    A.    It's a court order.  It's
15 something that is ordered by the court.
16    Q.    And were you aware that a
17 court in Cyprus ordered that any assets
18 you have be frozen?
19         MR. TREMONTE:  Objection.
20         Asked and answered twice.
21         You can answer.
22    A.    I don't have an answer.
23    Q.    You testified that you had
24 seen this order before.
25         In what circumstances had you
```

Page 69

```
1              JANNA BULLOCK
2  seen this order before?
3     A.    I don't remember.
4     Q.    Ms. Bullock, what's your
5  understanding of the current status of
6  the proceeding in Cyprus?
7          MR. TREMONTE:  Objection to
8      form.
9     A.    I don't know.
10    Q.    Do you understand that a case
11 in Cyprus is still active?
12    A.    Probably.
13    Q.    Are you appearing in a case
14 in Cyprus?
15         MR. TREMONTE:  Objection to
16     form.
17    A.    According to this page, yes.
18    Q.    Have you retained lawyers to
19 represent you in Cyprus?
20    A.    Not personally.
21    Q.    When you say "not
22 personally," what do you mean?
23    A.    That's what I mean.
24    Q.    Has anyone retained lawyers
25 to represent you in Cyprus?
```

Page 70

```
 1              JANNA BULLOCK
 2      A.    I don't remember the
 3  specifics.
 4      Q.    Do you remember any -- in
 5  more general terms whether any lawyers
 6  represent you in Cyprus?
 7      A.    What I understand about
 8  Cyprus that Vladimir Putin personal
 9  account administrator is the president
10  of the country, therefore, anything in
11  Cyprus is possible.  Now, I once
12  understand that Cyprus is completely
13  and fully built on Russian money, that
14  specifically come from Gazprombank,
15  therefore, anything that comes from
16  Cyprus is possible.
17      Q.    Ms. Bullock, that's not
18  responsive.
19            The question is, do any
20  lawyers represent you in Cyprus?
21      A.    Yes.
22      Q.    Who?
23      A.    A Mr. Akileus Anstesos.
24      Q.    And if you go to Page 2 in
25  the attachment in Exhibit 3, carrying
```

Page 71

```
 1              JANNA BULLOCK
 2  over into Page 3, did you understand
 3  that by an order of the Cyprus court,
 4  your assets were frozen?
 5      MR. TREMONTE:  Objection.
 6            Asked and answered three
 7      times.
 8            You can answer.
 9      A.    I don't know.
10      MS. DONOVAN:  I'll just mark
11      this as Exhibit 4.
12            (Whereupon, a document was
13      marked as Bullock Exhibit 4 for
14      Identification.)
15      Q.    And Ms. Bullock, if you'll
16  please look at what's been mark as
17  Exhibit 4, the document Bates-labeled
18  Bullock-8041, continuing 8042.
19      MS. DONOVAN:  And for your
20      reference, Ms. Bullock, any
21      redaction, the black box was done
22      by counsel before producing the
23      document for a claim of privilege.
24      MR. TREMONTE:  And just so
25      the record is clear, the
```

Page 72

```
 1              JANNA BULLOCK
 2  redactions are done by your
 3  counsel, not by any counsel.
 4            They can't redact a document
 5      that you produce.
 6      Q.    Do you recognize the document
 7  before you as Exhibit 4?
 8      A.    No.
 9      Q.    Now, at the bottom
10  communication from John Piskora to a
11  Mathias Vuillermet, May 28, 2013.
12            Who is John Piskora?
13      A.    John Piskora is an attorney.
14      Q.    Your attorney, correct?
15      A.    He is an attorney.
16      Q.    Does Mr. Piskora do legal
17  work for you?
18      A.    I sometimes seek general
19  advice from him.
20      Q.    General legal advice?
21      A.    General advice.
22      Q.    Okay.  What about Mathias
23  Vuillermet.
24            Who is he?
25      A.    Mathias was an attorney.
```

Page 73

```
 1              JANNA BULLOCK
 2  It's one of the French attorneys whose
 3  name I've even forgotten.
 4      Q.    And you're copied on this
 5  communication, Ms. Bullock.
 6            For what reason did you
 7  understand Mr. Brockett to be copied?
 8      A.    As I mentioned earlier, he
 9  was my personal assistant at some time.
10      Q.    Okay.  And then it says in
11  the subject line, Cyprus case number
12  two, decision-granting course, initial
13  application for asset freezing order.
14            Ms. Bullock, does this
15  refresh your recollection when you
16  became aware of a freezing order from
17  the Cyprus court?
18      MR. TREMONTE:  Objection to
19      form.
20      A.    I'm under tremendous amount
21  of pressure and certain things I just
22  don't remember.
23      Q.    So you don't remember lawyers
24  that you paid sending you a
25  communication that your assets have
```

Janna Bullock - February 6, 2018

20 (Pages 74 to 77)

Page 74

```
1            JANNA BULLOCK
2  been frozen?
3            MR. CUCCARO:  Objection.
4            MR. TREMONTE:  Objection to
5  form.
6       A.   I don't.
7       Q.   What did you understand a
8  freezing order to require?
9            MR. TREMONTE:  Objection.
10      A.   I more understand what the
11 freezing order from Cyprus is.
12      Q.   What is the freezing order
13 from Cyprus?
14           MR. TREMONTE:  Objection.
15      A.   Anything possible in Cyprus.
16 Anything.
17      Q.   So you just testified that
18 you more understand what a freezing
19 order -- what the freezing order from
20 Cyprus is; is that correct?
21           MR. TREMONTE:  Objection.
22      A.   Yes.
23      Q.   And so it seems, Ms. Bullock,
24 that you have an understanding of the
25 Cyprus court's freezing order, correct?
```

Page 75

```
1            JANNA BULLOCK
2            MR. TREMONTE:  Objection.
3       A.   I don't know.  I don't have
4  answer to this question.
5            MS. DONOVAN:  Can we please
6  mark this as Exhibit 5.
7            (Whereupon, an order was
8  marked as Bullock Exhibit 5 for
9  Identification.)
10      Q.   Ms. Bullock, I'm giving you
11 what's been marked as Exhibit 5.
12           Take a moment and review
13 Exhibit 5.
14      A.   What?
15      Q.   Ms. Bullock, have you before
16 seen the document marked as Exhibit 5?
17      A.   No.
18      Q.   And were you aware that in
19 August 2012, the court in Cyprus issued
20 an interim order freezing yours and
21 other defendant's assets?
22      A.   I don't know.
23      Q.   You don't have any
24 recollection?
25      A.   I don't know.
```

Page 76

```
1            JANNA BULLOCK
2       Q.   And at no point since, have
3  you became aware of the freezing order?
4       A.   No.
5       Q.   All right.  Ms. Bullock, in
6  Exhibit 5, Page 3 of 6, we're going to
7  review what the order said, and you're
8  going to tell me what you understand
9  certain words to me, okay.
10           So I'm reading -- just to get
11 us started, "To issued and an order is
12 hereby issued which prohibits
13 defendants 1 to 15, and each defendant
14 separately, from directly or
15 indirectly, through their employees,
16 their representative, their agents, or
17 any other legal or natural person,
18 transfer, donate, sell, convey, charge,
19 mortgage, alienate, or diminish, in any
20 manner, their assets in Cyprus and/or
21 anywhere else in the world up to an
22 amount of US dollars, $26,344,765 or to
23 an equivalent to any other foreign
24 currency whether these assets be in
25 their name or in the name of other
```

Page 77

```
1            JANNA BULLOCK
2  individuals, or belong to them
3  exclusively or jointly or separately as
4  a whole or a trust or as any other form
5  of ownership directly or indirectly
6  through other natural or legal entities
7  until the final completion of the
8  lawsuit under the above-mentioned
9  number and title and/or new order of
10 the court."
11           Ms. Bullock, are you of
12 defendants 1 through 15 in the Cyprus
13 litigation?
14           MR. TREMONTE:  Objection.
15      A.   I'm sorry.
16      Q.   Are you any of defendants 1
17 through 15 in the Cyprus litigation?
18      A.   I mean, my name is there.
19      Q.   You're Defendant 1; is that
20 correct?
21      A.   Yes.
22      Q.   What do you understand the
23 paragraph that I just read to require
24 of defendants 1 through 15?
25           MR. TREMONTE:  Objection.
```

GregoryEdwards, LLC  |  Worldwide Court Reporting
GregoryEdwards.com  |  866-4Team GE

Janna Bullock – February 6, 2018

21 (Pages 78 to 81)

Page 78

JANNA BULLOCK
1
2          So she's testified that she
3     doesn't remember seeing this
4     document.
5          So you're asking her as she
6     sits here right now, assuming that
7     that is, in fact, an order of the
8     court and that it's duly valid and
9     separate and a apart from any
10    communications she's had with
11    counsel, like what does she
12    understand those words to mean?
13         MS. DONOVAN: So I want to
14    understand what she thinks this
15    means right now, because while she
16    might not have –– she cannot
17    clearly recall, I want to see what
18    awareness she has generally.  And
19    we're going to test that as we go.
20    Q.    So Ms. Bullock, what do you
21    understand this to mean?
22    A.    Well, I understand that no
23    assets could be sold in the amount of
24    $26 million.
25    Q.    Now, in August of 2012, did

Page 79

JANNA BULLOCK
1
2     you have assets in excess of
3     $26 million?
4     A.    No.
5     Q.    What was the value of your
6     assets in August 2012?
7     A.    I don't know.
8     Q.    What approximately was the
9     value of your assets in August 2012?
10         MR. TREMONTE:  Objection.
11    A.    I don't know.
12    Q.    Where would you obtain that
13    information?
14    A.    I don't know.
15    Q.    If you wanted to see what
16    your assets were worth in August 2012,
17    where would you go to get that
18    information?
19    A.    I wouldn't go anywhere.
20    Q.    That information is recorded
21    nowhere?
22    A.    Mm hm.
23    Q.    Do you have assets in excess
24    of $26 million currently?
25    A.    No.

Page 80

JANNA BULLOCK
1
2     Q.    Did you have assets in excess
3     of $26 million in March 2013?
4     A.    I don't know.
5     Q.    At any point between
6     August 2012 and today, have you had
7     assets in excess of $26 million?
8     A.    Not personally.
9     Q.    And what do you mean, "not
10    personally"?
11         MR. TREMONTE:  Objection.
12    Go ahead; you can answer.
13    A.    Personally, I did not have
14    those assets.
15    Q.    So the assets belong to
16    someone or something else?
17         MR. TREMONTE:  Objection to
18    form.
19    A.    Personally, I did not have
20    assets in the amount of $26 million.
21    Q.    So does that mean you don't
22    have access to assets in excess of
23    $26 million?
24         MR. TREMONTE:  Objection.
25    A.    It means that I don't have

Page 81

JANNA BULLOCK
1
2     assets in the amount of $26 million.
3     Q.    Does any entity controlled by
4     you have access to assets in excess of
5     $26 million.
6     A.    I don't control any assets.
7     Q.    Do you control any entities?
8     A.    No.
9         MR. TREMONTE:  Again, you're
10    asking as of now?
11         MS. DONOVAN:  (Nonverbal
12    gesture).
13         MR. TREMONTE:  You'll have to
14    verbalize your answer for the
15    court reporter.
16    Q.    So currently, you don't have
17    control of any entities?
18    A.    No.
19    Q.    At any point since August
20    2012, have you had control of any
21    entities?
22    A.    I'm not good with dates or
23    money.  I don't know.
24    Q.    Now, Ms. Bullock, do you know
25    what the word transfer means?

Janna Bullock - February 6, 2018

22 (Pages 82 to 85)

Page 82

```
 1              JANNA BULLOCK
 2     A.    Yes.
 3         MR. TREMONTE:  Objection.
 4     Q.    What does it mean?
 5         MR. TREMONTE:  Objection.
 6     Q.    I want your understanding of
 7  the word transfer.
 8     A.    It's a movement.
 9     Q.    Okay.  Do you understand what
10  the word donate means?
11         MR. TREMONTE:  Objection.
12     A.    Yes.
13     Q.    What do you understand donate
14  to mean?
15     A.    That somebody -- it's the
16  process of giving.
17     Q.    Do you understand what the
18  word sell means?
19     A.    Yes.
20     Q.    What did you understand sell
21  to mean?
22         MR. TREMONTE:  Objection.
23     A.    It's exchange.  It's a
24  transfer of ownership in exchange for
25  money.
```

Page 83

```
 1              JANNA BULLOCK
 2     Q.    Do you know what the word
 3  convey means?
 4         MR. TREMONTE:  Objection.
 5     A.    No.
 6     Q.    Do you understand what the
 7  word charge means?
 8         MR. TREMONTE:  Objection.
 9     A.    Yes.
10     Q.    What do you understand charge
11  to mean?
12         MR. TREMONTE:  Objection.
13     A.    It's put something with
14  power.
15     Q.    Excuse me?
16     A.    It's enforce something with
17  power.
18     Q.    Do you know what the word
19  mortgage means?
20         MR. TREMONTE:  Objection.
21     A.    Yes.
22     Q.    What does mortgage mean?
23         MR. TREMONTE:  Objection.
24     A.    It's a loan that is
25  guaranteed by the real estate.
```

Page 84

```
 1              JANNA BULLOCK
 2     Q.    Do you know what the word
 3  alienate means?
 4         MR. TREMONTE:  Objection.
 5     A.    No.
 6     Q.    Do you know what the word
 7  diminish means?
 8         MR. TREMONTE:  Objection.
 9     A.    Yes.
10     Q.    What does it mean?
11         MR. TREMONTE:  Objection.
12     A.    It's decrease in value.
13     Q.    Ms. Bullock, have you
14  transferred any assets since August 14,
15  2012?
16         MR. TREMONTE:  Objection.
17     A.    No.
18     Q.    Let me ask you, Ms. Bullock,
19  what do you understand asset to mean?
20         MR. TREMONTE:  Objection.
21     A.    Anything of value.
22     Q.    Have you transferred any
23  assets since March 6, 2013?
24         MR. TREMONTE:  Objection.
25     A.    Not that I remember.
```

Page 85

```
 1              JANNA BULLOCK
 2     Q.    And you testified that
 3  transfer was a movement, correct?
 4     A.    Yes.
 5     Q.    So it's your testimony that
 6  you have not moved any asset since
 7  August 14, 2012?
 8     A.    Not personally.
 9     Q.    And you keep saying not
10  personally --
11         MR. TREMONTE:  Objection.
12     Q.    What do you mean by that?
13     A.    Personally, I did not move
14  anything that I owned.
15     Q.    Has anyone moved anything
16  that you owned?
17     A.    No.
18     Q.    Ms. Bullock, have you donated
19  any assets since August 14, 2012?
20         MR. TREMONTE:  Objection.
21     A.    No.
22     Q.    No time in the last five, six
23  years you've made a donation?
24         MR. TREMONTE:  Objection.
25     A.    I don't know.  Not that I
```

Janna Bullock - February 6, 2018

23 (Pages 86 to 89)

Page 86

```
 1           JANNA BULLOCK
 2  recall.
 3      Q.   Ms. Bullock, have you sold
 4  any assets since August 14, 2012?
 5      A.   I don't own anything to sell.
 6      Q.   Have you charged any assets
 7  since August 14, 2012?
 8      MR. TREMONTE:  Objection.
 9      A.   Charged?  I don't understand
10  what it means in this connection.
11      Q.   So earlier when I asked if
12  you understood what charge meant --
13      A.   And I gave description what I
14  mean by charge, give something with
15  power.  So I do not know.
16      Q.   Have you given anything with
17  power since August 2012, under your
18  understanding of the word charged?
19      A.   I don't know.
20      Q.   Have you mortgaged any assets
21  since August 14, 2012?
22      A.   I don't remember.
23      Q.   If you wanted to find the
24  answer to that question, what sources
25  of information would you look to?
```

Page 87

```
 1           JANNA BULLOCK
 2      A.   I don't have any sources.
 3      MR. TREMONTE:  Objection.
 4           You can answer.
 5      A.   I don't have any sources of
 6  information.
 7      Q.   So if you wanted to check
 8  whether you had obtained any mortgages,
 9  there are no information sources you
10  could go to?
11      A.   Probably not.
12      Q.   So no documents that you
13  could consult?
14      A.   No.
15      Q.   No people you could speak to?
16      A.   No.  There was one person,
17  but I'm not speaking with him anymore.
18      Q.   And who was that?
19      A.   His name was Stuart Smith.
20      Q.   Have you diminished the value
21  of any assets since August 14, 2012?
22      MR. TREMONTE:  Objection.
23      A.   I don't know.
24      Q.   Excuse me, that was?
25      A.   I don't know.
```

Page 88

```
 1           JANNA BULLOCK
 2      MR. TREMONTE:  I'm sorry can
 3  you read back the question?
 4           Was the question have you
 5  diminished any assets?
 6      MS. DONOVAN:  Yes.
 7      Q.   Have you diminished the value
 8  of any assets since August 14, 2012?
 9      A.   I don't know.
10      Q.   And if you wanted to see
11  whether you had diminished the value of
12  any assets, what sources of information
13  could you consult?
14      A.   I don't know.
15      Q.   Are there any documents you
16  could consult?
17      A.   I don't know.
18      Q.   Are there any people you
19  could consult?
20      A.   Not that I know.
21      Q.   Don't tell me the substance
22  of any communication, just answer the
23  question yes or no.
24           Have you consulted with
25  lawyers about the proceeding in Cyprus?
```

Page 89

```
 1           JANNA BULLOCK
 2      A.   No.
 3      Q.   So Ms. Bullock, go back to
 4  the document that's Exhibit 2 which is
 5  the document subpoena.  And please
 6  turn -- it's labeled Page 5 at the
 7  bottom.  But it's probably around Page
 8  in the handout.  I meant Page 4.  So
 9  go a bit further.
10           Actually, if I might,
11  Ms. Bullock, it's this one which is 2.
12      A.   Okay.
13      Q.   You'll see it, the bottom
14  middle, little four.
15      A.   So you'll recall this is the
16  document subpoena that you received in
17  this litigation here in the Southern
18  District of New York.
19           Do you understand that?
20      MR. TREMONTE:  Objection.
21           Asked and answered.
22      MS. DONOVAN:  I just want to
23  confirm that she's aware of the
24  document she's looking at.
25      MR. TREMONTE:  May, I?
```

Janna Bullock - February 6, 2018

24 (Pages 90 to 93)

Page 90

```
1                 JANNA BULLOCK
2           Janna, do you remember this
3     to be the subpoena that you
4     received in connection with this
5     matter?
6           THE WITNESS:  Yes.
7           MR. TREMONTE:  Yes.  Okay.
8     Q.    So look at the requested
9  document number one.
10    A.    Mm hm.
11    Q.    Now, Ms. Bullock, what do you
12 understand document request one to have
13 requested of you?
14          MR. TREMONTE:  Objection to
15    form.
16    A.    That they have to provide
17 location of the assets and ownership of
18 the assets and so on.
19    Q.    So where it says documents
20 sufficient to comply with paragraph two
21 of the freezing and disclosure order.
22          What do you understand it to
23 mean by the freezing and disclosure
24 order?
25          MR. TREMONTE:  Objection to
```

Page 91

```
1                 JANNA BULLOCK
2     form.
3     A.    Something we just read
4  before.
5     Q.    Do you have an understanding
6  what it means by the freezing and
7  disclosure order?
8     A.    Yes.
9     Q.    And you said it's something
10 we just read before.
11          Which something are you
12 referring to?
13    A.    The order on the other page.
14    Q.    Could you identify by exhibit
15 number which document you're referring
16 to?
17          MR. TREMONTE:  Objection.
18    A.    It's Exhibit 5.
19    Q.    Ms. Bullock, turn one page
20 back in the document subpoena.  This
21 one (indicating).  All right.
22          Paragraph 12, the freezing
23 and disclosure order shall mean the
24 order issued on March 6, 2013, at the
25 District Court of Limassol in Cyprus,
```

Page 92

```
1                 JANNA BULLOCK
2  action number 3573, back slash, 2012,
3  with which you were personally served
4  on April 24, 2013.
5           Ms. Bullock can you confirm
6  that that's the document that is
7  Exhibit 3?
8           MR. TREMONTE:  Objection.
9     A.    I don't think I was served
10 with anything on March 3rd, 2013.
11          MR. TREMONTE:  Janna, that's
12    not the question.
13          The question is, can you
14    confirm that the document that
15    counsel was just reading from is,
16    in fact, the document marked
17    Exhibit Number 3.
18          She's just asking about the
19    documents in front of you, whether
20    what she just read is Exhibit 3.
21    That's all she's asking.
22    A.    I don't know.
23    Q.    So take a look at Exhibit 3.
24          Now, what's marked Page 3 of
25 17 at the top.  So three pages in.
```

Page 93

```
1                 JANNA BULLOCK
2  There's a paragraph two, Ms. Bullock.
3  And that requires an affidavit
4  disclosing all assets exceeding 10,000
5  Euros.  And then it continues.
6           But just generally, did you
7  understand that you were required to
8  produce an affidavit in the Cyprus
9  litigation to disclosing all assets in
10 excess of 10,000 Euros?
11          MR. TREMONTE:  Objection.
12    A.    Well, this is what I see
13 right now.
14    Q.    So putting aside what was
15 required in Cyprus.
16          Did you understand that in
17 response to the document subpoena you
18 received in this case in New York, that
19 you were required to provide documents
20 sufficient to comply with that
21 paragraph of the Cyprus court order?
22    A.    I don't know.
23    Q.    Ms. Bullock, in your
24 production of documents in response to
25 this subpoena in the Southern District
```

Janna Bullock - February 6, 2018

25 (Pages 94 to 97)

Page 94

JANNA BULLOCK
1
2 of New York, did you produce documents
3 disclosing all assets that you have in
4 excess of 10,000 Euros?
5     A.   I reproduced everything that
6 was required.
7     Q.   Now, Ms. Bullock, it's your
8 testimony that you provided the
9 specific location of each asset?
10        MR. TREMONTE:  Objection to
11 form.
12    A.   Yes.
13    Q.   When you say, we produced
14 everything that was required, what did
15 you understand to be required?
16        MR. TREMONTE:  Objection.
17 And you know, again, to the extent
18 that --
19    A.   I think I answered this
20 question before.
21        MR. TREMONTE:  Okay.  And I
22 made an objection.  But to the
23 extent that you had conversations
24 with your lawyers, including us,
25 okay -- they don't want to know

Page 95

JANNA BULLOCK
1
2     about the substance of those
3     communications.  She's just asking
4     you, did you have a
5     general understanding as to what
6     -- I think she' asking, did you
7     have a general understanding as to
8     what was required to be produced?
9     A.   Yes.
10    Q.   What was required to be
11 produced?
12    A.   Assets that I own in the
13 amount of $26 million.
14    Q.   Why do you say $26 million?
15    A.   Because that's what is
16 listed.
17    Q.   And you're referring here to
18 the Cyprus court freezing order?
19    A.   Yes.
20    Q.   Let's stay on the document
21 that is the document subpoena in the
22 New York case.
23        What did you understand to be
24 required for production in this case?
25 So Southern District of New York, the

Page 96

JANNA BULLOCK
1
2 that's been before Judge Sullivan?
3        MR. TREMONTE:  Objection.
4        Caroline, can I take a stab
5     at this?  Just a quick voir dire.
6 EXAMINATION BY
7 MR. TREMONTE:
8     Q.   You understand that this
9 subpoena was served on you -- the
10 subpoena that is marked Exhibit 2, was
11 served on you in connection with this
12 action in the southern district,
13 correct?
14    A.   Yes.
15    Q.   Okay.  And again, without
16 getting into communication with
17 counsel, based on your consultation
18 with counsel and your review of the
19 subpoena, you understood that you had
20 to comply with all of its terms,
21 correct?
22    A.   Right.
23    Q.   Okay.  Directing your
24 attention to Page 4 where it says,
25 requested documents.  Please turn to

Page 97

JANNA BULLOCK
1
2 that page of the subpoena.
3        MR. TREMONTE:  Mark, can you
4     help, Page 4 of the subpoena.
5     Okay.
6     Q.   Directing your attention to
7 where it says, requested documents.
8        Can you point to those words,
9 please.  Just point to the words,
10 requested documents.  Sort of in the
11 middle of the lower part of the page.
12 It's underlined and in bold.
13        Do you see that?  I'll point
14 you.  It says requested documents.
15    A.   Okay.
16    Q.   And you see there's a number
17 1 and then there's some words?
18    A.   Mm hm.
19    Q.   Did you have an understanding
20 that everything, all of the words
21 there, everything that's listed there
22 after requested documents described the
23 things that you had to produce?
24        Did you understand that?
25        After consulting with counsel

Janna Bullock - February 6, 2018

26 (Pages 98 to 101)

Page 98

                    JANNA BULLOCK
1
2    you, understood that you had to produce
3    the documents listed in this subpoena,
4    correct?
5         A.   Yes.
6         Q.   To the extent that you had
7    any, right?
8         A.   Yes.
9         Q.   Okay.  And that includes
10   little paragraph one here on Page 4,
11   the specific location of the assets to
12   the extent that you had any, correct?
13        A.   Yes.
14        Q.   And it includes little
15   romanette 2, whether the assets belong
16   to you exclusively or jointly, correct?
17        A.   Yes.
18        Q.   And you understand that
19   exclusively means something that just
20   belongings to you, right?
21        A.   Yes.
22        Q.   And you understand that
23   jointly means something that you own
24   with someone or some other entity?
25        A.   Yes, I do.

Page 99

                    JANNA BULLOCK
1
2         Q.   And romanette 3, whether the
3    assets are held in trust or through
4    another form of ownership.
5              Do you see that?
6         A.   Yes.
7         Q.   You understood you had to
8    produce any document --
9         A.   Yes.
10        Q.   If you had them,
11   responsive --
12        A.   Right.
13        Q.   And isn't that also true of
14   everything written on --
15             MS. DONOVAN:  I'll take it
16        from here.
17             MR. TREMONTE:  Okay.
18   EXAMINATION BY
19   MS. DONOVAN:
20        Q.   So Ms. Bullock, go back to
21   Page 4.  So the page that you were just
22   looking at.  And as your counsel was
23   walking you through the requirements of
24   the subpoena, you answered in response
25   to his questions that you had an

Page 100

                    JANNA BULLOCK
1
2    understanding that things that had to
3    be produced, correct?
4         A.   Correct.
5         Q.   Okay.  And you went through
6    the little romanettes 1 through 4, and
7    you answered yes, you understood that
8    you were to produce the specific
9    location of each asset, correct?
10        A.   Yes.
11        Q.   Okay.  And it's your
12   understanding that what was produced in
13   your document production provided the
14   specific location of the assets?
15        A.   Yes.
16             MR. TREMONTE:  Objection.
17             To the extent that you had
18        any.
19        A.   Yes.
20        Q.   And you testified in response
21   to your counsel's questioning that you
22   understood the word exclusively to mean
23   belonging solely to you, correct?
24        A.   Mm hm.
25             MR. TREMONTE:  Objection to

Page 101

                    JANNA BULLOCK
1
2        form.
3             Go ahead.
4         Q.   Ms. Bullock.
5         A.   Yes.
6         Q.   Now, what did you understand
7    jointly to mean, Ms. Bullock?
8         A.   That I owned it with somebody
9    else.
10        Q.   Okay.  What assets do you own
11   with somebody else?
12        A.   None.
13        Q.   You own no assets with anyone
14   else?
15             Not your daughter?
16        A.   No.
17        Q.   Not your mother?
18        A.   No.
19        Q.   Not your ex-husband?
20        A.   No.
21        Q.   Now, what do you understand
22   it to mean by held in trust?
23        A.   That somebody owned -- that
24   trust owned something for me.
25        Q.   It says any other form of

Page 102

```
 1              JANNA BULLOCK
 2  ownership.
 3           What do you understand it to
 4  mean by another form of ownership?
 5      A.    I don't know other forms of
 6  ownership.
 7      Q.    So you understand that
 8  there's ownership by you personally, or
 9  ownership by a trust?
10      A.    Yes.
11      Q.    And you testified that you
12  hold some assets in trust, correct?
13      MR. CUCCARO:  Objection.
14      A.    No.
15      Q.    You testified earlier that
16  that you had three trusts established,
17  correct?
18      A.    Right.
19      MR. TREMONTE:  Objection.
20      Q.    And now, in romanette 4, it
21  says, whether the assets are held
22  directly by you.
23           What do you understand that
24  to mean, directly by you?
25      A.    That they are under my name.
```

Page 103

```
 1              JANNA BULLOCK
 2      Q.    And then when it says, or
 3  indirectly through other natural or
 4  legal entities, what did you understand
 5  that to mean?
 6      A.    That assets that are owned on
 7  my behalf by someone else.
 8      Q.    Are there any assets owned on
 9  your behalf by someone else?
10      A.    No.
11      Q.    So all assets that you own
12  are held in your name?
13      A.    I don't own anything.
14      MR. TREMONTE:  Objection to
15  form.
16      Q.    Ms. Bullock, are all assets
17  that you own held in your name?
18      MR. TREMONTE:  Objection to
19  form.
20      A.    I don't own anything.
21      Q.    You say you don't own
22  anything.  You earlier gave me your
23  understanding of the word assets which
24  are things of value; is that correct?
25      A.    Yes.
```

Page 104

```
 1              JANNA BULLOCK
 2      MR. TREMONTE:  Objection to
 3  form.
 4      Q.    Ms. Bullock, the apartment
 5  that you listed in response to the
 6  court reporter's question for an
 7  address, do you own that apartment?
 8      A.    No.
 9      Q.    Who owns that apartment?
10      A.    This apartment is in a trust.
11      Q.    What trust is that apartment
12  in?
13      A.    I don't even know.
14      Q.    Who established that trust?
15      MR. TREMONTE:  Objection to
16  form.
17      A.    This trust was established
18  really long time ago.
19      Q.    How do you have an
20  understanding of -- strike that.
21           How did you come to this
22  understanding that the apartment you
23  live in is held in a trust?
24      A.    I never owned this apartment.
25      Q.    No, what I'm asking is how
```

Page 105

```
 1              JANNA BULLOCK
 2  you know now, sitting here, that this
 3  apartment in New York where you live is
 4  primarily held in a trust?
 5      A.    Because it is in a trust.
 6      Q.    How do you know that?
 7      A.    That's what I was told.
 8      Q.    Who told you that?
 9      A.    A trust attorney who put it
10  in there.
11      Q.    And who is that attorney?
12      A.    I don't remember now.
13      Q.    When did you speak with this
14  trust attorney?
15      A.    I didn't speak with him.
16      Q.    Who spoke with this attorney
17  on your behalf?
18      MR. TREMONTE:  Objection to
19  form.
20      A.    No one spoke to him on my
21  behalf.
22      Q.    Did you ever at any point in
23  time own the apartment in New York in
24  which you now live?
25      A.    No.  Never.
```

Janna Bullock — February 6, 2018

Page 106

```
 1              JANNA BULLOCK
 2      Q.    And it's your testimony
 3 that's always been held in a trust?
 4      A.    Yes.
 5          MR. TREMONTE:  Objection to
 6 form.
 7      Q.    And you're not aware of the
 8 identity of this trust.
 9      A.    No.
10      Q.    You don't know its name?
11      A.    No.
12      Q.    Do you know any of its
13 trustees?
14      A.    No.
15      Q.    Do you know if it has
16 trustees?
17      A.    I'm not involved in that.
18      Q.    Do you know if there are any
19 beneficiaries of the trust?
20      A.    I don't know.  No.
21          THE WITNESS:  Can I get some
22 water?
23          MR. TREMONTE:  It's 1:00 --
24          MS. DONOVAN:  We can break.
25          We can go off.
```

Page 107

```
 1              JANNA BULLOCK
 2          THE VIDEOGRAPHER:  The time
 3 is approximately 1:00 p.m.
 4          This will end Media Unit
 5 Number 2, and we are going off the
 6 record.
 7          (Whereupon, a lunch break was
 8 taken at this time.)
 9          THE VIDEOGRAPHER:  The time
10 is approximately 1:55 p.m.
11          This is the start of Media
12 Unit Number 3, and we're back on
13 the record.
14      Q.    Did you have income in the
15 year 2017?
16      A.    No.
17      Q.    You testified that you
18 complete your own tax returns, that's
19 right?
20      A.    Not for 2017 yet.
21      Q.    For 2016, did you declare
22 income on your tax return?
23      A.    I don't remember.
24      Q.    Do you recall working during
25 the 2016 year?
```

Page 108

```
 1              JANNA BULLOCK
 2      A.    No.
 3      Q.    Did you operate a business in
 4 2016?
 5      A.    No.
 6      Q.    Did you operate a business in
 7 2017?
 8      A.    No.
 9      Q.    Did you -- were you employed
10 in 2016?
11      A.    No.
12      Q.    Were you employed in 2015?
13      A.    No.
14      Q.    Were you employed in 2014?
15      A.    No.
16      Q.    Were you employed in 2013?
17      A.    I don't remember.  I might.
18      Q.    And the same questions as to
19 operating a business.
20          Did you operate a business in
21 2015?
22      A.    No.
23      Q.    Did you operate a business in
24 2014?
25      A.    No.
```

Page 109

```
 1              JANNA BULLOCK
 2      Q.    Did you operate a business in
 3 2013?
 4      A.    I don't remember.
 5      Q.    In 2014, did you declare any
 6 income on your tax returns?
 7      A.    I don't remember.
 8      Q.    In 2015, did you declare any
 9 income?
10      A.    Tax returns have been
11 prepared by professionals.  I don't
12 remember.
13      Q.    Who prepared your tax return?
14      A.    I don't remember.
15      Q.    Did you engage a law --
16 excuse me -- did you engage a
17 professional services firm to prepare
18 your tax returns?
19      A.    Yes.  They were prepared by
20 my tax attorney.
21      Q.    And that's Stuart Smith?
22      A.    Yes.
23      Q.    For what time period did a
24 professional firm prepare your tax
25 returns?
```

Janna Bullock – February 6, 2018

29 (Pages 110 to 113)

Page 110

JANNA BULLOCK

```
 1                JANNA BULLOCK
 2       A.    Always.
 3       Q.    In 2014, did you receive any
 4  investment income?
 5       A.    No.
 6       Q.    In 2015, did you receive any
 7  investment income?
 8       A.    No.
 9       Q.    In 2016, did you receive any
10  investment income?
11       A.    No.
12       Q.    Ms. Bullock, do you review
13  your own tax returns?
14       A.    I don't remember.
15       Q.    Are you aware if any income
16  was declared on any tax return after
17  2013?
18       A.    I don't remember.
19       Q.    Ms. Bullock, where do you
20  file tax returns?
21       A.    They get filed by
22  professionals.
23       Q.    Do you know in what
24  jurisdictions?
25       A.    I don't know about
```

Page 111

```
 1                JANNA BULLOCK
 2  jurisdictions.
 3       Q.    Do you file federal tax
 4  returns?
 5       A.    Whatever needs to be filed is
 6  filed.
 7       Q.    Did you sign your own tax
 8  returns?
 9       A.    I think they filed
10  electronically now.
11       Q.    And to confirm, you do or
12  don't review them before they're filed?
13       A.    I don't know.  I do whatever
14  I'm asked to do.
15       Q.    Did you recall ever reviewing
16  a tax return prepared for you?
17       A.    Yes.
18       Q.    Okay.  And do you recall if
19  there was any income declared on that
20  tax return?
21       A.    I was getting salary at some
22  point.
23       Q.    At what point were you
24  getting salary?
25       A.    I was a gérant of the French
```

Page 112

```
 1                JANNA BULLOCK
 2  hotels at some point.
 3       Q.    What does it mean to be a
 4  gérant of the French hotels?
 5       A.    Just a manager.
 6       Q.    So it's like a manager or
 7  director of a corporation?
 8       A.    More of a manager.
 9       Q.    Okay.  And when you were
10  referencing the French hotels, which
11  hotels are those?
12       A.    These are Pralong and
13  Crystal.
14       Q.    Are you the beneficial owner
15  of the Hotel Pralong?
16       A.    No.
17       Q.    Are you the beneficial owner
18  of the Hotel Crystal?
19       A.    No.
20       Q.    Have you at any time been the
21  beneficial owner of the Hotel Pralong?
22       A.    No.
23       Q.    Have you at any time been the
24  beneficial owner of the Hotel Crystal?
25       A.    No.
```

Page 113

```
 1                JANNA BULLOCK
 2       Q.    And Ms. Bullock, if you
 3  wanted to determine the identity of the
 4  firm that prepared your tax returns,
 5  where would you obtain that
 6  information?
 7       A.    I don't remember their names.
 8       Q.    How would you find out their
 9  names?
10       A.    I have to probably call
11  somebody.
12       Q.    Who would you have to call?
13       A.    I will call my lawyer.
14       Q.    And who is that?
15       A.    I will call Stuart Smith.
16       Q.    Do you keep any records in
17  connection with the preparation of your
18  own tax returns?
19       A.    No.
20       Q.    Ms. Bullock, do you keep cash
21  on hand?
22       A.    No.
23       Q.    Ms. Bullock, do you have any
24  bank accounts?
25       A.    No.
```

Janna Bullock — February 6, 2018

Page 114

JANNA BULLOCK
1
2    Q.    Do you have a debit card?
3    A.    No.
4    Q.    Ms. Bullock, when you need
5 cash for everyday purposes, how do you
6 get that cash?
7    A.    I ask my —
8         MR. CUCCARO:  Objection to
9 form.
10        You can answer.
11   A.    I ask my mom.
12   Q.    And your mother's name is?
13   Q.    What is your mother's name?
14   A.    ██████████████
15   Q.    Her last name?
16   A.    ██████████████
17   Q.    Does your mother live with
18 you?
19   A.    Yes.
20   Q.    And your mother has bank
21 accounts?
22   A.    I don't know.
23   Q.    So in any instance where you
24 need cash, you go to your mother?
25   A.    I go to my daughter too.

Page 115

JANNA BULLOCK
1
2    Q.    Do you know where your mother
3 maintains bank accounts?
4    A.    No.
5    Q.    Do you know where your mother
6 takes out cash in the City of New York?
7    A.    No.
8    Q.    You've never been with her
9 when she's taken out cash from an ATM?
10   A.    No.
11   Q.    Do you know if your daughter
12 maintains bank accounts?
13   A.    I don't know.
14   Q.    Have you been with your
15 daughter at any point when she's taken
16 out cash?
17   A.    No.
18   Q.    So whenever you've gotten
19 cash from your mother or your daughter,
20 they've just had it on hand?
21        MR. CUCCARO:  Objection to
22 form.
23   Q.    I'll remind you you're under
24 oath.
25   A.    Right.

Page 116

JANNA BULLOCK
1
2    Q.    Do you have any credit cards,
3 Ms. Bullock?
4    A.    No.
5    Q.    Do you have any charge cards?
6    A.    No.
7    Q.    Do you ever go out to dinner
8 with friends?
9    A.    I go.
10   Q.    Yes or no, do you go out to
11 dinner with friends?
12   A.    Yes.
13   Q.    In those instances, do you
14 occasionally pay?
15   A.    Sometimes I do.
16   Q.    How do you pay?
17   A.    I have cash.
18   Q.    Okay.  And where do you get
19 that cash?
20   A.    I ask my mom or my daughter.
21   Q.    Does your daughter live with
22 you?
23   A.    Yes.
24   Q.    Do you all live in the same
25 apartment?  I believe it was the

Page 117

JANNA BULLOCK
1
2 penthouse.
3    A.    We live in the same building.
4    Q.    What unit is your daughter
5 in?
6    A.    ██████████████
7    Q.    Excuse me?
8    A.    ██████████████
9    Q.    Are eight?
10   A.    ██████████████
11   Q.    ██████████████
12   A.    Mm hm.
13   Q.    And in what unit is your
14 mother?
15   A.    ██████████████
16   Q.    ██████████████
17   A.    Mm hm.
18   Q.    Does your mother own her
19 apartment?
20   A.    I don't know.
21   Q.    Did you assist your with
22 purchasing her apartment?
23   A.    I don't remember.
24   Q.    When did your mother purchase
25 her apartment?

Janna Bullock - February 6, 2018

31 (Pages 118 to 121)

Page 118

```
 1              JANNA BULLOCK
 2      A.    I don't remember.
 3      Q.    When did your mother begin
 4 living in the unit, ████?
 5      A.    I don't remember.
 6      Q.    Remind me the address on your
 7 current apartment is?  Street and
 8 number?
 9      A.    ████████████
10      Q.    When did you first move to
11 ████████████
12      A.    I believe it was probably the
13 year 2000.
14      Q.    And did you move into the
15 penthouse at that time?
16      A.    I moved in a different
17 apartment.
18      Q.    Speak up.
19      A.    I moved in a different
20 apartment.
21      Q.    And then what was that
22 apartment that you initially moved
23 into?
24      A.    ████
25      Q.    Did you purchase ████
```

Page 119

```
 1              JANNA BULLOCK
 2             Did you purchase Apartment
 3 ████
 4      A.    That apartment was in a
 5 trust.
 6      Q.    What trust?
 7      A.    I don't remember.
 8      Q.    Who handled the formation of
 9 the trust?
10      A.    An attorney.
11      Q.    Which attorney?
12      A.    Samuel Pisar.
13      Q.    Last name is spelled how?
14      A.    P-I-S-A-R.
15      Q.    Do you still work with an
16 attorney, Samuel Pisar?
17      A.    Not anymore.
18      Q.    Was he then located or
19 working in New York?
20      A.    Yes.
21      Q.    Did you work with Mr. Pisar
22 with respect to any other transactions?
23      A.    Yes.
24      Q.    Which?
25      A.    He assisted me a lot in a lot
```

Page 120

```
 1              JANNA BULLOCK
 2 of different issues.
 3      Q.    Can you give me some
 4 examples, please?
 5      A.    Mostly, my ex-husband's
 6 troubles in Russia.
 7      Q.    Did he assist you with any
 8 real estate transactions in the US?
 9      A.    No.
10      Q.    When you say he assisted you
11 with your husband's troubles in Russia,
12 is that the point in time where you put
13 assets in trust?
14      A.    No.
15      Q.    Ms. Bullock, do you use
16 QuickBooks?
17      A.    No.
18      Q.    Do you know if any
19 accountants of yours have used
20 QuickBooks?
21      A.    I don't know.
22      Q.    Have you ever consulted a
23 record from an accountant that was
24 generated on QuickBooks?
25      A.    No.
```

Page 121

```
 1              JANNA BULLOCK
 2      Q.    Now, Ms. Bullock, do you
 3 currently have any Money Market
 4 accounts?
 5      A.    No.
 6      Q.    And have you had any Money
 7 Market accounts at any time since
 8 August 2012?
 9      A.    No.
10      Q.    I'm going to reask with
11 respect to bank accounts.
12             Do you currently have any
13 bank accounts?
14             MR. CUCCARO:  Objection.
15             Asked and answered.
16      A.    No.
17      Q.    And do you understand --
18 so strike that.
19             When I'm saying bank
20 accounts, I'm talking about commercial
21 retail banking like a Bank of America
22 or, you know, even a Wells Fargo.
23             Do you have any commercial
24 retail bank accounts?
25      A.    I do not.
```

Janna Bullock - February 6, 2018

32 (Pages 122 to 125)

Page 122

JANNA BULLOCK
1
2      Q.    And have you had any at any
3  point in time since August 2012?
4      A.    I had an account at Citibank.
5  It was closed.
6      Q.    When did you have that
7  Citibank account?
8      A.    I opened this account in
9  1991.
10     Q.    When did you close it?
11     A.    The bank closed it.
12     Q.    When did the bank close it?
13     A.    Around this time.
14     Q.    Around 19 --
15     A.    I don't remember.  But around
16  that time.
17     Q.    So the home where you live
18  currently, that's held in trust,
19  correct?
20     A.    Yes.
21     Q.    Are there any condo fees that
22  you pay in connection with that
23  apartment?
24     A.    I don't pay any fees.
25     Q.    So are there fees in

Page 123

JANNA BULLOCK
1
2  connection with that apartment?
3      A.    Yes.
4      Q.    And what are the monthly fees
5  in connection with that apartment?
6      A.    I don't know.
7      Q.    Do you have any sense of the
8  magnitude?
9      A.    Probably two, $3,000.
10     Q.    Monthly?
11     A.    Yes.
12     Q.    How do those monthly -- do
13  those fees get paid?
14     A.    Yes.
15     Q.    How do they get paid?
16     A.    They get paid by the trust.
17     Q.    Do you have any records
18  reflecting the payment of these fees by
19  the trust?
20     A.    No.
21     Q.    Who would have those records?
22     A.    The trustee.
23     Q.    Who is the trustee?
24     A.    I don't know.
25     Q.    Ms. Bullock, do you know

Page 124

JANNA BULLOCK
1
2  anything about this trust that was
3  established.
4      A.    No.
5      Q.    Who established the trust --
6      A.    And I don't want to know.
7      Q.    Why not?
8      A.    I don't know.
9      Q.    So you're aware that
10  Mr. Pisar, a lawyer, helped form this
11  trust, correct?
12     A.    Yes.
13     Q.    Are you aware of anything
14  else about this trust?
15     A.    No.
16     Q.    Do you know any other assets
17  that are held by the trust that holds
18  the current apartment where you live?
19     A.    No.
20     Q.    How do you pay -- excuse me.
21        Do you pay property tax on
22  your apartment, the one where you
23  currently live?
24     A.    I don't pay.
25     Q.    Who pays?

Page 125

JANNA BULLOCK
1
2      A.    I don't know.
3      Q.    Do you get a tax bill from
4  the City of New York?
5      A.    I don't know.
6      Q.    Who would receive the tax
7  bill if you don't?
8      A.    I don't know.
9      Q.    Do you receive any tax bills
10  from any taxing authority?
11     A.    I don't know.
12     Q.    In the past year, have you
13  received, at your primary residence,
14  any tax bill?
15     A.    I don't know.
16     Q.    Are you working with a
17  current tax attorney?
18     A.    I don't know.
19     Q.    Are you working with a
20  current tax professional?
21     A.    I don't know.
22     Q.    Ms. Bullock, you're aware
23  that you've made personal
24  representations on your tax returns,
25  correct?

Page 126

```
 1              JANNA BULLOCK
 2      A.   I don't know.
 3      Q.   You're representing to the,
 4  for instance, federal government, what
 5  you earn in income, what's deductible,
 6  credits that are owed to you.
 7           Do you understand that?
 8      A.   I don't know.
 9      Q.   Do you review those documents
10  before they are submitted?
11      A.   I don't know.
12      Q.   Ms. Bullock, do you own any
13  homes in the State of New York?
14      A.   No.
15      Q.   Do you own any other homes --
16  excuse me.
17           Do you own any homes in the
18  US?
19      A.   No.
20      Q.   It's your testimony that you
21  own no property in the United States?
22      A.   No.
23      Q.   It's not your testimony?
24      A.   Yes.
25      Q.   So just for the sake of
```

Page 127

```
 1              JANNA BULLOCK
 2  clarity, your testimony is that you own
 3  no property in the United States?
 4      A.   I do not own any property in
 5  the United States.
 6      Q.   At any point since
 7  August 2012, have you owned property in
 8  the United States?
 9      A.   No.
10      Q.   Do you rent any property
11  currently?
12      A.   No.
13      Q.   At any point since
14  August 2012, have you rented property?
15      A.   No.
16           THE WITNESS:  Can I step out
17  for one second?
18           MS. DONOVAN:  We'll go off
19  for one moment, but we need to
20  keep these briefs so that we can
21  finish today.
22           THE VIDEOGRAPHER:  The time
23  is approximately 2:14 p.m., and
24  we're going off the record.
25           (Whereupon, a short break was
```

Page 128

```
 1              JANNA BULLOCK
 2  taken at this time.)
 3           THE VIDEOGRAPHER:  The time
 4  is approximately 2:22 p.m., and we
 5  are back on the record.
 6      Q.   Ms. Bullock, do you own
 7  property in Southampton?
 8      A.   No.
 9      Q.   Have you owned property in
10  Southampton at any time since
11  August 2012?
12      A.   No.
13           MS. DONOVAN:  I think we're
14  on Exhibit 6.
15           Can we please mark the
16  document I'm handing you now as
17  Exhibit 6.
18           (Whereupon, an open listing
19  agreement was marked as Bullock
20  Exhibit 6 for Identification.)
21      Q.   Ms. Bullock, could you please
22  look at Exhibit 6.
23      A.   Mm hm.
24      Q.   Are you familiar with the
25  document that is Exhibit 6?
```

Page 129

```
 1              JANNA BULLOCK
 2      A.   No.
 3           MS. DONOVAN:  For the record,
 4  it's an open listing agreement
 5  dated November 18, 2014, to Janna
 6  Bullock with respect to 210 Meadow
 7  Lane, Southampton, New York.
 8           First paragraph reading,
 9  "This will confirm that you have
10  engaged Brown Harris Stevens of
11  the Hamptons LLC, under an open
12  listing agreement commencing on
13  November 18, 2014.  We are
14  authorized to list the property at
15  a sales price of $29 million."
16  End quote.
17      Q.   Do you recall entering into
18  an opening listing agreement with Brown
19  Harris Stevens in connection with the
20  property at 210 Meadow Lane?
21      A.   No.
22      Q.   At any point prior to
23  November 2014, did you engage Brown
24  Harris Stevens of the Hamptons to list
25  a property at 210 Meadow Lane?
```

Janna Bullock — February 6, 2018

34 (Pages 130 to 133)

Page 130

JANNA BULLOCK
1
2    A.    No.
3    Q.    At any point subsequent, did
4 you engage Brown Harris Stevens of the
5 Hamptons to list a property at 210
6 Meadow Lane?
7    A.    No.
8        MS. DONOVAN:  Can we please
9    mark as Exhibit 7, a document, an
10   e-mail correspondence that I'm
11   handing you now.
12       (Whereupon, an e-mail
13   correspondence was marked as
14   Bullock Exhibit 7 for
15   Identification.)
16   Q.    Ms. Bullock, please review
17 Exhibit 7.  It's an e-mail
18 correspondence, so it's typically
19 easier to review it from back to front.
20       Ms. Bullock are you familiar
21 with Exhibit 7?
22   A.    No.
23   Q.    Now, Ms. Bullock, if you
24 could go to Page 2 of 3, please.
25   A.    Mm hm.

Page 131

JANNA BULLOCK
1
2    Q.    It's an e-mail from Janna
3 Bullock at an e-mail address,
4 ███████████████ to a Tony Cerio
5 with regard to 210 Meadow Lane.
6       Is that your e-mail address,
7 Ms. Bullock?
8    A.    I don't use this e-mail
9 address.
10   Q.    Have you ever used this
11 e-mail address?
12   A.    Only Janna goes through
13 there.
14   Q.    So did you not e-mail Tony
15 Cerio from this e-mail address?
16   A.    I don't remember everything.
17 I also have to point out the address
18 that is listed here, I don't know if
19 this address even exists.
20   Q.    Okay.  Let's keep looking at
21 e-mail that's Exhibit 7 in front of
22 you.
23       So at the bottom, Tony
24 e-mails you and he says, "Hi, Janna.
25 Hope all is well.  Is August still

Page 132

JANNA BULLOCK
1
2 available for 210 Meadow Lane?  Jill
3 Yablon would like to offer 170K.
4 Please let me know your thoughts."  End
5 quote.
6       Do you know Tony Cerio?
7    A.    I don't remember.
8    Q.    Did you work with any real
9 estate brokers in the Hamptons at any
10 point since August 2012?
11   A.    I don't know.  Maybe.
12   Q.    Why might you then have
13 worked with real estate brokers in the
14 Hamptons?
15       MR. CUCCARO:  Objection to
16   form.
17   A.    Because I managed 210.
18   Q.    You just earlier said that
19 you weren't even sure whether the
20 address is real.
21   A.    Yes, this address is not real
22 (indicating).
23   Q.    The Union Street [phonetic].
24       You're aware of the property
25 at 210 Meadow Lane, correct?

Page 133

JANNA BULLOCK
1
2    A.    Yes, I do.
3    Q.    When you say you manage the
4 property, what do you mean by that?
5    A.    It means that I made sure
6 that there is water, there is
7 electricity, there is cable, there is
8 pool in operating order.
9    Q.    For how long have you managed
10 210 Meadow Lane?
11   A.    For a really long time.
12   Q.    Who owns the property at 210
13 Meadow Lane?
14   A.    The trust owns.
15   Q.    The same trust that owns your
16 apartment?
17   A.    I don't know.
18   Q.    Ms. Bullock, are you the
19 beneficial owner of the property at 210
20 Meadow Lane?
21   A.    No, I am not.
22   Q.    Do you have any rights with
23 respect to that property?
24   A.    I only take care of this
25 property.

Janna Bullock - February 6, 2018

35 (Pages 134 to 137)

Page 134

JANNA BULLOCK

1
2      Q.   So by that description,
3  you're like a groundskeeper for the
4  house?
5      A.   Yes.
6      Q.   Okay.  A groundskeeper who is
7  authorized to rent it?
8      A.   I didn't rent it.  There's no
9  signature on this.
10      Q.   Okay.  Let's keep going in
11  your e-mail chain.
12          So you respond, "It's too
13  early in a season to consider such a
14  low price, but she was an excellent
15  tenant."
16          So by she was an excellent
17  tenant, you're referring to Jill
18  Yablon; is that correct?
19      A.   It might not be me who
20  answered this e-mail.
21      MR. CUCCARO:  I note for the
22      record that Exhibit 7 is not a
23      document that we produced in this
24      litigation, nor is Exhibit 6.
25      MS. DONOVAN:  Part of the

Page 135

JANNA BULLOCK

1
2      problem we're going to run into is
3      that this document was not
4      produced by Ms. Bullock in
5      response to a document subpoena
6      that would have called for it.
7      Q.   So Ms. Bullock --
8      A.   It's not my document.  I
9  don't know where it's coming from.
10      Q.   I want you to focus on the
11  Exhibit 7, the e-mail correspondence
12  that's before you, where Janna Bullock
13  is replying to Tony Cerio saying, "It's
14  too early in a season to consider such
15  a low price, but she was an excellent
16  tenant."
17          Ms. Bullock, did you write
18  that?
19      A.   I don't remember.
20      Q.   You're under oath.
21          Do you have any reason to
22  believe somebody else accessed your
23  e-mail and wrote to Tony Cerio from it?
24      A.   My e-mails were compromised
25  many times.  I don't recall this

Page 136

JANNA BULLOCK

1
2  e-mail.
3      Q.   You don't recall having any
4  discussion with Tony Cerio about
5  renting the property at 210 Meadow Lane
6  in the summer of 2015?
7      A.   I don't remember.
8      Q.   Did you ever rent the
9  property at 210 Meadow Lane to Jill
10  Yablon?
11      A.   I don't remember.
12      Q.   Okay.  You said or the writer
13  writing as Janna Bullock said, "She was
14  an excellent tenant."
15          Do you know Jill Yablon.
16      A.   No, I don't.
17      Q.   Tony Cerio replies, "I
18  understand.  What would the bottom line
19  be?"
20          Janna Bullock replies, "750
21  for the season."
22          Is that the typical price at
23  which you rented the home at 210 Meadow
24  Lane?
25      MR. CUCCARO:  Objection to

Page 137

JANNA BULLOCK

1
2      form.
3      A.   No.  I don't know.
4      Q.   Ms. Bullock, was the home at
5  210 Meadow Lane rented for the 2015
6  summer season?
7      A.   I don't remember.
8      Q.   How many other properties do
9  you manage?
10      A.   At least one more.
11      Q.   What's that?
12      A.   2170 Meadow Lane.
13      Q.   Did you own that property?
14      A.   No.
15      Q.   Who owns that property?
16      A.   The property is in a trust.
17      Q.   What trust?
18      A.   I don't remember the name.
19      Q.   You'll recall that the
20  subpoena that was served on you for
21  documents in this case, the one through
22  the District Court for the Southern
23  District of New York called for you to
24  disclose all assets held directly by
25  you or indirectly through other natural

Janna Bullock – February 6, 2018

36 (Pages 138 to 141)

Page 138

                    JANNA BULLOCK
1
2  or legal entities.
3       A.    But I do not own it.
4       Q.    Who ones the home at 2170 and
5  210 Meadow Lane?
6       A.    The trust.
7       Q.    And tell me everything you
8  can recall with about that trust.
9       A.    The trust was set up by
10 Samuel Pisar really long time ago for
11 the benefit of my children.
12      Q.    So this property is held in
13 trust for the benefit of your children?
14      A.    Yes.
15      Q.    When was it setup?
16      A.    1996.
17      Q.    What can you do with respect
18 to this property?
19      MR. CUCCARO:  Objection to
20      form.
21           You can answer.
22      A.    I cannot do anything.
23      Q.    But you can rent it?
24      A.    I cannot do anything.
25      Q.    If you rent it, where does

Page 139

                    JANNA BULLOCK
1
2  the income from the rental go?
3       A.    I cannot do anything.
4       Q.    Ms. Bullock, have you ever
5  attempted to rent the property at 210
6  Meadow Lane?
7       A.    The property was rented.
8       Q.    When was the property rented?
9       A.    I don't remember.
10      Q.    Roughly?
11      A.    I don't remember.
12      Q.    In the last five years?
13      A.    I don't remember.
14      Q.    Do you recall who rented the
15 property?
16      A.    No.
17      Q.    As the manager of 210 Meadow
18 Lane, can you engage in discussion with
19 brokers to sell that property?
20      A.    I don't know.
21      Q.    What's the source of your
22 understanding of your rights with
23 respect to the property at 210 Meadow
24 Lane?
25      A.    I have no rights.

Page 140

                    JANNA BULLOCK
1
2       Q.    So how do you know you have
3  no rights?
4       A.    Because I don't have any
5  rights.
6       Q.    Do you host events,
7  Ms. Bullock, at the property at 210
8  Meadow Lane?
9       A.    No.
10      Q.    Have you ever?
11      A.    In probably 2005, 2004.
12      Q.    Did you host multiple events?
13      A.    No.
14      Q.    So what was the one event you
15 hosted at 210 Meadow Lane?
16      A.    It was a house opening.
17      Q.    And who attended the house
18 opening in 2000 -- what year?
19      A.    I don't remember.
20      Q.    You don't remember who
21 attended or the year?
22      A.    I don't remember who attended
23 or year.
24      Q.    Ms. Bullock, you're in the
25 real estate business -- or you were.

Page 141

                    JANNA BULLOCK
1
2           Do you understand what an
3  open listing agreement is?
4       A.    I do.
5       Q.    What is it?
6       A.    It's when broker lists the
7  house on his own will.  When the broker
8  has no agreement with the purchaser --
9  when the broker has no agreement with
10 the owner to list the house.
11      Q.    So the broker listing the
12 house doesn't have the exclusive
13 listing, correct?
14      A.    Well, doesn't have any
15 listing.  It's not a listing.
16      Q.    So how long did you work in
17 the real estate business?
18      A.    Enough to understand what
19 open listing is.
20      Q.    So the broker who has an open
21 listing cannot sell the house?
22      A.    Anybody could sell the house.
23      Q.    Right.  Including that broker
24 who has that open listing agreement?
25      A.    Any broker could sell the

Janna Bullock – February 6, 2018

37 (Pages 142 to 145)

Page 142

JANNA BULLOCK

1
2 house.  As long as he or she has a
3 license, he could sell the house.
4         Q.    And in order to enter into an
5 open listing agreement, the broker
6 comes to an agreement with the seller
7 that they are going to be in an open
8 listing agreement?
9         A.    No, my understanding is that
10 for the open listing, you don't need an
11 open agreement.  If you walk the street
12 and you see a sign for sale, you go and
13 you could show it to your clients.
14         Q.    If it's for sale by seller?
15         A.    Or by broker.
16         Q.    And if it's an exclusive
17 listing by a broker, another person can
18 list it as an open listing?
19         A.    I don't think that open
20 listing in general has any value
21 whatsoever.
22         Q.    Excuse me?
23         A.    I don't think that open
24 listing has any value whatsoever.  It
25 mostly -- just the broker just like to

Page 143

JANNA BULLOCK

1
2 accumulate traffic, so they list things
3 that they -- whatever they feel like
4 listing.
5         Q.    And sellers sometimes want to
6 get traffic through their properties by
7 multiple different brokers, so they go
8 into open listing agreements?
9         A.    I do not know about that.
10         Q.    Have you ever sold a home in
11 a open listing?
12         A.    I don't know.  I don't
13 remember.
14              MS. DONOVAN:  Can we please
15         mark this as Exhibit 8.
16              It's another open listing
17         agreement, this time for 2170
18         Meadow Lane.
19              (Whereupon, an open listing
20         agreement was marked as Bullock
21         Exhibit 8 for Identification.)
22         Q.    Could you please review
23 Exhibit 8, Ms. Bullock?
24         A.    Yes.  It's the same thing.
25 It's the same address.

Page 144

JANNA BULLOCK

1
2         Q.    And it says, "This will
3 confirm you have engaged Brown Harris
4 Stevens of the Hamptons LLC under an
5 open listing agreement commencing on
6 November 18, 2014.  We are authorized
7 to list the property at a sales price
8 of $22 million."  End quote.
9              MR. CUCCARO:  I note for the
10         record that this is a document
11         that has not been executed.
12         A.    And it has no address here.
13         Q.    Now, Ms. Bullock, I'm going
14 to provide the court reporter with
15 another document in connection with the
16 listing at 2170.
17              MS. DONOVAN:  Will you please
18         mark this as Exhibit 9.
19              It's an e-mail
20         correspondence.
21              (Whereupon, an e-mail
22         correspondence was marked as
23         Bullock Exhibit 9 for
24         Identification.)
25         Q.    Ms. Bullock, if you could,

Page 145

JANNA BULLOCK

1
2 please review Exhibit 9.
3         A.    Okay.
4         Q.    Do you recognize Exhibit 9?
5         A.    No.
6         Q.    So we'll start at Page 2 in
7 an e-mail from Tony Cerio from
8 November 18, 2014.
9              He writes, "Hi, Janna.  I am
10 updating all of our Southampton
11 oceanfront listings for sale and rent.
12 Would you be so kind as to give us your
13 2015 rates and the sale status of the
14 property?  I currently have a customer
15 who would be interested in the property
16 for sale.  Could you please advise."
17         Do you recall receiving this
18 communication from Tony Cerio?
19         A.    No.
20         Q.    Do you have reason to believe
21 you did not receive this communication
22 from Tony Cerio?
23         A.    I don't remember.
24         Q.    Okay.  On Tuesday
25 November 18, same day,

Janna Bullock - February 6, 2018

Page 146

```
1                 JANNA BULLOCK
2    ███████████████ replies, "Hi,
3    Tony.  Both properties have a free
4    listing and could be easily find in a
5    website.  210 is 29 MLN, 750K rent for
6    the season.  2170 is 22.  Rent is 350
7    for the season."
8              Ms. Bullock, what did you
9    mean by 210 is 29 MLN?
10        A.    I don't know.
11        Q.    Is that a reference to
12   29 million?
13        A.    I don't know.
14        Q.    Is 29 million the sales price
15   that you were quoting in November of
16   2014 for the property at 210 Meadow
17   Lane?
18        A.    I don't know.
19        Q.    Ms. Bullock, you say that
20   2170 is 22.
21              What did you mean by that?
22        A.    I don't know.
23        Q.    Ms. Bullock, do you recall
24   writing this e-mail?
25        A.    I don't remember.
```

Page 147

```
1                 JANNA BULLOCK
2         Q.    Do you recall generally
3    thinking about renting or selling
4    either of the Southampton properties
5    around November 2014?
6         A.    I don't remember.
7         Q.    So is the sale of a
8    $29 million house, is that a
9    significant transaction for you?
10             MR. CUCCARO:  Objection to
11   form.
12        A.    I don't know.
13        Q.    How frequently do you sell
14   $29 million properties?
15        A.    I don't know.
16        Q.    More than 100 times in your
17   life?
18        A.    I don't know.  I don't
19   remember.
20        Q.    Is it possible then -- so I
21   guess go back to my question.
22             In more than a hundred
23   instances, have you sold a property
24   worth more than $29 million?
25             MR. CUCCARO:  Objection.
```

Page 148

```
1                 JANNA BULLOCK
2         Asked and answered.
3         Q.    At some point there needs to
4    be an answer of something different
5    than I don't know.
6         A.    I don't know.
7         Q.    Ms. Bullock, do you recall
8    ever seeking to rent the property at
9    2170 Meadow Lane?
10        A.    I don't know.
11        Q.    What don't you know?
12        A.    I don't know anything.  I'm
13   just exhausted.
14        Q.    So you testified earlier that
15   there was nothing impairing your
16   ability to give truthful and accurate
17   testimony.
18             Is that sill the case,
19   Ms. Bullock?
20        A.    Yes.
21        Q.    And the testimony you've been
22   providing is truthful and accurate?
23        A.    Yes, it's just a lot of
24   pressure.
25        Q.    So all I want you to do --
```

Page 149

```
1                 JANNA BULLOCK
2    and this part, I really don't mean to
3    be a pressure-filled activity -- is to
4    think back and remember, did you try to
5    sell a house for $29 million?
6         A.    I don't know.  People are in
7    the business of selling and buying.
8    That's all it is.
9         Q.    But you're in that business,
10   correct?
11        A.    No, I'm not a broker.
12        Q.    In 2014, were you acting as a
13   seller?
14        A.    No, I was acting as an agent.
15        Q.    An agent for who?
16        A.    For 2170 and 210.
17        Q.    And what's the basis for that
18   agency relationship?
19        A.    I take care of property.
20        Q.    Did you enter into any
21   agreements that allowed you to offer
22   for sale the property at 2170 Meadow
23   Lane?
24        A.    I don't remember.
25        Q.    You've testified that you
```

Janna Bullock – February 6, 2018

39 (Pages 150 to 153)

| Page 150 |
| --- |

JANNA BULLOCK

1
2  were the manager for the property?
3      A.    That's correct.
4      Q.    You've testified that you
5  were an agent for the property?
6      A.    That's correct.
7      Q.    Which allows you to offer for
8  sale the property?
9      A.    Whatever is with the
10 agreement.
11     Q.    What's that agreement?
12     A.    That I'm taking care of the
13 property.
14     Q.    When did you make this
15 agreement?
16     A.    At the time of the purchase.
17     Q.    When was the time of the
18 purchase?
19     A.    It was a long time ago.  I
20 don't remember exactly.
21     Q.    Who did you make the
22 agreement with?
23     A.    It was a trustee.
24     Q.    Who is the trustee?
25     A.    It was the seller who is the

| Page 151 |
| --- |

JANNA BULLOCK

1
2  lawyer.
3      Q.    And who was that?
4      A.    It was Samuel Pisar.
5      Q.    Do you know Samuel Pisar
6  socially?
7      A.    I've met him through my
8  business partner.
9      Q.    And who is your business
10 partner?
11     A.    I mentioned his name before.
12 Jeffrey Steiner.
13     Q.    Okay.  So in what other
14 businesses is Mr. Steiner a business
15 partner?
16     A.    Just real estate.
17     Q.    What real estate in
18 particular?
19     A.    We've done investments in
20 Russia successfully together.
21     Q.    Ms. Bullock, I'm going to
22 give you another e-mail.
23           MS. DONOVAN:  Would you
24     please mark this as Exhibit 10.
25           It's another e-mail

| Page 152 |
| --- |

JANNA BULLOCK

1
2  correspondence.
3           (Whereupon, an e-mail
4      correspondence was marked as
5      Bullock Exhibit 10 for
6      Identification.)
7      Q.    Ms. Bullock, please look at
8  Exhibit 10.
9           Do you recognize Exhibit 10?
10     A.    No.
11     Q.    Okay.  Ms. Bullock, please go
12 to Page 2.  We get another e-mail from
13 Tony Cerio to you Janna.
14           "Hi, Janna.  My assistant,
15 Jared, e-mailed you yesterday in regard
16 to have our photographer shoot new
17 pictures of both properties.  We are
18 part of Chrisitie's Great Estates, and
19 we need all high resolution photos so
20 we can send our customers the best
21 possible pictures.  Please advise."
22 End quote.
23           Do you recall having high
24 resolution photos taken of the
25 properties at 210 and 2170 Meadow Lane?

| Page 153 |
| --- |

JANNA BULLOCK

1
2      A.    No.
3      Q.    Do you remember any events
4  from three years ago?
5           MR. CUCCARO:  Objection to
6      form.
7      A.    I don't know.
8      Q.    Now, Ms. Bullock you reply,
9  "As long as we understand it's an open
10 listing, I'll arrange you the access."
11           Do you recall this exchange
12 with Mr. Cerio?
13     A.    No.
14     Q.    He replies, "Of course it is
15 an open listing for sale and rent.  Let
16 me know what day is best, and I will
17 arrange with our photographer."
18           You reply, "Any day."
19           Do you recall corresponding
20 with Mr. Cerio about the date on which
21 a photographer could take pictures of
22 your homes?
23     A.    No.
24     Q.    Have you previously had
25 photographs take pictures of these

Page 154

```
 1              JANNA BULLOCK
 2  homes?
 3      A.    I don't remember.
 4      Q.    Are you familiar with Brown
 5  Harris Stevens of the Hamptons?
 6      A.    I remember -- I know the
 7  name.
 8      Q.    What do you know about them?
 9      A.    Nothing in particular.
10      Q.    They're a reputable firm?
11      A.    They're okay.
12      Q.    Why do you say "they're
13  okay"?
14      A.    Because there are a lot of
15  reputable firms.
16      Q.    Okay.  But you have no reason
17  to find them dishonest?
18      A.    Oh, I would not make any
19  statements.
20          MS. DONOVAN:  This is Exhibit
21          11, please.  If we could mark
22          this.  Another correspondence
23          between Janna Bullock and Tony
24          Cerio.
25              (Whereupon, an e-mail
```

Page 155

```
 1              JANNA BULLOCK
 2          correspondence was marked as
 3          Bullock Exhibit 11 for
 4          Identification.)
 5      Q.    Ms. Bullock, do you recognize
 6  Exhibit 11?
 7      A.    No.
 8      Q.    And this time, on
 9  November 20, 2014, Tony Cerio writes
10  you, quote, "Hi, Janna.  Are we all at
11  set to shoot pictures tomorrow at 9:00
12  a.m.?  We would like to shoot 2170
13  Meadow Lane first, followed by 210
14  Meadow Lane.  Please advise."  End
15  quote.
16          Do you recall this
17  communication from Tony Cerio?
18      A.    No.
19      Q.    You reply same day, "Hi,
20  Tony.  It was nice talking to you this
21  morning.  If your assistant comes
22  tomorrow, and the gate would be
23  opened," parens, "(fire alarm went
24  on)," end parens.  "Please ask her to
25  push [REDACTED] on a security pad."
```

Page 156

```
 1              JANNA BULLOCK
 2  Parens, "(Bosch on a wall next to the
 3  laundry room)," End paren, "So the gate
 4  starts functioning again.  Many thanks,
 5  JB."  End quote.
 6          Do you recall responding like
 7  this to Mr. Cerio?
 8      A.    No.
 9      Q.    Is that the command for the
10  gate at 2170 Meadow Lane?
11      A.    I don't know.
12      Q.    Were you responsible for the
13  commands on the gate as the property
14  manager or agent of 2170?
15          MR. CUCCARO:  Objection to
16          form.
17      A.    I don't know.
18      Q.    Ms. Bullock, did you search
19  your [REDACTED] e-mail
20  address as part of your production of
21  documents in response to the subpoena?
22      A.    The computer was turn in, so.
23      Q.    So you understand that if you
24  give a computer, certain material is
25  stored on the computer, certain
```

Page 157

```
 1              JANNA BULLOCK
 2  material is stored for the servers?
 3          Do you understand that?
 4      A.    I don't know.
 5      Q.    Did you tell your lawyers
 6  that you maintained an e-mail account
 7  that was [REDACTED]
 8      A.    I don't remember.  I think I
 9  told everything.
10      Q.    Ms. Bullock, if I asked you
11  to search for this e-mail on your
12  [REDACTED] e-mail address,
13  would you have it?
14      A.    I don't know.  I don't use
15  this e-mail account at all.
16      Q.    Well, you used it in November
17  of 2014, correct?
18      A.    I don't know.
19      Q.    What do you mean you don't
20  know?  We've looked at four or five
21  different e-mails that have been
22  communications between you and a real
23  estate broker on an e-mail address that
24  you've never disclosed until now when
25  you're confronted with an e-mail.
```

Janna Bullock - February 6, 2018

41 (Pages 158 to 161)

Page 158

JANNA BULLOCK
1
2      A.   I don't know.  This e-mail
3 was never used for any purposes.
4      Q.   So if we looked at this
5 e-mail, if your attorneys looked for
6 different communications, they would
7 find no other correspondence with
8 brokers?
9      A.   I don't know.
10      Q.   No other offers to sell any
11 other property?
12      A.   I don't know.
13      Q.   No other offers to rent any
14 other property?
15      A.   I have no answers to those
16 question.
17      Q.   Well, did you use that
18 e-mail?
19      A.   I do not know.  I used
20 ███████████████
21      Q.   And obviously, sometimes you
22 used ████████████████
23      A.   I don't know how.  I just
24 don't use this e-mail.
25      Q.   Currently?

Page 159

JANNA BULLOCK
1
2      A.   Not currently.  I went from
3 one professional e-mail to another.  I
4 didn't use this e-mail.
5      Q.   Is this a social e-mail or a
6 nonprofessional e-mail?
7      A.   I don't know what kind of
8 e-mail is that.  I don't use it.
9      Q.   When is the last time you've
10 used this e-mail?
11      A.   I don't know.  From my
12 recollection, I don't use this e-mail.
13      Q.   Don't, current?
14      A.   I do not.
15      Q.   When is the last time you saw
16 Tony Cerio?
17      A.   I don't remember.
18      Q.   What's the current status of
19 the property at 210 Meadow Lane?
20      A.   I don't know.
21      Q.   Are you still a property
22 manager of the property at 210 Meadow
23 Lane?
24      A.   I am.
25      Q.   And what do you do as the

Page 160

JANNA BULLOCK
1
2 property manager?
3      A.   I take care of the property.
4      Q.   Tell me everything you do.
5      A.   I take care of the property.
6      Q.   What does that mean?
7      A.   I look after it.
8      Q.   And you hire people to do
9 certain work with respect to that
10 property?
11      A.   Yes.
12      Q.   Okay.  What work?
13      A.   Plumbing, pool work, electric
14 work, gardening.
15      Q.   When somebody -- one of those
16 people gives you a bill, here's a bill
17 for $1,000 for pool cleaning, what do
18 you do with the bill?
19      A.   The bill gets paid.
20      Q.   How?
21      A.   It just gets paid.
22      Q.   It doesn't just get paid.  I
23 want to hear how that bill gets paid.
24          What do you do so that that
25 bill gets paid?

Page 161

JANNA BULLOCK
1
2      A.   The bill gets paid.
3      Q.   How?
4      A.   I don't know.
5      Q.   Do you receive any bills in
6 connection with the house at 210 Meadow
7 Lane for some of the services you just
8 described?
9      A.   I don't know.
10      Q.   What do you mean, you don't
11 know?
12      A.   It might go directly to the
13 property.
14      Q.   Have you received any bill
15 from any person who does work on the
16 house at 210 Meadow Lane?  It's a
17 yes-or-no answer.
18      A.   Yes.
19      Q.   What bills have you received
20 for the house at 210 Meadow Lane?
21      A.   Plumbing.  Electric.  I would
22 guess.
23      Q.   Don't guess.  Did you receive
24 a plumbing bill for the house at 210
25 Meadow Lane?

Janna Bullock - February 6, 2018

42 (Pages 162 to 165)

Page 162

```
 1              JANNA BULLOCK
 2       A.   Yes.
 3       Q.   When you received that
 4  plumbing bill, any -- a plumbing bill
 5  for the house at 210 Meadow Lane, what
 6  do you do with that bill?
 7       A.   I don't know.
 8       Q.   Do you give it to somebody?
 9       A.   I don't know.
10       Q.   I need to understand how you
11  couldn't know you what do with bills
12  you received.
13       A.   I probably don't know what I
14  do.
15            THE WITNESS:  I will take a
16  break.
17            I don't know what I would do.
18            MS. DONOVAN:  Off the record
19  for a moment.
20            THE VIDEOGRAPHER:  The time
21  is approximately 2:59 p.m., and
22  we're going off the record.
23            (Whereupon, a break was taken
24  at this time.)
25            THE VIDEOGRAPHER:  The time
```

Page 163

```
 1              JANNA BULLOCK
 2  is approximately 3:15 p.m.
 3            This is the start of Media
 4  Unit Number 4, and we are back on
 5  the record.
 6       Q.   Ms. Bullock, do you own any
 7  vehicles?
 8       A.   I do.
 9       Q.   And what are those vehicles?
10       A.   I own old Aston Martin.
11       Q.   An old Aston Martin?
12       A.   (Nonverbal gesture).
13       Q.   Did you purchase the Aston
14  Martin?
15       A.   No.  My ex-husband gave it to
16  me as a present.
17       Q.   Roughly when was this?
18       A.   When my daughter was born.
19       Q.   So that was?
20       A.   1996.
21       Q.   Any other cars?
22       A.   None that I own.
23       Q.   Do you use any other cars?
24       A.   I use a Suburban sometimes.
25       Q.   How did you obtain the
```

Page 164

```
 1              JANNA BULLOCK
 2  Suburban?
 3       A.   I don't remember.
 4       Q.   When did you obtain the
 5  Suburban?
 6       A.   It was a long time ago.
 7       Q.   What's a long time ago?
 8       A.   I don't know.  It's pretty
 9  old.
10       Q.   Roughly?
11       A.   I -- I trade in the car I had
12  before for Suburban.
13       Q.   So other than a Suburban,
14  Aston Martin, you have no other cars.
15       A.   I don't.  I don't.
16       Q.   Where do you keep the Aston
17  Martin?
18       A.   At home.  I keep it in
19  garage.
20       Q.   In the City?
21       A.   No.
22       Q.   Where?
23       A.   In the country.
24       Q.   Where?
25       A.   At 2170 Meadow Lane.
```

Page 165

```
 1              JANNA BULLOCK
 2       Q.   How large is the garage
 3  there?
 4       A.   It has two cars.
 5       Q.   So the Aston Martin is in
 6  there, and is any other car kept in the
 7  garage?
 8       A.   My daughter's car is in
 9  there.
10       Q.   How old is your daughter?
11       A.   Twenty-one.
12       Q.   Did you buy her her car?
13       A.   I didn't buy it.
14       Q.   Who did?
15       A.   The trust bought it.
16       Q.   What trust?
17       A.   I don't remember.
18       Q.   Is it the Azur Trust?
19       A.   I don't remember.
20       Q.   Is it the Purple Trust?
21       A.   I don't remember.
22       Q.   Is it the Golden Venture
23  Trust?
24       A.   I don't remember.
25       Q.   Are there any other trust
```

Janna Bullock – February 6, 2018

43 (Pages 166 to 169)

Page 166

```
 1              JANNA BULLOCK
 2  that you're aware of?
 3       A.   I don't remember.
 4       Q.   So there could be more than
 5  those three trust?
 6       A.   I don't know.
 7       Q.   The apartment in New York,
 8  your primary residence, is that held by
 9  one of the three trust I just
10  mentioned?
11       A.   I don't know.
12       Q.   To refresh, that's the Purple
13  Trust, the Azur Trust or the Golden
14  Venture Trust?
15       A.   (Nonverbal gesture).
16       Q.   And you don't know if any of
17  those three own the apartment where you
18  live?
19       A.   I don't know.
20       Q.   Where do you keep the
21  Suburban?
22       A.   In the garage.
23       Q.   With the Aston Martin?
24       A.   No.  My daughter uses it.
25       Q.   What's your daughter's car?
```

Page 167

```
 1              JANNA BULLOCK
 2       A.   She uses Suburban.
 3       Q.   Does she have another car?
 4       A.   I don't know.  I don't know.
 5       Q.   So does she live with you
 6  when she is not in school?
 7       A.   I have another daughter.
 8       Q.   So what is your 21-year old
 9  daughter's name?
10       A.   Twenty-nine year old.
11       Q.   Excuse me, did you say you
12  had a 21-year old daughter?
13       A.   Yes.
14       Q.   What's her name?
15       A.   ███████
16       Q.   Does ███████ go to college?
17       A.   She does.
18       Q.   When she's not at college,
19  does she live with you?
20       A.   Yes.
21       Q.   And does she live with you in
22  Manhattan and in Southampton?
23       A.   She lives with me in
24  Manhattan.
25       Q.   Does she go to Southampton as
```

Page 168

```
 1              JANNA BULLOCK
 2  well?
 3       A.   She does.
 4       Q.   Does ███████ own a car?
 5       A.   She does.
 6       Q.   What type of car is that?
 7       A.   It's a Porsche Macan.
 8       Q.   And then, does she own any
 9  other car besides the Porsche?
10       A.   She doesn't own this car.
11  She uses it.
12       Q.   So me question is, does
13  ███████ own any car?
14       A.   Not that I know of.
15       Q.   Does ███ work?
16       A.   She's a student.
17       Q.   So does she make income?
18       A.   I don't know.
19       Q.   As her mother, are you aware
20  of any income that she has?
21       A.   I don't know.
22       Q.   So no?
23       A.   I don't know.
24       Q.   You said you had another
25  daughter.
```

Page 169

```
 1              JANNA BULLOCK
 2       What's her name?
 3       A.   ███████
 4       Q.   And how old is ███████
 5       A.   Twenty-nine.
 6       Q.   Does ███ own any car?
 7       A.   No.
 8       Q.   Does ███████ use any cars?
 9       A.   Yes.
10       Q.   What are those?
11       A.   She uses Suburban and
12  Porsche.
13       Q.   How was the Porsche obtained?
14       MR. CUCCARO:  Objection to
15  form.
16       A.   I don't know.
17       Q.   When did you obtain the
18  Porsche?
19       MR. CUCCARO:  Objection to
20  form.
21       A.   I did not obtain Porsche.
22       Q.   Who obtained the Porsche?
23       A.   The trust.
24       Q.   When was the Porsche obtained
25  by the trust?
```

Janna Bullock - February 6, 2018

44 (Pages 170 to 173)

Page 170

                    JANNA BULLOCK
1
2       A.    I don't know.
3       Q.    What trust?
4       A.    I don't know.
5       Q.    If you wanted to get
6  information about the trust that
7  obtained the Porsche, how would you do
8  so?
9       A.    I don't know.
10      Q.    So if you have any questions
11 about any of the trust, what would you
12 do?
13      A.    I don't want to know anything
14 about the trust.
15      Q.    So do you think you have any
16 obligations under any laws to know what
17 occurs with some of your trusts?
18           MR. CUCCARO:  Objection to
19      form.
20      A.    I don't want to know.
21      Q.    I understand you don't want
22 to know, but have you had occasion
23 where you needed to find information
24 out anything held in any trust?
25      A.    I don't know.

Page 171

                    JANNA BULLOCK
1
2       Q.    Have you ever reached back
3  out to Samuel Pisar to ask him any
4  question about any trust?
5       A.    No.
6       Q.    Have you ever reached back
7  out to Mr. Papas to ask him any
8  question about any trust?
9       A.    No.
10      Q.    Do you pay for any parking in
11 the City for any vehicle?
12      A.    No.
13      Q.    What about your 21-year old
14 daughter's tuition.
15           Do you pay for that?
16      A.    No.
17      Q.    Who does?
18      A.    I don't know.
19      Q.    Did she go to private school
20 when she was -- prior to college?
21      A.    Yes.
22      Q.    So she was under 18 at that
23 time?
24      A.    Yes.
25      Q.    You're her guardian?

Page 172

                    JANNA BULLOCK
1
2       A.    Yes.
3       Q.    How'd you pay for her private
4  school?
5       A.    The trust paid.
6       Q.    What trust?
7       A.    I don't know.
8       Q.    Do you employ any domestic
9  servants in your house in New York?
10      A.    No.
11      Q.    In your house in Southampton?
12      A.    No.
13      Q.    You have no housekeeper?
14      A.    No.
15      Q.    No cook?
16      A.    No.  My daughter is a cook.
17 My mother helps me clean.
18      Q.    Okay.  Ms. Bullock, could you
19 estimate for me your monthly expenses?
20      A.    I don't know.
21      Q.    Estimate please.
22      A.    I can't.
23      Q.    So break it down.
24           How much do you think you
25 spend on clothing?

Page 173

                    JANNA BULLOCK
1
2       A.    I don't know.
3       Q.    Give me a ballpark.
4       A.    I don't know.
5       Q.    More than $5,000 in a month?
6       A.    I don't know.
7       Q.    If you looked back at your
8  purchases last month on clothing, could
9  you give me a sense of what those would
10 entail?
11      A.    No.
12      Q.    What about jewelry?
13      A.    No.
14      Q.    Have you purchased any
15 jewelry in the past year?
16      A.    No.
17      Q.    Ms. Bullock, does anybody owe
18 you money?
19      A.    I don't know.
20      Q.    Has anybody owed you money
21 since August 2012?
22      A.    I don't know.
23      Q.    Do you receive any payments
24 on any routine basis, for example,
25 rent?

Janna Bullock - February 6, 2018

45  (Pages 174 to 177)

Page 174

JANNA BULLOCK
```
 1                JANNA BULLOCK
 2        A.    No.
 3        Q.    Have you at any point since
 4   August 2012?
 5        A.    No.
 6        Q.    What about payments under a
 7   lease.
 8               Have you received any since
 9   2012?
10        A.    No.
11        Q.    You have no investments; is
12   that correct?
13        A.    Yes.
14        Q.    Do you maintain any 401(k)s?
15        A.    No.
16        Q.    Roth IRA?
17        A.    No.
18        Q.    Mutual funds?
19        A.    No.
20        Q.    Have you at any point since
21   August 2012?
22        A.    Never.
23        Q.    What about publicly traded
24   stock.
25               Do you own any?
```

Page 175

JANNA BULLOCK
```
 1                JANNA BULLOCK
 2        A.    No.
 3        Q.    Have you at any point since
 4   August 2012?
 5        A.    No.
 6        Q.    Do you understand what I mean
 7   by a publicly traded stock?
 8        A.    Yes.
 9        Q.    What about any not publicly
10   traded stock.
11               Do you own any?
12        A.    No.
13        Q.    Have you since August 2012?
14        A.    No.
15        Q.    What about government bonds.
16               Down own any?
17        A.    No.
18        Q.    Have you since August 2012?
19        A.    No.
20        Q.    Okay.  Corporate bonds.
21               Have you owned any since
22   August 2012?
23        A.    No.
24        Q.    Do you own any currently?
25        A.    No.
```

Page 176

JANNA BULLOCK
```
 1                JANNA BULLOCK
 2        Q.    Ms. Bullock, does your mother
 3   maintain investment accounts?
 4        A.    I don't know.
 5        Q.    Does your daughter ████
 6   maintain investment accounts?
 7        A.    I don't know.
 8        Q.    Does your daughter ████
 9   maintain investment accounts?
10        A.    I don't know.
11        Q.    You said you borrow money
12   from your mother and from your
13   daughter.
14               Was it ████
15        A.    Yes.
16        Q.    When you borrow money from
17   your mother, do you pay it back?
18        A.    No.
19        Q.    How much money do you take
20   from your mother in a given year?
21        A.    I don't know.
22        Q.    Give me a sense.
23        A.    I don't know.
24        Q.    More than 50,000?
25        A.    No.
```

Page 177

JANNA BULLOCK
```
 1                JANNA BULLOCK
 2        Q.    So it's less than $50,000 a
 3   year?
 4        A.    Yes.
 5        Q.    Does that fund your
 6   lifestyle?
 7        A.    I don't know.
 8        Q.    Does the money you get from
 9   your mom cover all the expenses
10   associated with your life?
11        A.    I don't know.
12        Q.    So it's under 50,000 that you
13   borrow from your mom or you get from
14   your mother.
15               Is it all in cash?
16        A.    No.
17        Q.    What other forms does it
18   take?
19        A.    I don't know.
20        Q.    What --
21        A.    I don't know.
22        Q.    So you go to your mother, you
23   say you're going out to dinner, you
24   need cash, and she will what?
25               How does she provide it to
```

Janna Bullock — February 6, 2018

46 (Pages 178 to 181)

Page 178

```
1                 JANNA BULLOCK
2  you?
3        A.    Usually people pay for my
4  dinner.
5        Q.    Okay.  Are there instances
6  where you pay for your own?
7        A.    I don't eat much and I use
8  Subway.
9        Q.    Do you ever treat people to
10 dinner, host them?
11       A.    When my daughter cooks.
12       Q.    You never pick up a bill at a
13 restaurant?
14       A.    I don't know.
15       Q.    I'm asking, do you?
16       A.    I don't remember.
17       Q.    You don't remember the last
18 time you picked up a bill at a
19 restaurant?
20       A.    I don't remember.
21       Q.    How many times a week do you
22 get money from your mother?
23       A.    I don't know.
24       Q.    Estimate.
25       A.    Once a month.  Twice a month.
```

Page 179

```
1                 JANNA BULLOCK
2        Q.    And does she give you cash?
3        A.    Yes.
4        Q.    Does she give you anything
5  other than cash?
6        A.    No.
7        Q.    And your daughter, ████
8        A.    Yes.
9        Q.    How often do you take money
10 from her?
11       A.    I don't know.
12       Q.    Ms. Bullock, why don't you
13 open a bank account?
14       A.    Because after I was trashed
15 by Russians and my name was like put in
16 the mud, and there is not one thing
17 that opens a bank account for me.
18             (Reporter clarification.)
19       A.    There's no bank that opens a
20 bank account for me.
21       Q.    Are you aware if you're a
22 specially designated person?
23       A.    What is this?
24       Q.    It's a term.
25       A.    I don't know what this is.
```

Page 180

```
1                 JANNA BULLOCK
2        Q.    Have you ever -- and put
3  aside legal counsel -- do you believe
4  or have you been told by a bank that
5  you present a money laundering risk?
6        A.    No.  I've never been told
7  that.
8        Q.    So what's the basis for your
9  belief that a bank won't open an
10 account for you?
11       A.    I received a letter saying
12 that -- from the bank saying -- that's
13 what letter said -- from time to time,
14 we review our client list, and we find
15 it inconvenient to provide you with the
16 banking services.  Something like that.
17       Q.    What bank provided you that
18 letter?
19       A.    Citibank.
20       Q.    And this is back in 1991?
21       A.    No.
22       Q.    When was this?
23       A.    Probably 2012, 2011.  I don't
24 remember exactly.
25       Q.    So you had a Citibank until
```

Page 181

```
1                 JANNA BULLOCK
2  2011, 2012?
3        A.    Yes.  Something like that.
4        Q.    At any point since
5  August 2012, have you owned any other
6  property in Manhattan?
7        A.    No.
8        Q.    What about property that you
9  were renovating or restoring?
10       A.    I never owned them.
11       Q.    So who owned them?
12       A.    They were in a trust.
13       Q.    Are you using the word trust
14 generally to mean something that isn't
15 you personally?
16             MR. CUCCARO:  Objection to
17 form.
18       Q.    What do you mean a trust?
19 What do you understand a
20 trust to be?
21       A.    A trust, it's a -- I never
22 personally owned the property and it
23 was -- the one that was acquired was
24 put in a trust.
25       Q.    So do you also understand
```

Page 182

```
                JANNA BULLOCK
1
2    that there are entities or LLCs, often,
3    that could own property?
4         A.    That's true.  I do understand
5    that.
6         Q.    And do you have control of
7    any entities that own real estate in
8    Manhattan?
9         A.    No.
10        Q.    Have you ever since
11   August 2012 controlled entities that
12   have real property in Manhattan?
13        A.    No.
14        Q.    What about anywhere else in
15   the United States?
16        A.    No.
17        Q.    Anywhere in France?
18        A.    No.  Personally, I never
19   owned anything.
20        Q.    I'm going to provide you what
21   we'll mark as Exhibit 12, please.
22             (Whereupon, a February 28,
23        2011 e-mail was marked as Bullock
24        Exhibit 12 for Identification.)
25        Q.    So now providing you what's
```

Page 183

```
                JANNA BULLOCK
1
2    been marked as Exhibit 12.
3             Please take a minute to
4    review Exhibit 12.
5         A.    Okay.
6         Q.    Are you familiar with the
7    exhibit marked Exhibit 12?
8         A.    No.
9         Q.    Okay.
10             MS. DONOVAN:  For the record,
11        it's a February 28, 2011, e-mail
12        from Randall Brockett to Janna
13        Bullock, entitled current
14        payables.
15        Q.    Now, Ms. Bullock, Randall
16   says, "Attached are the current
17   payables."
18             What did you understand him
19   to mean by payables?
20        A.    These are bills that are
21   supposed to be paid.
22        Q.    And so you testified that
23   Randall Brockett was your assistant,
24   correct?
25        A.    Yes.
```

Page 184

```
                JANNA BULLOCK
1
2         Q.    Do you know what his process
3    was for retaining bills and compiling
4    this payables spreadsheet?
5         A.    He would collect the bills.
6         Q.    How'd he get the bills?
7         A.    How does he get the bills?
8         Q.    Yeah.  Or how did he get the
9    bills?
10        A.    I guess he would collect
11   them.
12        Q.    From who?
13        A.    From the address they were
14   sent.
15        Q.    He references speaking with
16   Richard Moon who is pretty upset.
17             Who is Richard Moon?
18        A.    He was a project manager.
19        Q.    For what property?
20        A.    Fourteen East 82nd.
21        Q.    Why was he upset?
22        A.    Or 412 East 82nd.  Because
23   there was no money to do the work.
24        Q.    So you owed him that money?
25        A.    I don't remember.
```

Page 185

```
                JANNA BULLOCK
1
2         Q.    At this point in time in
3    February 2011, you were still operating
4    a real estate development business or a
5    renovations business, correct?
6         A.    I was probably trying.
7         Q.    So tell me the process by
8    which you would pay a project manager.
9         A.    I don't remember.
10        Q.    So Richard Moon, he says,
11   here's a bill for last month's work.
12   It's $280,000.
13             Does he provide that bill to
14   you?
15        A.    Most likely he provide it to
16   Randall.  Otherwise, he would have
17   mentioned it to me.
18        Q.    Okay.  Let's go to the
19   attachment.
20        A.    Mm hm.
21        Q.    So about five lines down,
22   there's a New York City Department of
23   Finance taxes in the amount of
24   $43,728.20 in connection with the
25   property
```

Janna Bullock – February 6, 2018

48 (Pages 186 to 189)

Page 186

```
 1              JANNA BULLOCK
 2        That's your home, correct?
 3     A.   Yes.
 4     Q.   Did you pay that tax bill?
 5     A.   It was paid by the trust.
 6     Q.   Again, what trust?
 7     A.   I don't remember.
 8     Q.   So Randall sends this to you,
 9  not the trustee, correct?
10     A.   I don't know.  Maybe he sends
11  it to me to be sent to the trustee.
12     Q.   So he says in the first page,
13  "I know most of it has to wait, but let
14  me know which you want to pay, and I'll
15  send to Stuart."
16        He's asking you for payment
17  instructions, correct?
18     A.   I don't know what he's
19  asking.
20     Q.   Well, you received this
21  e-mail, correct?
22     A.   Yes.
23     Q.   And you understood he's
24  saying, let me know what you want to
25  pay, correct?
```

Page 187

```
 1              JANNA BULLOCK
 2     A.   I don't know.  The trustee
 3  was paying the bills.
 4     Q.   Did you communicate to the
 5  trustee which to pay?
 6     A.   I think that he communicated
 7  to the trustee, yeah.
 8     Q.   How would he communicate with
 9  the trustee?
10     A.   I don't know.
11     Q.   Did you ever ask him?
12     A.   I haven't.  I don't remember.
13     Q.   Are you aware of the
14  trustee -- of a trustee in connection
15  with any of the trusts that you've
16  established.
17     A.   I didn't understand the
18  question.
19     Q.   Do you know the identity of a
20  single trustee overseeing any of the
21  trusts you've established?
22     A.   Stuart Smith.
23     Q.   Was a trustee?
24     A.   Was a trustee.
25     Q.   Of which trust?
```

Page 188

```
 1              JANNA BULLOCK
 2     A.   I don't remember.
 3     Q.   For what period of time was
 4  he a trustee?
 5     A.   I don't remember.
 6     Q.   Anybody else who was a
 7  trustee?
 8     A.   Papas was a trustee before.
 9     Q.   Before Stuart?
10     A.   Mm hm.
11     Q.   For what period of time?
12     A.   I don't remember.
13     Q.   Anybody else?
14     A.   Yes, Stuart Sundlun.
15     Q.   And who is Stuart Sundlun?
16     A.   He's a friend.
17     Q.   And he's the trustee of what
18  trust?
19     A.   I don't remember.  The one
20  that I mentioned.  For the trust of the
21  kids.
22     Q.   What's your understanding of
23  your children's ability to receive the
24  benefits of the trust?
25     A.   I don't remember.
```

Page 189

```
 1              JANNA BULLOCK
 2     Q.   Do your children receive any
 3  income from any trust currently?
 4     A.   I don't know.
 5     Q.   Does the trust hold any -- do
 6  the trust hold any investment that pays
 7  them investment income?
 8     A.   I don't know.
 9     Q.   So you said the purpose of
10  the trust was to settle up for your
11  children, correct?
12     A.   Yes.
13     Q.   And what did you intend to do
14  by that?
15     A.   That they will be taken care
16  of.
17     Q.   Do your children have access
18  to the assets currently?
19     A.   I don't know.
20     Q.   So if your 21-year old
21  daughter wanted to draw from one of the
22  trusts, you don't know if she can or
23  not?
24     A.   I don't know.
25     Q.   Has she ever tried to?
```

Page 190

```
 1              JANNA BULLOCK
 2       A.   I don't know.
 3       Q.   Is she aware of the formation
 4  of the trust?
 5       A.   I don't know.
 6       Q.   Did you tell your children
 7  that they have available to them trust?
 8       A.   I didn't tell them anything.
 9       Q.   So were they aware of the
10  trust in their ostensible benefit?
11            MR. CUCCARO:  Objection to
12       form.
13       A.   I don't know.
14       Q.   Have you personally ever told
15  your daughter ███████ that you've
16  created trust for her benefit?
17            MR. CUCCARO:  Objection to
18       form.
19            MS. DONOVAN:  You can answer.
20       A.   Yes.
21       Q.   Okay.  What did you tell her
22  about those trust?
23       A.   Nothing else.
24       Q.   What did you tell her?
25       A.   That there was a trust
```

Page 191

```
 1              JANNA BULLOCK
 2  established for they benefit.
 3       Q.   How old was she when you told
 4  her this?
 5       A.   I don't remember.
 6       Q.   Roughly, how long ago was
 7  this?
 8       A.   I don't remember.
 9       Q.   Roughly?
10       A.   I don't know.
11       Q.   Okay.  Was it 12 years ago?
12       A.   I don't know.
13       Q.   Was it 15?
14       A.   I don't know.
15       Q.   Was she a child when you told
16  her?
17       A.   I don't remember.
18       Q.   Was she old enough to
19  appreciate what you were telling her?
20       A.   I don't remember.
21       Q.   And then your daughter ███████
22  did you ever tell her about any of
23  these trust?
24       A.   Yes.
25       Q.   What did you tell her about
```

Page 192

```
 1              JANNA BULLOCK
 2  these trust?
 3       A.   I don't remember.
 4       Q.   When did you tell her about
 5  these trust?
 6       A.   I don't remember.
 7       Q.   Have you had other
 8  conversations with her about these
 9  trust?
10       A.   I don't remember.
11       Q.   Do you have a will?
12       A.   No.
13       Q.   Do you have any other estate
14  plans?
15       A.   No.
16       Q.   All right.  Looks like there
17  is halfway down the page, an entry for
18  164 Cook Street.  The vendor is 900
19  Grand Street Milk LLC.  The purpose is
20  rent in the amount, $11,997.49.
21            What's that payable?
22       A.   That's a rent for the
23  storage.
24       Q.   For the storage of what?
25       A.   I've done a lot of show
```

Page 193

```
 1              JANNA BULLOCK
 2  houses.  So there was -- there is lot
 3  of furniture accumulated from the show
 4  houses.
 5       Q.   Do you know if that's an
 6  annual charge or is that monthly or
 7  what frequency?
 8       A.   It's probably annual.
 9       Q.   Do you know if that $11,990
10  was paid?
11       A.   I don't know.
12       Q.   Look like there's a common
13  charge in connection with the Plaza
14  Condo 615.  The vendor is listed Cooper
15  Square Realty Inc., in the amount -- or
16  common charges in the amount of
17  $14,675.
18       A.   Right.
19       Q.   Was that paid?
20       A.   I don't know.
21       Q.   What's the Plaza Condo 615?
22       A.   That's a property.
23       Q.   Where?
24       A.   It says Plaza Condo.
25       Q.   So is it in the Plaza?
```

Janna Bullock - February 6, 2018

Page 194

```
1                JANNA BULLOCK
2       A.    I don't know.
3       Q.    You received this spreadsheet
4  from Randall Brockett, correct?
5       A.    Yes.  I received a lot of
6  stuff from Randall Brockett.
7       Q.    And he was asking you to let
8  him know which you wanted to pay.
9             Did you review this
10 spreadsheet?
11      A.    I don't remember.
12      Q.    Was it your practice to
13 review spreadsheets sent to you asking
14 for your confirmation of payment?
15      A.    I don't remember.
16      Q.    Going further down, you'll
17 see the house at 210 Meadow Lane.  The
18 village taxes are listed as $31,164.60.
19            Were those paid?
20      A.    I don't know.
21      Q.    And you understood that
22 Randall was reaching out to you, not a
23 trust, about the payment of those
24 taxes?
25      A.    I assume.  It says that he
```

Page 196

```
1                JANNA BULLOCK
2  a whole slew of entries in connection
3  with a project at 54 East 64 Street
4  LLC.
5             What's the 54 East 64th
6  Street LLC?
7       A.    It's a building.
8       Q.    Okay.  Is it the building or
9  is it the entity?
10      A.    Both.
11      Q.    Okay.  Did you own the
12 building at 54 East 64th Street at any
13 point in time?
14      A.    The trust owned it.
15      Q.    What trust?
16      A.    One of the trusts that was
17 set up for the benefit of my children.
18      Q.    Did the LLC own the building
19 at 54 East 64th Street?
20      A.    I don't know.
21      Q.    All right.  So it's saying
22 the property tax on the property at 12
23 East 82nd Street were due in the amount
24 of $43,840.
25            Were those paid?
```

Page 195

```
1                JANNA BULLOCK
2  was reaching out to the trust as
3  well -- to the trustee as well.
4       Q.    You say you assumed he's
5  reaching out?
6       A.    That's my second language.
7  English is my second language.
8       Q.    I'm not trying to parse the
9  language.  I just need to be clear
10 about what you mean.
11            Do you have a reason to
12 believe he was sending this to the
13 trustee, a trustee as well?
14      A.    Yes.
15      Q.    And what is that reason?
16      A.    I don't know.
17      Q.    Looks like town taxes on the
18 property at 210 Meadow Lane are in the
19 amount of $48,658.74.
20            Did you pay those?
21      A.    I don't know.
22      Q.    Again, did you forward them
23 to a trustee for payment?
24      A.    I don't know.
25      Q.    All right.  Next, you'll see
```

Page 197

```
1                JANNA BULLOCK
2       A.    I don't know.
3       Q.    So if you want to pay these,
4  do you go to your mother?
5       A.    These are trust properties
6  and it goes to the trustee.
7       Q.    Any document that you could
8  point me towards that shows something
9  like this going to the trustee?
10            MR. CUCCARO:  Objection to
11 form.
12      A.    That's what the -- that's
13 what the e-mail says.  I'll send to
14 Stuart.
15      Q.    Okay.  And Stuart was acting
16 then as the trustee?
17      A.    Stuart was a trustee.
18      Q.    And if I wanted to get more
19 information about Stuart's role as a
20 trustee, what documents do you have in
21 your possession that can tell me about
22 Stuart's role as a trustee?
23      A.    I don't know.  He was a
24 trustee.
25      Q.    You understand there would be
```

Page 198

                    JANNA BULLOCK
1
2    records made in connection with his
3    serving as a trustee?
4         A.    I'm very bad with records.   I
5    don't keep records.
6         Q.    Okay.   And who would keep
7    records about who was serving as
8    trustees?
9              MR. CUCCARO:   Objection.
10        A.    Stuart.   Stuart would have
11   those records.
12        Q.    So name --
13        A.    An attorney who set up the
14   trust would have record.
15        Q.    Okay.   Any people that you
16   pay or work with -- strike that.
17             Can you list for me the
18   people who have, since August 2012,
19   maintained records for you?
20        A.    Stuart Smith maintained
21   records.
22        Q.    Yup.   Who else?
23        A.    I don't know.   The records
24   were in e-mail.
25        Q.    Whose e-mail?

Page 199

                    JANNA BULLOCK
1
2         A.    My e-mail.
3         Q.    Okay.   What records are you
4    thinking of?
5         A.    I'm not think of anything.
6    But if there are records, they should
7    be in the e-mail.
8         Q.    Records concerning the
9    trustees?
10        A.    The lawyers would have
11   records.
12        Q.    So in response to Randall's
13   e-mail to let me know which you want to
14   pay, did you do anything?
15        A.    I don't remember.
16        Q.    Did you let him know any of
17   these that he should pay?
18        A.    I don't remember.   It was
19   really long time ago.
20        Q.    Okay.   Did you receive these
21   from Randall on any other occasions?
22        A.    I don't remember.
23        Q.    And did you have any practice
24   in receiving these documents and
25   instructing him what to pay?

Page 200

                    JANNA BULLOCK
1
2         A.    I don't remember.
3         Q.    On the second page, there's
4    an Eastern Savings Bank, a mortgage for
5    $30,259.   That's being listed in
6    connection with a property at 34 East
7    62nd Street.
8         A.    Right.
9         Q.    What property is that?
10        A.    It was a property that I was
11   trying to develop.
12        Q.    Okay.   You were trying to
13   develop it, and then did you sell it?
14        A.    The trust sold it.
15        Q.    Now, bottom of the page.
16   2170 Meadow Lane.   It looks like you
17   have half of the taxes for 2010, 2011
18   due in the amount of $31,012.
19             Do you know if these were
20   paid?
21        A.    I don't know.
22        Q.    And do you know how they were
23   paid?
24        A.    The trustee paid it.
25        Q.    So did Stuart Smith -- it

Page 201

                    JANNA BULLOCK
1
2    looks like these all sum to a total of
3    $2,578,058, these different payables.
4             Did Stuart Smith have access
5    to over two and a half million dollars
6    with which to pay all the amounts owed
7    by you?
8         A.    I don't know.
9              MS. DONOVAN:   Okay.   So we'll
10   call this Exhibit 13, please.
11             (Whereupon, an e-mail
12   correspondence was marked as
13   Defendant's Exhibit 13 for
14   Identification.)
15        Q.    Please take a look at Exhibit
16   13.
17             Do you recognize Exhibit 13?
18        A.    No.
19        Q.    Okay.
20             MS. DONOVAN:   For the record,
21   it's an e-mail from Randall
22   Brockett to Janna Bullock on
23   June 29, 2013, entitled, May, June
24   payables, attaching a list of
25   payables at Page 2, the list of

Janna Bullock - February 6, 2018

52 (Pages 202 to 205)

Page 202

JANNA BULLOCK

1
2  payables.
3      Q.   It's disclosing a property
4  tax of $92,521 in connection with the
5  penthouse apartment where you live
6  currently.
7          Do you see where I'm looking?
8      A.   Yes.
9      Q.   Do you know if that amount
10  was paid?
11     A.   I don't know.
12     Q.   Now, he doesn't indicate in
13  this e-mail that he's sending the same
14  spreadsheet to Stuart.
15          Do you have an understanding
16  of why he sent this to you personally?
17     A.   I don't know.
18     Q.   Did you typically review your
19  expenses on a monthly or bimonthly
20  basis?
21     A.   These are not my expenses.
22     Q.   Whose expenses are they?
23     A.   These are trust expenses.
24     Q.   Okay.  Now, in the body of
25  the e-mail it says, "Here are the

Page 203

JANNA BULLOCK

1
2  payables I have to date, not including
3  the Barneys or CeCe expenses."
4          What did you understand him
5  to mean which the Barney's expenses?
6      A.   Somebody shopped in Barney's.
7      Q.   And it's your view that those
8  are also expenses of the trust?
9      A.   I don't know.
10     Q.   Do you shop at Barney's
11  Ms. Bullock?
12     A.   Not recently.
13     Q.   Ms. Bullock, at any time
14  since August 2012, have you shopped at
15  Barney's?
16          This isn't a hard question,
17  and we've remained under oath as we
18  have since the beginning.
19     A.   Probably.
20     Q.   Probably?  You have no
21  definitive memory of walking through
22  the doors of Barney's and buying
23  anything?
24     A.   I might.
25     Q.   What's CeCe's?

Page 204

JANNA BULLOCK

1
2      A.   It was a nanny.
3      Q.   A nanny for who?
4      A.   For my grandchildren.
5      Q.   Okay.  So do you pay her
6  expenses?
7      A.   The trust pays her expenses.
8      Q.   And typically, what are her
9  expenses annually?
10     A.   I don't know.
11     Q.   Ms. Bullock, this also
12  discloses village taxes for the
13  property at 2170 Meadow Lane in the
14  amount of $33,903.
15          During this point, you were
16  acting as the manager for this
17  property; is that correct?
18     A.   Yes.
19     Q.   Okay.  And one of your
20  responsibilities then was the
21  responsibility for the payment of
22  taxes?
23     A.   I never pay taxes for 2170.
24  That was responsibility for the
25  trustee.  My responsibility would be to

Page 205

JANNA BULLOCK

1
2  make sure that the house is in working
3  order.
4      Q.   Did you ever speak with a
5  trustee about the property at 2170
6  Meadow Lane?
7      A.   I don't recall.
8      Q.   How did you learn what your
9  responsibilities were supposed to have
10  been then as the house manager?
11     A.   The responsibility is
12  obviously the house has to function.
13     Q.   So who let you know you could
14  stay there?
15          If you don't own the place,
16  why are you staying there?
17     A.   I stayed there with my
18  children.
19     Q.   Yeah.  But what's the basis?
20  I don't own that house.
21          Could I stay there?
22     A.   I don't know.
23     Q.   You appreciate something
24  needs to allow you to know that you can
25  stay in a place.

Janna Bullock - February 6, 2018

53 (Pages 206 to 209)

Page 206

JANNA BULLOCK

1
2        What allowed you to know that
3  you could stay in 2170?
4        MR. CUCCARO:  Objection to
5     form.
6        A.    It's a house for my children.
7  Maybe they want me there.  I take care
8  of grandchildren.
9        Q.    And remind me, when did the
10  trust acquire 2170 Meadow Lane?
11        A.    I don't remember the year.
12        Q.    Before the birth of your
13  children?
14        A.    After the births of my
15  children.
16        Q.    Ms. Bullock, do you own any
17  art?
18        A.    I -- trust owns some art.
19        Q.    You personally don't own any
20  art?
21        A.    Not anymore.
22        Q.    Since when?
23        A.    I don't know.
24        Q.    Roughly?
25        A.    I don't know.

Page 207

JANNA BULLOCK

1
2        Q.    I need an approximation.
3        A.    I don't know.
4        Q.    Was it in the last 10 years?
5        A.    Probably.
6        MS. DONOVAN:  All right.
7     I'll produce you with what's been
8     marked as Exhibit 14.  Excuse me.
9        (Whereupon, an article was
10     marked as Bullock Exhibit 14 for
11     Identification.)
12        Q.    If you can take a look at the
13  article that's been produced or that's
14  before you as Exhibit 14.
15        A.    Okay.
16        Q.    Ms. Bullock, the article
17  references your joining the board of
18  trustees at the Guggenheim?
19        A.    Mm hm.
20        Q.    Do you recall joining the
21  Guggenheim board?
22        A.    Yes.
23        Q.    It notes as well,
24  "Ms. Bullock is no slouch when it comes
25  to the world of art collection.  She

Page 208

JANNA BULLOCK

1
2  has assembled some 4,000 works by
3  Russian artists," according to a press
4  release about the appointment.
5        Did you assemble a collection
6  of 4,000 works by Russian artists?
7        A.    My husband had -- my
8  ex-husband owned an exceptional book
9  collection of rare books.  So I would
10  just suggest that this is just
11  misinterpretation of the extensive book
12  collection that he owns.  It was
13  probably in the amount of 4,000 books.
14        Q.    So you believe you were
15  appointed to the Guggenheim board, not
16  because you had a personal interest and
17  had personally put together a large art
18  collection, but because your husband --
19  ex-husband collected rare books?
20        MR. CUCCARO:  Objection to
21     form.
22        A.    We also had some art.
23        Q.    Okay.  How much art?
24        A.    It's hard to say now.
25        Q.    Any painters we would know?

Page 209

JANNA BULLOCK

1
2        Any artists we would know?
3        A.    I don't know.
4        Q.    When you say "We had some
5  art," are you referring to you and your
6  ex-husband?
7        A.    Yes.
8        Q.    Did you retain that art after
9  you and your ex-husband divorced?
10        A.    No.  That art was ceased
11  by -- most of it was ceased by Russian
12  authorities.
13        Q.    Okay.  So that was art kept
14  in Russia?
15        A.    That's where he lived.
16        Q.    Yup.  And then did you own
17  art that was kept elsewhere, outside
18  Russia?
19        A.    Yes.
20        Q.    Where did you keep art?
21        A.    In the house I live.
22        Q.    Okay.  Do you have art there
23  currently?
24        A.    Yes.
25        Q.    Okay.  Ms. Bullock, does any

Janna Bullock - February 6, 2018

54 (Pages 210 to 213)

Page 210

```
 1              JANNA BULLOCK
 2  of that art -- is any of that art
 3  valued in excess of 10,000 Euros?
 4       A.   Maybe.  I don't know.
 5       Q.   Okay.  And if we look at
 6  documents that show Picassos or
 7  Kandinskys, will that refresh your
 8  recollection whether you own any art
 9  valued in excess of 10,000 Euros?
10       A.   That art is not owned by me.
11       Q.   And again, for the sake of
12  clarity, who is it owned by?
13       A.   It's in a trust.
14       Q.   Okay.  What trust?
15       A.   It's children trust.
16       Q.   What is the Jaze Collection?
17       A.   That was the foundation, the
18  trust for the art.
19       Q.   And what did it do?
20       A.   It holds some art.  It hosted
21  a few exhibitions.  It supported young
22  artists.
23       Q.   What was your connection to
24  the Jaze Collection?
25       A.   I was a settlor of the trust.
```

Page 211

```
 1              JANNA BULLOCK
 2       Q.   But Jaze wasn't the trust,
 3  correct?
 4       A.   It was the trust.
 5       Q.   So Jaze is one of the trusts?
 6       A.   Yes.
 7       Q.   And Jaze holds some of the
 8  art that you're referencing?
 9       A.   Yes.
10       Q.   Are you familiar with the
11  company Southwark?  S-O-U-T-H-W-A-R-K.
12       A.   No.  I read it's one of the
13  defendants.
14       MS. DONOVAN:  Can we please
15       mark this as Exhibit 14?
16       MR. CUCCARO:  Is this 15?
17       MS. DONOVAN:  Excuse me, 15.
18       Thank you.
19       (Whereupon, an e-mail
20       correspondence was marked as
21       Bullock Exhibit 15 for
22       Identification.)
23       Q.   There's two pages.  It's an
24  e-mail correspondence from May 2006.
25       Could you please review
```

Page 212

```
 1              JANNA BULLOCK
 2  Exhibit Number 15, Ms. Bullock?
 3       A.   This is an incorrect -- this
 4  is an incorrect fact, because the trust
 5  was only set up with me being the
 6  beneficiary -- me being a settlor, and
 7  two of my children being the
 8  beneficiary.
 9       Q.   So Ms. Bullock, first, do you
10  recognize this document?
11       A.   I don't recognize it.  I just
12  looked at the facts.
13       Q.   Okay.  So it's an e-mail from
14  May 16, 2006, from CP Palema,
15  Papas@Palemanet.com, to a
16  JS200005@Yahoo.com?
17       A.   This is not my e-mail.
18       Q.   It's addressed to, dear
19  Janna?
20       A.   Mm hm.
21       Q.   Have you ever been used this
22  e-mail?
23       A.   No.
24       Q.   Have you ever used an e-mail
25  address that's associated with a
```

Page 213

```
 1              JANNA BULLOCK
 2  student named Jimmy Stewart or James
 3  Stewart?
 4       A.   Never.
 5       Q.   Do you know a James Stewart?
 6       A.   No.
 7       Q.   Ms. Bullock, if I presented
 8  you with more documents from him to you
 9  at this e-mail address, would that
10  refresh your recollection of any use of
11  that e-mail address?
12       A.   I believe that that's who
13  worked for me with this e-mail.  I
14  never ever used it.
15       Q.   Okay.  So who is that person?
16       A.   I never ever used this
17  e-mail.
18       Q.   Do you know how long or for
19  what reason the person who worked for
20  you is communicating on this e-mail
21  address?
22       A.   Probably to fool somebody
23  around to do something inappropriate.
24       Q.   So this reflects that you're
25  a settlor and a beneficiary on the
```

Janna Bullock - February 6, 2018

55 (Pages 214 to 217)

Page 214

JANNA BULLOCK

1
2 Purple Trust?
3     A.    I was never a beneficiary of
4 the trust, at any day or time I was the
5 beneficiary of the trust.
6     Q.    Ms. Bullock, were you in
7 e-mail correspondence with Mr. Papas
8 after the creation of the trust?
9     A.    I don't think so.
10    Q.    Did you ever have Mr. Papas
11 store art for you.
12    A.    No, not for me.  And to the
13 best of my knowledge, not for the
14 trust.
15    Q.    And did any artwork ever go
16 through Mr. Papas or his firm when
17 being shipped to you?
18    A.    I don't think so.
19    Q.    Ms. Bullock, who is Frédéric
20 Bouin?  B-O-U-I-N.
21    A.    He was an art dealer.
22    Q.    And what was your
23 relationship with Mr. Bouin?
24    A.    I knew him socially.
25    Q.    And you are aware that in

Page 215

JANNA BULLOCK

1
2 divorce proceedings between him and his
3 ex-wife, it was alleged that you
4 received art from Mr. Bouin?
5     A.    And we responded to that,
6 that I did never store any art or hide
7 any art for Mr. Bouin.
8     Q.    Ms. Bullock, are you familiar
9 with a company, a storage and shipping
10 company called Harsch Transports?  It's
11 in Geneva.
12    A.    It's a very big company.
13 It's a very big moving company.
14    Q.    Okay.  So it's a moving
15 company.
16          Have you done work with them
17 before?
18    A.    Not personally, but I know
19 about the company.
20    Q.    Okay.
21    MS. DONOVAN:  Can we please
22 mark this as Exhibit 16.
23          (Whereupon, composite
24 documents were marked as Bullock
25 Exhibit 16 for Identification.)

Page 216

JANNA BULLOCK

1
2     Q.    And Ms. Bullock, if you want
3 to flip through, I'll direct your
4 attention to particular pages here.
5     A.    Mm hm.
6     Q.    Do you recognize the
7 documents that are compiled as Exhibit
8 16?
9     A.    I don't think I've ever seen
10 it.
11    Q.    Okay.  So if you go five
12 pages in, Ms. Bullock, invoice ending
13 801X -- or maybe it might be easier to
14 identify it by little 81 up in the top
15 right.
16    A.    (Nonverbal gesture).
17    Q.    All right.  So this
18 reflects -- it's an invoice.  Appears
19 to be for two crates.  Goods type
20 described as Kandinsky and Marakami and
21 the shipper is the Jaze Foundation,
22 care of this moving company.  And
23 you're listed as the consignee.
24          Did you receive these crates
25 of Kandinsky and Marakami paintings?

Page 217

JANNA BULLOCK

1
2     A.    I don't know.
3     Q.    So look at the date.  Some
4 time around February 2008?
5     A.    Right.
6     Q.    Did you receive -- it looks
7 like it's going to you in New York at
8 East 67 Street, this artwork?
9     A.    Right.
10    Q.    Did you receive it?
11    A.    I don't remember.
12    Q.    Do you know what it means to
13 be the consignee?
14    A.    No.
15    Q.    Now, if you flip the page, do
16 you recognize this document?
17    A.    No.  I never been personally
18 involved in that.
19    Q.    What do you mean in that?
20    A.    In shipping of the art.
21    Q.    So this shipping invoice
22 reflects a shipment from Bouin in New
23 York to consignee J. Bullock in Geneva
24 and Courchevel?
25    A.    Right.

Janna Bullock - February 6, 2018

56 (Pages 218 to 221)

Page 218

```
1              JANNA BULLOCK
2      Q.    And it looks like it's
3  shipping two particular pieces of art;
4  am I correct?
5      A.    Mm hm.
6      Q.    Did you ever receive the
7  Kandinsky Leichter Block?
8      A.    They were ship to Courchevel.
9      Q.    Did you ever receive them in
10 Courchevel?
11     A.    I don't know.
12     Q.    And is Courchevel where your
13 French hotel properties are located?
14          MR. CUCCARO:  Objection to
15     form.
16     A.    There is where French hotels
17 are located.
18     Q.    And it's your testimony that
19 you're not beneficial owner of those
20 French hotels?
21     A.    No.
22     Q.    And those are Pralong in
23 Crystal?
24     A.    No.
25     Q.    Those are not?
```

Page 219

```
1              JANNA BULLOCK
2      A.    No.
3      Q.    What hotels are they?
4          MR. CUCCARO:  Objection to
5     form.
6      Q.    Ms. Bullock, when you're
7  referencing the French hotels, which
8  hotels are you referring to?
9      A.    Pralong and Crystal.
10     Q.    Okay.  All right.  And the
11 Esser Doubt Frankreich.
12     A.    Mm hm.
13     Q.    Did you receive that
14 property -- excuse me -- that work in
15 either Geneva or Courchevel?
16     A.    The hotel needs to be asked.
17     Q.    So you said we need to
18 consult the hotel to see if either of
19 those works were received.
20          And because your relationship
21 to the hotel is what?
22     A.    I don't have no relationship
23 with the hotels anymore.
24     Q.    Since when?
25     A.    Since Cyprus Case 1 was over.
```

Page 220

```
1              JANNA BULLOCK
2      Q.    And when was that?
3      A.    I don't remember.
4      Q.    Roughly?
5      A.    I don't remember.
6      Q.    When you refer to Cyprus Case
7  1, what are you referring to?
8      A.    That was another allegation
9  that I did something wrong in Cyprus.
10     Q.    Since August 2012, have you
11 had any interest in Hotel Pralong?
12     A.    I don't remember.
13     Q.    Since August 2012, have you
14 had any interest in the Hotel Crystal?
15     A.    I'm very bad with times, with
16 dates.  It's been really long time ago.
17 So I cannot.
18     Q.    But it seems that you don't,
19 from your testimony, personally own or
20 you've stated that you don't personally
21 own much.
22          So I'm asking you to
23 recollect the point in time where you
24 actually owned things.
25     A.    I never personally owned
```

Page 221

```
1              JANNA BULLOCK
2  those hotels.
3      Q.    Were you the beneficial owner
4  of those hotels?
5      A.    I don't think so.
6      Q.    Now, Ms. Bullock, if you
7  continue looking through this, you'll
8  see a whole host of art shipping to
9  you.  One -- this is the Page 109 in
10 the top right corner.  It reflects Egon
11 Schiele, four works, and two cases
12 going to consignee Janna Bullock at the
13 Chalet Santa Maria in Gstaad,
14 G-S-T-A-A-D.
15     A.    Mm hm.
16     Q.    Do you own property in
17 Gstaad?
18     A.    The trust owns property in
19 Gstaad.
20     Q.    And which trust owns property
21 in Gstaad?
22     A.    One of the trusts that was
23 mentioned before.
24     Q.    Did you have any documents in
25 your possession concerning the property
```

Page 222

1              JANNA BULLOCK
2  in Gstaad?
3      A.   No.
4      Q.   Now, here it appears, at the
5  Page 117 in the top right corner, that
6  some sculptures in bronze, care of the
7  Palema Trust or Palema administrator,
8  to the Purple Trust, are being shipped
9  to consignee, Monsieur Bouin in New
10  York.
11           What's your understanding of
12  why Mr. Bouin was receiving property of
13  the Purple Trust?
14      A.   I don't know.  This is the
15  first time I see this paper.
16           MS. DONOVAN:  A momentary
17  break.
18           THE VIDEOGRAPHER:  The time
19  is approximately 4:20 p.m.
20           Going off the record.
21           (Whereupon, a short break was
22  taken at this time.)
23           THE VIDEOGRAPHER:  The time
24  is 4:37 p.m., and we are back on
25  the record.

Page 223

1              JANNA BULLOCK
2           MS. DONOVAN:  Could we please
3  mark this as Exhibit 17, please.
4           (Whereupon, a verified
5  complaint was marked as Bullock
6  Exhibit 18 for Identification.)
7      Q.   Ms. Bullock, could you please
8  review Exhibit 17.
9      A.   Okay.
10      Q.   Ms. Bullock, do you recognize
11  the document marked as Exhibit 18?
12      A.   Yes.
13      Q.   And this is the verified
14  complaint, your verified complaint
15  against the architect, Giancarlo
16  Alhadeff?
17      A.   Mm hm.
18      Q.   Ms. Bullock, can you confirm
19  that that's your signature at Page 10?
20      A.   Yes.
21      Q.   In which you swear that
22  you've read the foregoing verified
23  complaint and know the contents thereof
24  to be true to the best of my knowledge
25  except as to matters stated therein to

Page 224

1              JANNA BULLOCK
2  the alleged upon information and
3  belief, and as to those, I believe them
4  to be true.
5      A.   Yes.
6           MS. DONOVAN:  At this point,
7  I'm going to suspend the
8  deposition.
9           We have real concerns about
10  the production from Ms. Bullock
11  and frankly, her veracity and
12  forthrightness in the proceeding.
13           Before I formally suspend, as
14  her counsel, do you have questions
15  for her?
16           MR. CUCCARO:  I do.  I have
17  about 10 to 15 minutes worth of
18  questions that I was going to ask
19  when you are done.
20           I understand from your
21  representation that you are done,
22  at least for today.
23           MS. DONOVAN:  And we'll be
24  moving to court.
25           MR. CUCCARO:  Okay.  I'd like

Page 225

1              JANNA BULLOCK
2  to just take a couple of minutes
3  before I do that.
4           But again, it should be about
5  10, 15 minutes.
6           THE VIDEOGRAPHER:  The time
7  is approximately 4:40 p.m., and we
8  are going off the record.
9           (Whereupon, a break was taken
10  at this time.)
11           THE VIDEOGRAPHER:  The time
12  is approximately 4:49 p.m., and
13  we're back on the record.
14  EXAMINATION BY
15  MR. CUCCARO:
16      Q.   Ms. Bullock, do you
17  understand that we're here today in
18  connection with an action in the
19  Southern District of New York for
20  discovery in aid of a foreign
21  proceeding in Cyprus?
22      A.   Yes.
23      Q.   I'd like to ask you a few
24  questions about the claims that have
25  been alleged against you in that

Janna Bullock - February 6, 2018

58 (Pages 226 to 229)

Page 226

```
1                JANNA BULLOCK
2   pending Cyprus litigation.
3          Gazprombank alleges that it
4   purchased bonds in 2005 and 2006 issued
5   by the Moscow Region Mortgage Agency
6   OAO.  And I refer to that as MOAO,
7   under that acronym, will you understand
8   what I'm referring to?
9      A.   Yes.
10     Q.   And the Moscow Region
11  Investment Mortgage Company, if I refer
12  to that as MOITK, will you understand
13  what that acronym refers to?
14     A.   Yes.
15     Q.   Prior to the commencement of
16  the Cyprus action, were you aware that
17  Gazprombank purchased bonds from MOAO
18  or MOITK?
19     A.   No.
20     Q.   Prior to the commencement of
21  the Cyprus action, were you aware that
22  MOAO or MOITK issued bonds?
23     A.   No.
24     Q.   Did you intend that
25  Gazprombank purchase bonds issued by
```

Page 227

```
1                JANNA BULLOCK
2   either MOAO or MOITK?
3      A.   I didn't know anything about
4   it.
5      Q.   Did you ever intend to
6   personally profit from any bonds that
7   may have been issued either by MOAO or
8   MOITK?
9      A.   No.
10     Q.   Did you ever intend to profit
11  indirectly through any company or trust
12  from any bonds that may have been
13  issued by either MOAO or MOITK?
14     A.   No.
15     Q.   Did you have any role
16  whatsoever in the bond issuance by
17  MOAO?
18     A.   No.
19     Q.   Did you have any role
20  whatsoever in connection with any
21  prospectus issued by MOAO in connection
22  with any bond offering?
23     A.   No.
24     Q.   Did you ever make any
25  representations to Gazprombank in
```

Page 228

```
1                JANNA BULLOCK
2   connection with its alleged bond
3   purchases from MOAO?
4      A.   No.
5      Q.   Did you ever have any role
6   whatsoever in the supervisory council
7   that approved the bond issuance by
8   MOAO?
9          MS. DONOVAN:  Objection.
10         MR. CUCCARO:  You can answer.
11     A.   No.
12     Q.   Did you ever have any role
13  whatsoever in the bond issuance by
14  MOITK?
15     A.   No.
16     Q.   Did you have any role
17  whatsoever in connection with any
18  prospectus issue by MOITK in connection
19  with any bond offering?
20         MS. DONOVAN:  Objection.
21         MR. CUCCARO:  You can answer.
22     A.   No.
23     Q.   Did you ever make any
24  representations to Gazprombank in
25  connection with its alleged bond
```

Page 229

```
1                JANNA BULLOCK
2   purchases from MOITK?
3          MS. DONOVAN:  Objection.
4      A.   No.
5      Q.   Did you have any role
6   whatsoever in the supervisory council
7   that approved the bond issuance by
8   MOITK?
9          MS. DONOVAN:  Objection.
10     A.   No.
11         MR. CUCCARO:  Please respond
12  audibly.
13     Q.   Did anyone act at your
14  direction in connection with any bond
15  issuance by MOAO?
16     A.   No.
17     Q.   Did anyone act at your
18  direction in connection with any bond
19  issuance by MOITK?
20     A.   No.
21     Q.   Did you ever intend to
22  personally profit from any bonds that
23  may have been issued by either MOAO or
24  MOITK?
25         MS. DONOVAN:  Objection.
```

Janna Bullock - February 6, 2018

59 (Pages 230 to 233)

Page 230

JANNA BULLOCK

1
2   A.   No.
3   Q.   Did you ever conspire with
4   anyone to misappropriate the money
5   Gazprombank allegedly invested in MOAO
6   or MOITK?
7        MS. DONOVAN:  Objection.
8   A.   No.
9   Q.   Did you ever encourage anyone
10  misappropriate the money Gazprombank
11  allegedly involved in MOAO or MOITK
12  bonds?
13       MS. DONOVAN:  Objection.
14  A.   No.
15  Q.   Did you ever assist anyone in
16  misappropriating money Gazprombank
17  allegedly invested in MOAO or MOITK
18  bonds?
19       MS. DONOVAN:  Objection.
20  A.   No.
21  Q.   Are you aware of anyone who
22  intended to misappropriate the money
23  Gazprombank allegedly invested in MOAO
24  or MOITK bonds?
25  A.   No.

Page 231

JANNA BULLOCK

1
2        MS. DONOVAN:  Objection.
3   Q.   Did you ever have an
4   agreement with anyone to defraud MOAO
5   or MOITK bond investors?
6        MS. DONOVAN:  Objection.
7   A.   No.
8   Q.   Did you ever have an
9   agreement with anyone to misappropriate
10  the proceeds of the MOAO or MOITK
11  bonds?
12  A.   No.
13  Q.   Did you personally divert any
14  assets of MOAO?
15  A.   No.
16  Q.   Did you ever direct any other
17  person to divert assets from MOAO?
18  A.   No.
19       MS. DONOVAN:  Objection.
20  Q.   Did you personally divert any
21  assets of MOITK?
22  A.   No.
23  Q.   Did you ever direct anyone
24  other person to divert assets from
25  MOITK?

Page 232

JANNA BULLOCK

1
2   A.   No.
3   Q.   Did you ever control MOITK
4   either directly or indirectly?
5        MS. DONOVAN:  Objection.
6   A.   No.
7   Q.   Did you ever control MOAO
8   either directly or indirectly?
9        MS. DONOVAN:  Objection.
10  A.   No.
11  Q.   Gazprombank's statement of
12  claim filed in Cyprus makes reference
13  to an alleged bond guarantor named The
14  Mortgage Company of the Moscow Region,
15  OAO.
16       If I refer to that entity as
17  ICMO, will you understand what that
18  acronym refers to?
19  A.   Yes.
20  Q.   Okay.  I'm going to refer to
21  Mortgage Company of the Moscow Region
22  OAO as ICMO.
23  A.   No.  I don't know what that
24  is.
25  Q.   Okay.  Did you personally

Page 233

JANNA BULLOCK

1
2   divert any assets belonging to the
3   Mortgage Company of the Moscow Region?
4   A.   No.
5        MS. DONOVAN:  Objection.
6   Q.   Did you ever direct any other
7   person to divert assets from the
8   Mortgage Company of the Moscow Region?
9        MS. DONOVAN:  Objection.
10  A.   No.
11  Q.   Did you ever control the
12  mortgage company of the Moscow region?
13       MS. DONOVAN:  Objection.
14  A.   No.
15  Q.   Have you ever held a position
16  with the government of the Moscow
17  Region?
18  A.   No.
19  Q.   Have you ever directed the
20  financial affairs of the government of
21  the Moscow Region either directly or
22  indirectly?
23       MS. DONOVAN:  Objection.
24  A.   No.
25  Q.   Have you ever held a position

Janna Bullock – February 6, 2018

60 (Pages 234 to 237)

Page 234

```
1              JANNA BULLOCK
2  as an officer or director of the
3  Russian company, OOORIG Group?
4       A.   No.
5          MS. DONOVAN:  Objection.
6       Q.   Have you ever had the
7  authority to direct the corporate
8  affairs of OOORIG Group?
9       A.   No.
10          MS. DONOVAN:  Objection.
11       Q.   Have you ever held a position
12  as an officer or director of the
13  Russian company IFC RIGroup Finance
14  ZAO?
15       A.   No.
16       Q.   Have you ever had the
17  authority to direct the corporate
18  affairs of RIG Group Finance?
19       A.   No.
20       Q.   Prior to the commencement of
21  the litigation in Cyprus, were you
22  aware that RIG Group Finance served as
23  underwriter for any MOAO bond issuance?
24          MS. DONOVAN:  Objection.
25       A.   No.
```

Page 235

```
1              JANNA BULLOCK
2       Q.   Have you ever held a position
3  as an officer or director of the
4  Russian bank ZAO Moscow Zola Ngovivi
5  Bank [phonetic], which I will refer to
6  as MZB?
7       A.   No.
8       Q.   Have you ever had the
9  authority to direct the corporate
10  affairs of MZB?
11          MS. DONOVAN:  Objection.
12       A.   No.
13       Q.   Prior to the commencement of
14  the litigation in Cyprus, were you
15  aware that MZB served as payment agent
16  for any MOAO bond issuance?
17          MS. DONOVAN:  Objection.
18       A.   No.
19       Q.   Have you ever held a position
20  as an officer or director of the
21  Russian company OOO Konfael?
22       A.   No.
23       Q.   Have you ever had the
24  authority to direct the corporate
25  affairs of Konfael?
```

Page 236

```
1              JANNA BULLOCK
2          MS. DONOVAN:  Objection.
3       A.   No.
4       Q.   Have you ever held a position
5  as an officer or director of a Russian
6  company OOO NEFTMASH?  N-E-F-T-M-A-S-H.
7       A.   No.
8       Q.   Have you ever had the
9  authority to direct the cooperate
10  affairs of NEFTMASH?
11          MS. DONOVAN:  Objection.
12       A.   No.
13       Q.   Have you ever held a position
14  as an officer or director of a Russian
15  company OOO EDOM Invest?
16       A.   No.
17       Q.   Have you ever had the
18  authority to direct the corporate
19  affairs of OOO EDOM Invest?
20          MS. DONOVAN:  Objection.
21       A.   No.
22       Q.   Have you ever held a position
23  as an officer or director of the
24  Russian company OOO Prom Audit?
25       A.   No.
```

Page 237

```
1              JANNA BULLOCK
2          MS. DONOVAN:  Objection.
3       Q.   Have you ever had the
4  authority to direct the corporate
5  affairs of OOO Prom Audit?
6       A.   No.
7       Q.   Did you cause MOITK to breach
8  any contract?
9          MS. DONOVAN:  Objection.
10       A.   No.
11       Q.   Did you cause MOAO to breach
12  any contractor?
13          MS. DONOVAN:  Objection.
14       A.   No.
15       Q.   Did you cause the MOAO to
16  breach any contract?
17          MS. DONOVAN:  Objection.
18       A.   No.
19       Q.   Did you cause the Mortgage
20  Company of the Moscow Region OAO to
21  breach any contract?
22          MS. DONOVAN:  Objection.
23       A.   No.
24       Q.   Did you have any role
25  whatsoever in connection with the
```

Page 238

```
 1              JANNA BULLOCK
 2  decision by MOITK to declare
 3  insolvency?
 4              MS. DONOVAN:  Objection.
 5       A.    No.
 6       Q.    Did you have any role
 7  whatsoever in connection with the
 8  decision by MOAO to declare insolvency?
 9              MS. DONOVAN:  Objection.
10       A.    No.
11       Q.    Did you have any role
12  whatsoever in connection with the
13  decision by the Mortgage Company of the
14  Moscow Region OAO to declare
15  insolvency?
16              MS. DONOVAN:  Objection.
17       A.    No.
18              MR. CUCCARO:  I have no
19  further questions for the witness.
20              MS. DONOVAN:  So we'll
21  suspend, and we'll go to the judge
22  on some of the concerns I raised
23  earlier about the production and
24  forthrightness.
25              MR. CUCCARO:  Obviously, we
```

Page 239

```
 1              JANNA BULLOCK
 2       dispute that there are any such
 3  valid, concerns.
 4              But yes, we will discuss this
 5  offline.
 6       THE VIDEOGRAPHER:  This
 7  concludes Volume 1 of today's
 8  testimony for the video deposition
 9  of Ms. Janna Bullock.
10       Today's testimony consists of
11  four media units.  The master
12  recordings will be held in the
13  custody of GregoryEdwards LLC,
14  located at 400 Virginia Avenue
15  South West, Washington, D.C.
16  20024.
17       The time is approximately
18  4:59 p.m. and we are going on the
19  record.
20       MR. CUCCARO:  I'm sorry
21  there's one other thing I'd like
22  to get on the record.
23       THE VIDEOGRAPHER:  Counsel
24  has noted that there is another
25  item he wants to put on the
```

Page 240

```
 1              JANNA BULLOCK
 2  record.
 3       The time is 4:59 p.m. and we
 4  are back on the record.
 5       MR. CUCCARO:  We are
 6  designating this transcript in its
 7  entirety as confidential under the
 8  protective order that is in place
 9  in this action.
10       THE VIDEOGRAPHER:  The time
11  is approximately 4:59 p.m., and
12  we're going off the record.
13       (Whereupon, at ^(TIME), the
14  examination of this witness was
15  concluded.)
16
17  _____
              JANNA BULLOCK
18  Subscribed and sworn to before me
    this _____ day of _____ 20___.
19
20  _____
              NOTARY PUBLIC
21
22
23
24
25
```

Page 241

```
 1
 2                  I N D E X
 3  EXAMINATION BY                        PAGE
    MS. DONOVAN                             6
 4  MR. TREMONTE                           96
    MS. DONOVAN                            99
 5  MR. CUCCARO                           225
 6           E X H I B I T S
 7  DONOVAN EXHIBITS:  FOR ID:
 8  EXHIBIT 1       subpoena                 7
 9  EXHIBIT 2       subpoena                23
10  EXHIBIT 3       Cyprus filings          64
11  EXHIBIT 4       document                71
12  EXHIBIT 5       order                   75
13  EXHIBIT 6       open listing agreement 128
14  EXHIBIT 7       e-mail correspondence  130
15  EXHIBIT 8       open listing agreement 143
16  EXHIBIT 9       e-mail correspondence  144
17  EXHIBIT 10      e-mail correspondence  152
18  EXHIBIT 11      e-mail correspondence  155
19  EXHIBIT 12      February 28, 2011 e-mail 182
20  EXHIBIT 13      e-mail correspondence  201
21  EXHIBIT 14      article                207
22  EXHIBIT 15      e-mail correspondence  211
23  EXHIBIT 16      composite documents    215
24  EXHIBIT 18      verified complaint     223
25          (Exhibits retained by Counsel.)
```

Janna Bullock — February 6, 2018

Page 242

```
 1
 2             C E R T I F I C A T E
 3  STATE OF NEW YORK      )
                           :SS.:
 4  COUNTY OF KINGS        )
 5            I, AVERY N. ARMSTRONG, a Notary Public
 6  for and within the State of New York, do hereby
 7  certify:
 8            That the witness whose examination is
 9  hereinbefore set forth was duly sworn and that
10  such examination is a true record of the testimony
11  given by that witness.
12            I further certify that I am not related
13  to any of the parties to this action by blood or
14  by marriage and that I am in no way interested in
15  the outcome of this matter.
16            IN WITNESS WHEREOF, I have hereunto set
17  my hand this 6th day of February 2018.
18
19
                     _____
20                        AVERY N. ARMSTRONG
21
22
23
24
25
```