UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of GORSOAN LIMITED and GAZPROMBANK OJSC for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | No. 17-cv-5912 (RJS) <br> OPINION AND ORDER |

RICHARD J. SULLIVAN, Circuit Judge:

Since November 2013, Petitioners Gazprombank OJSC, a Russian bank, and its assignee

Gorsoan Limited, a Cyprus limited liability company (together, "Gorsoan"), have sought discovery

from Janna Bullock and others under 28 U.S.C. § 1782 in connection with a foreign proceeding in

Cyprus. (*See* Doc. No. 1, 13-mc-397.) To say the least, Gorsoan's efforts have met with limited

success. Now before the Court are Gorsoan's requests that the Court: (1) issue findings and draw

adverse inferences that, in lieu of further discovery, can be used in the Cyprus proceeding; (2) order

Bullock to produce responsive documents; (3) impose spoliation sanctions; and (4) impose other

sanctions. (Doc. No. 55.) For the reasons set forth below, Gorsoan's requests are GRANTED in

part and DENIED in part.

## I. BACKGROUND

The present dispute can be traced back to August 2012, when Gorsoan sued Bullock and

twenty-nine other defendants in the District Court of Limassol, Cyprus, claiming approximately

$22 million in damages for fraud stemming from the defendants' diversion of bond proceeds

allegedly owed to Gorsoan (the "Cyprus proceeding"). *See In re Application of Gorsoan Ltd. &*

*Gazprombank OJSC*, No. 13-mc-397 (PGG), 2014 WL 7232262, at *1–3 (S.D.N.Y. Dec. 10,

2014), *aff'd sub nom.*, *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7 (2d Cir. 2016). In March 2013,

the Cyprus court froze Bullock's assets worldwide and directed her to disclose all her assets

exceeding 10,000 euros in value.  (Doc. Nos. 4, 4-5, 13-mc-397.)  As of April 2020, the Cyprus proceeding is still ongoing.  (Doc. Nos. 61–63.)

On November 27, 2013, Gorsoan filed an application pursuant to 28 U.S.C. § 1782 in this district seeking discovery from Bullock, her daughter Zoe Bullock Remmel (together with Bullock, the "Bullocks"), RIGroup LLC (a limited liability company of which Bullock is the only member), and the Bullocks' former counsel, Stuart A. Smith.  (Doc. Nos. 1, 2, 13-mc-397.)  Judge Gardephe granted Gorsoan's § 1782 application on December 4, 2013.  (Doc. No. 6, 13-mc-397.)  One year later, Judge Gardephe denied the Bullocks' motions for reconsideration and to quash subpoenas to produce documents and appear for depositions, which the Second Circuit affirmed in June 2016.  *See Gorsoan*, 652 F. App'x at 10; *In re Application of Gorsoan*, 2014 WL 7232262, at *12.  Nevertheless, even after the Second Circuit's affirmance, the Bullocks refused to comply with certain aspects of the subpoenas and Judge Gardephe's orders.  (Doc. Nos. 86, 87, 13-mc-397.)  The parties' dispute over the Bullocks' non-compliance came before this Court as a miscellaneous matter pursuant to Part I in October 2016.  (*See* Doc. No. 3 at 1.)  Only after this Court held the Bullocks in contempt under Federal Rule of Civil Procedure 45(g) did they begin to comply with the subpoenas at issue.  (Doc. Nos. 86, 87, 96, 13-mc-397.)  Accordingly, on January 13, 2017, the Court closed Case No. 13-mc-397 and restored the matter to Part I.  (Doc. No. 96, 13-mc-397.)

In August 2017, the parties submitted a joint letter apprising the Court of yet another subpoena-compliance dispute, which became the subject of the instant civil matter, Case No. 17-cv-5912.  (Doc. No. 3.)  Specifically, Gorsoan asserted that the Bullocks had wrongfully withheld whole categories of relevant documents and that Bullock refused to appear for her deposition.  (Doc. No. 4 at 1–3.)  With respect to the withheld documents, Gorsoan claimed, for example, that

Bullock failed to produce any bank statements or real property records for any assets valued in excess of 10,000 euros, despite evidence indicating that Bullock clearly held such assets.  (*Id.* at 3; Doc. No. 10 ("Sept. 2017 Conf. Tr.") at 3:3–4:15.)  At a September 11, 2017 conference, Bullock and her counsel represented to the Court that she had fully complied with all Gorsoan's document requests.   (Sept. 2017 Conf. Tr. at 9:16–20, 14:18–20.)   With her production obligations purportedly fulfilled, Bullock also agreed to sit for a deposition, consistent with the subpoenas and prior orders issued by Judge Gardephe and the Second Circuit.  (*Id.* at 7:9–10.)

Nevertheless, Bullock did not appear for her scheduled deposition on November 21, 2017, and initially did not agree to a later deposition date or accept service of a subpoena for a rescheduled deposition.  (Doc. No. 13.)  Shortly thereafter, the Court held a show-cause hearing, at which Bullock's counsel informed the Court that Bullock did not appear for her scheduled deposition because, remarkably, her counsel in related French legal proceedings advised her not to show up – ostensibly because the parties in that proceeding were apparently *nearing* a settlement and stay of all litigation matters.  (Doc. No. 42 ("Dec. 2017 Conf. Tr.") at 8:13–18:24.)  Faced again with the prospect of contempt – and with no global settlement or stay in fact reached in France – Bullock agreed to sit for a deposition on January 18, 2018 (Doc. No. 15), a date that was subsequently moved back to February 6, 2018 (Doc. No. 18).

Bullock ultimately "sat for a deposition" – literally, but as discussed below, not in any meaningful sense – on February 6, 2018.  (Doc. No. 32 ("Feb. Dep. Tr.").)  Her testimony was almost comical in its implausibility and flagrant obfuscation.  (*See* Doc. No. 25 at 1–4.)  Bullock answered "I don't know" approximately 180 times, disclaiming knowledge on basic questions such as who paid property taxes on the penthouse apartment where she lived (Feb. Dep. Tr. at 124:16–125:2), who paid for her daughter's private school tuition (*id.* at 171:13–18), who paid

3

for her daughter's Porsche (*id.* at 170:5–14), whether she had received any tax bills in the last year, and whether she was working with a tax professional or tax attorney (*id.* at 124:21–125:21), whether anyone owed her money (*id.* at 173:17–19), and roughly how much her monthly expenses were, including whether they were more than $5,000 (*id.* at 172:18–173:6; *see also id.* at 148:10–12 (Bullock: "I don't know."  Q: "What don't you know?"  Bullock: "I don't know anything.")). Bullock also testified that she did not "have any assets" or "control any assets or entities" (*id.* at 66:10, 81:6–8), including any bank accounts, debit cards, or credit cards, and that she did not keep cash on hand (*id.* at 113:20–114:11, 116:2–4; *see also id.* at 103:13–20 (Bullock: "I don't own anything.")).  To the extent Bullock admitted to knowing anything at all about how she paid for her lifestyle (or even her ordinary costs of living), she attributed her wealth to trusts that she in turn mostly knew nothing about (*e.g.*, *id.* at 104:9–106:20, 123:4–124:15, 181:4–12), or cash that she received from her mother or daughter (*id.* at 114:4–115:25, 176:16–179:13).

Bullock's testimony relating to a multimillion-dollar property in Southampton, New York – a property which, unbeknownst to Gorsoan at the time of the deposition, Bullock had sold just two months earlier – was especially outrageous.  Bullock testified that she had no ownership interest in the property, and that she merely performed groundskeeping functions.  (*Id.* at 133:12–134:5.)  When asked to further explain her basic duties as property manager, the following exchange, which was characteristic of the deposition as a whole, ensued:

Q:  . . . [W]hat do you do as the property manager?
A:  I take care of the property.
Q:  Tell me everything you do.
A:  I take care of the property.
Q:  What does that mean?
A:  I look after it.
. . .

4

Q:  When somebody [who performs services on the property] . . . gives you a bill,
    . . . what do you do with the bill?

A:  The bill gets paid.

Q:  How?

A:  It just gets paid.

Q:  It doesn't just get paid.  I want to hear how that bill gets paid.  What do you do
    so that the bill gets paid?

A:  The bill gets paid.

Q:  How?

A:  I don't know.

. . .

Q:  . . . Did you receive a plumbing bill for the house . . . ?

A:  Yes.

Q:  When you received . . . a plumbing bill for the house . . . , what do you do with
    that bill?

A:  I don't know.

Q:  Do you give it to somebody?

A:  I don't know.

Q:  I need to understand how you couldn't know what [to] do with bills you
    received.

A:  I probably don't know what I do.

(*Id.* at 159:25–162:14.)

Contrary to her testimony, however, Bullock was not merely an uninformed
groundskeeper.  When presented with documentary evidence – an email sent from Bullock's email
address to a real estate agent, Tony Cerio, indicating that Bullock had been seeking to sell or rent
the Southampton property – Bullock claimed initially that the email address was not hers and then
suggested that her email address might have been compromised.  (*Id.* at 130:8–136:2.)  She also
testified that she did not engage Cerio's real estate firm, Brown Harris Stevens, to list the property
in question, and that she did not remember if she even knew who Cerio was.  (*Id.* at 129:22–132:7.)
Indeed, she repeatedly testified that she "cannot do anything" with respect to the property other

than maintain the grounds.  (*Id.* at 138:17–139:3; *see also id.* at 139:17–140:5 (answering "I don't know" to the question of whether she could "engage in discussion[s] with brokers to sell th[e] property," and testifying that she had "no rights" with respect to the property).)   Yet, in December 2017, less than two months *before* her February 2018 deposition, Bullock had actually sold the property with Cerio serving as the agent.  (*See* Doc. No. 25 at 2.)  After Gorsoan suspended the deposition due to concerns over the veracity of Bullock's answers (Feb. Dep. Tr. at 224:6–15), Bullock's counsel produced – for the first time – three documents relating to the sale of the Southampton property, including a Bargain and Sale Deed that Bullock herself had signed on behalf of the seller, Mid-Summer Dream Holdings (Doc. No. 25 at 3; *see also* Doc. No. 37 ("Apr. 2018 Conf. Tr.") at 68:1–4 (trustee of the trust that owned the Southampton property testifying that Bullock, "[a]s manager[,] . . . was delegated the power to sell the property")).[1]

The parties appeared for a conference before the Court on April 17, 2018.  At that conference, the Court held Bullock in contempt for violating the Court's order to appear for a deposition and answer questions truthfully, and imposed sanctions to compensate Gorsoan for costs associated with the deposition, conference and the parties' related correspondence.[2] (Apr. 2018 Conf. Tr. at 47:24–48:7, 56:20–25; Apr. 17, 2018 Minute Entry.)  Furthermore, in light of Bullock's post-deposition production of documents relating to the Southampton property, as well as the revelation at the deposition that Bullock owned email addresses and two laptops (one of which she threw out only months before her deposition) that had not been searched for

---

[1] Although the contract of sale listed Mid-Summer Dream Holdings as the seller (Doc. No. 25), Bullock contends that the Southampton property was actually owned by an entirely different entity – the Landmark Trust, a U.S.-based trust that is the sole owner of Mid-Summer Dream Holdings.  According to Bullock, Mid-Summer Dream Holdings was merely the property's manager.  (Apr. 2018 Conf. Tr. at 11:24–12:5, 59:2–6, 60:2–7.)

[2] *See Hutto v. Finney*, 437 U.S. 678, 691 (1978) (explaining that civil contempt may carry with it a "remedial fine" that "compensates the party who won the injunction for the effects of his opponent's noncompliance"); *see also* Fed. R. Civ. P. 37(b)(2)(A)(vii), 45(g).

responsive documents, the Court directed the parties to confer on a protocol for reviewing that material.  (Apr. 2018 Conf. Tr. at 53:18–56:19; *see also id.* at 2:19–22 ("I think it's quite obvious that [Bullock] hasn't produced documents that were requested by the subpoenas . . . ."); *id.* at 55:1–3 ("I have no confidence that Ms. Bullock has produced documents that are responsive or relevant to the inquiry here.").)

Two months later, the Court issued an order that required Bullock to conduct further document review and to "produce all documents concerning the Landmark Trust," which owned the Southampton property.  (Doc. No. 44 at 2; *see also* Apr. 2018 Conf. Tr. at 59:25–60:7 (testimony of Landmark Trust's trustee).)  Though the Court declined to enter a document review protocol proposed by Gorsoan (Doc. No. 41-2), it directed the parties to "discuss additional search terms to determine what documents [Bullock] still needs to produce" and noted that Gorsoan could renew its request "[i]n the event that the parties are unable to reach a consensus on the[] issue[]" (Doc. No. 44 at 1).  Finally, the Court directed the parties to resume Bullock's deposition (Apr. 2018 Conf. Tr. at 94:10–11) and raised the prospect of referring Bullock's conduct at her deposition to the U.S. Attorney's Office for a potential perjury investigation and prosecution (*id.* at 6:16–18, 94:17–23).

Faced with the prospect of criminal proceedings, Bullock retained additional counsel in advance of resuming her deposition on August 8, 2018.  (Doc. Nos. 46, 55 at 9.)  After entering a notice of appearance, Bullock's new counsel advised the Court that there was a "significant likelihood that . . . Bullock [would] assert her Fifth Amendment rights in connection with the questions posed at the deposition."  (Doc. Nos. 45, 46.)  Nevertheless, in the weeks leading up to the resumed deposition, the parties continued to discuss additional search terms for a document review, as directed by the Court.  (Doc. No. 55 at 222–28.)  On August 5, 2018, three days before

7

the resumed deposition, Bullock's counsel "agree[d] to [Gorsoan's] proposal" for search terms, albeit while reserving all of Bullock's rights.  (*Id.* at 222.)

With Bullock's testimony and the potential discovery of additional responsive documents seemingly within Gorsoan's reach, the parties appeared on August 8, 2018, to resume Bullock's deposition.  (*Id.* at 7.)  After Bullock answered preliminary questions about her name and address, she, on the advice of counsel, invoked her Fifth Amendment rights in response to every question posed at the deposition – hundreds of times in total.  (*Id.* at 14–217, Tr. at 8:19–211:25.)  In addition, despite the Court's prior order to produce documents relating to the Landmark Trust and to conduct further document review, and despite the parties' agreement on additional search terms, Bullock's counsel represented for the first time at the deposition that "there may be Fifth Amendment issues with respect to the document production."  (*Id.* at 26, Tr. at 20:7–9.)  At a conference held later the same day, the Court directed Gorsoan to submit a letter setting forth all remaining issues in the case.  (*Id.* at 262, Tr. at 18:5-11; Aug. 8, 2018 Minute Entry.)  On August 30, 2018, Bullock "assert[ed] her Fifth Amendment rights with respect to any remaining document production obligations."  (Doc. No. 55 at 231.)

On September 7, 2018, Gorsoan requested that the Court:  (1) issue findings and draw adverse inferences that, in lieu of further discovery, can be used in the Cyprus proceeding; (2) order Bullock to produce certain documents; (3) hold Bullock in contempt for spoliation based on her destruction of her laptop prior to her first deposition; and (4) impose sanctions to compensate Gorsoan for all its fees and costs in this case.  (Doc. No. 55 at 1–6.)  On September 21, 2018, Bullock filed a response.  (Doc. No. 57.)  On July 31, 2019, Gorsoan filed a supplemental letter advising the Court of Bullock's actions in a related § 1782 matter pending before Judge Abrams (Doc. No. 59), *see In re Gorsoan Ltd.,* No. 18-mc-431 (RA), 2020 WL 409729, at *1 (S.D.N.Y.

Jan. 24, 2020), *appeal docketed*, No. 20-680 (Feb. 21, 2020), and on August 7, 2019, Bullock filed a response to that letter (Doc. No. 60).   On December 19, 2019, Gorsoan filed a further supplemental letter apprising the Court that the Cyprus proceeding was "approach[ing] the merits phase."   (Doc. No. 61.)   Bullock responded days later, characterizing Gorsoan's update on the Cyprus proceeding as "pure surmise."   (Doc. No. 62.)

## II. DISCUSSION

### A.   Adverse Findings in Lieu of Discovery

Gorsoan requests that the Court find Bullock in violation of her § 1782 discovery obligations, including the underlying subpoenas, due to her failure to produce certain documents and refusal to testify truthfully.   (Doc. No. 55 at 2.)   Gorsoan further requests that, based on such a finding, the Court draw adverse inferences that Bullock (1) in fact holds assets that exceed 10,000 euros in value and (2) previously held such assets and transferred them in breach of the Cyprus court's order.   (*Id.* at 2–3.)   These findings, Gorsoan argues, "would be most helpful when this record is conveyed to the Cyprus [p]roceeding" and would be "for the foreign court's consideration" in that proceeding.   (*Id.* at 2.)

The Court agrees with Gorsoan that Bullock has failed to satisfy her § 1782 discovery obligations.   Nevertheless, the Court lacks the authority to make factual findings or draw adverse inferences against Bullock to be used in the Cyprus proceeding.

Although § 1782 authorizes federal courts to assist foreign tribunals in gathering evidence, nothing in the statute's text allows courts to make factual findings in lieu of discovery – *i.e.*, findings *solely* for use in a foreign proceeding.   For instance, § 1782(a) permits a district court to order a resident of the district to give "testimony" or to produce "a document or other thing."   But should those discovery efforts prove unsuccessful, the statute does not invite the district court to

9

issue factual findings as a fallback.  This is consistent with the limited scope of a § 1782 proceeding: "[T]he only issue before the district court is discovery; the underlying litigation rests before a foreign tribunal." *Deposit Ins. Agency v. Leontiev*, No. 17-mc-414 (GBD) (SN), 2018 WL 3536083, at \*10 (S.D.N.Y. July 23, 2018) (quoting *In re Application of the Republic of Ecuador*, 735 F.3d 1179, 1182 (10th Cir. 2013)).  Accordingly, ultimate fact-finding responsibilities are vested in the hands of the Cyprus court, *see Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247–49 (2004) (noting that the court's role is merely to help "gather[] evidence for use in foreign tribunals"); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012), and this Court will not issue what would amount to an advisory opinion, *Flast v. Cohen*, 392 U.S. 83, 96–97 (1968).  (*See also* Doc. No. 55 at 247, Tr. at 3:18–25 (admitting that if this Court were to draw an adverse inference "it's up to the Cyprus court to credit that or not").)

To be sure, the Court has no hesitation in acknowledging that Bullock has utterly failed to comply with her discovery obligations, including by refusing to produce documents or testify truthfully.  And the Cyprus court may well choose to draw adverse inferences from those facts.  But it is not this Court's place to make that decision for a foreign tribunal.

**B.      Fifth Amendment Act-of-Production Privilege**

Gorsoan next challenges Bullock's invocation of her Fifth Amendment right against self-incrimination as a basis for withholding documents subject to the § 1782 subpoena and the Court's orders, and requests that the Court compel Bullock to produce such documents.  Again, the Court agrees with Gorsoan and concludes that Bullock must produce these documents.  Even assuming

Bullock could establish that a valid Fifth Amendment privilege exists here, her tactical delay in asserting that privilege has resulted in its waiver.[3]

The Fifth Amendment shields an individual from being "compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V; *see also Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (acknowledging that the Fifth Amendment may be invoked outside of criminal proceedings).  It is elementary that this privilege protects individuals against giving forced testimony.  But communication is not limited merely to statements – "acts also convey messages." *In re Various Grand Jury Subpoenas*, 924 F. Supp. 2d 549, 552 (S.D.N.Y. 2013).  Synthesizing these concepts, the Fifth Amendment prevents a court from compelling document production where the mere act of production would itself be incriminating – termed the act-of-production privilege.  *See In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 339, 343 (2d Cir. 2013); *see also Fisher v. United States*, 425 U.S. 391, 410 (1976).

But while important, the act-of-production privilege is neither absolute nor self-executing; it may be affirmatively waived or "lost [if] not assert[ed] . . . in a timely fashion."  *Maness v. Meyers*, 419 U.S. 449, 466 (1975); *see also Roberts v. United States*, 445 U.S. 552, 559 (1980) (acknowledging that "[t]he Fifth Amendment privilege against compelled self-incrimination is not self-executing" and "may not be relied upon unless it is invoked in a timely fashion"); *United Auto. Ins. Co. v. Veluchamy*, 747 F. Supp. 2d 1021, 1026–27 (N.D. Ill. 2010) (stating that the Fifth

---

[3] The Court is skeptical that Bullock's Fifth Amendment privilege, even if timely invoked, could shield her from producing additional documents.  After nearly five years of resisting document production demands under a valid § 1782 subpoena, often by engaging in misconduct or through otherwise questionable tactics, Bullock gave false testimony when finally made to sit for a deposition, and then proceeded to rely on the self-imposed risk of a perjury prosecution to avoid producing any responsive documents going forward.  Allowing Bullock to evade her document production obligations because she exposed herself to a perjury prosecution, at this late stage of the proceedings – over four years after Judge Gardephe granted Gorsoan's § 1782 application – would likely constitute a sword-like use of the Fifth Amendment that is prohibited under *United States v. Rylander* and its progeny.  *See United States v. Rylander*, 460 U.S. 752, 758 (1983) (rejecting the "conver[sion of] the [Fifth Amendment] privilege from the shield . . . which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his").

Amendment privilege "may not be relied upon unless invoked in a timely fashion," and collecting cases).   A tardy assertion of the privilege is likely to result in its loss where the delay was intentional and done for tactical gain.   *See In re DG Acquisition Corp.*, 151 F.3d 75, 84 (2d Cir. 1998) (discussing cases in which a bad faith delay in asserting a privilege resulted in its waiver).   Nevertheless, the waiver of such a fundamental constitutional guarantee should not be inferred lightly.   *Emspak v. United States*, 349 U.S. 190, 196 (1955).   Moreover, even unreasonable delay in asserting the Fifth Amendment privilege does not result in its waiver as a matter of law; the decision is left to the trial court's discretion.   *See DG Acquisition*, 151 F.3d at 82.

Even a cautious review of the facts demonstrates that Bullock intentionally delayed asserting her privilege for strategic advantage, resulting in significant prejudice to Gorsoan.[4] Bullock certainly should have been aware that she might face criminal charges when Gorsoan's counsel halted her deposition out of a concern that Bullock had lied under oath.   (Feb. Dep. Tr. at 224:6–15.)   But even extending Bullock significant leeway, it became unmistakably clear that she might be prosecuted when the Court raised the prospect of a perjury charge at the April 17, 2018 hearing.   (Apr. 2018 Conf. Tr. at 52:24–53:1, 94:17–23.)   If Bullock intended to assert her act-of-production privilege, she should have done so at least as of that hearing or shortly thereafter. *See DG Acquisition*, 151 F.3d at 82 ("[A]ssuming the [respondents] had a reasonable basis for asserting the Fifth Amendment privilege at the time they first received the subpoenas, they should have raised the privilege at that time."); *accord In re Kave*, 760 F.2d 343, 354 n.22 (1st Cir. 1985). Instead, she continued to negotiate a document review protocol with Gorsoan – without mentioning the possibility that she may categorically refuse to produce additional documents –

---

[4] Accordingly, the Court need not resolve the parties' dispute over whether the documents the subpoena targets are corporate records that are exempt from the Fifth Amendment privilege under *Braswell v. United States*, 487 U.S. 99, 109–10 (1988).

well into August 2018.  (Doc. No. 55 at 222–28.)  Bullock also led the Court to believe that she

had agreed to produce more documents.  On August 1, 2018, Bullock, in a joint letter with Gorsoan,

asked the Court to adjourn her second deposition, which was scheduled for a week later, because

of the parties' "ongoing meet and confer discussions concerning the scope of document review

and production."  (Doc. No. 48.)  In making this request, Bullock did not caution the Court that

she might entirely refuse to produce any additional documents on Fifth Amendment grounds.

Bullock's response – that she "never stated, one way or the other, whether any additional

responsive documents even exist, and certainly never agreed to produce any such documents"

(Doc. No. 57 at 3), and that during negotiations she "expressly reserved all of her rights" (*id.* at 4)

– is absurd in the extreme.  First, as noted above, by agreeing to a renewed discovery protocol after

months of negotiation and without warning Gorsoan that she may assert a blanket privilege,

Bullock implied that she was willing to produce additional documents.  *Cf. SEC v. Oxford Capital

Sec., Inc.*, 794 F. Supp. 104, 109 (S.D.N.Y. 1992) ("[D]efendants could have sought to condition

their execution of the Judgments upon an agreement by the Commission to insert a provision

preserving their Fifth Amendment privileges.").  Second, Bullock's boilerplate reservations of

rights were insufficient to put Gorsoan on notice about her intentions.  *See DG Acquisitions*, 151

F.3d at 81 (stating that a general reservation of rights does not automatically preserve the Fifth

Amendment privilege because "Rule 45(c)(2)(B) . . . require[s] the recipient of a subpoena to raise

all objections at once, rather than in staggered batches, so that discovery does not become a

'game'").  If Bullock wanted to preserve her privilege, she should have informed Gorsoan's

counsel, even if informally, that she was considering invoking it.  *See Brock v. Gerace*, 110 F.R.D.

58, 64 (D.N.J. 1986) (acknowledging that "[t]imely notice [that the defendant intended to invoke

his Fifth Amendment privilege] at least was informally given").  Third, Bullock's request that the

Court adjourn her deposition until after the parties completed negotiations plainly implied that Bullock intended both to produce additional documents and sit for a deposition based on those documents.  It appears, therefore, that Bullock was determined to kick the discovery can down the road to further delay Gorsoan, and that she invoked her privilege only once she could no longer delay the proceedings any further.

Bullock's belated invocation of her privilege after months of negotiation smacks of "procedural gamesmanship" and "dilatory tactics," *Day v. Bos. Edison Co.*, 150 F.R.D. 16, 23 (D. Mass. 1993) (internal quotation marks omitted), designed to frustrate Gorsoan, rather than to protect Bullock, *cf. United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir. 1974) (noting that the Fifth Amendment testimonial privilege may not be used for purposes other than protection against self-incrimination).  Indeed, her foot-dragging cannot be explained as an innocent lack of knowledge concerning her rights.  The Court's statements at the April 17, 2018 hearing unmistakably raised the possibility of prosecution.  (Apr. 2018 Conf. Tr. at 6:14-19 ("We have the prospect of me referring this to the U.S. Attorney's Office for a criminal investigation and prosecution.").)  Moreover, Bullock clearly understood this risk when she notified the Court in July 2018 that she intended to invoke her Fifth Amendment testimonial privilege at her deposition. (Doc. No. 46.)  Notably, however, Bullock failed to mention her act-of-production privilege both at that time and some two weeks later when she sought to adjourn her deposition.  And while such a delay could possibly be explained by a change in circumstances, *DG Acquisition*, 151 F.3d at 83, Bullock does not point to any such developments.

What's more, Bullock's tardy assertion of her rights has prejudiced Gorsoan.  *See Klein v. Harris*, 667 F.2d 274, 288 (2d Cir. 1981) ("[A] waiver of the fifth amendment's privilege . . . should be inferred only in the most compelling of circumstances.  Such circumstances do not exist

unless a failure to find a waiver would prejudice a party to the litigation."). Bullock intentionally delayed presenting this issue to the Court, thereby costing Gorsoan months of time. Such a delay is uniquely prejudicial in the context of a § 1782 action. With each passing day, the Cyprus proceeding inches closer toward the merits phase. (Doc. No. 61 at 1.) Once it reaches that point, this Court has very little ability to provide Gorsoan with a remedy, since the Court cannot reschedule the foreign proceeding to account for Bullock's obstruction. Consequently, Bullock's delay has prejudiced Gorsoan and cost Bullock her act-of-production privilege. Any other result would be "tantamount to encouraging dilatory tactics." *See Brock*, 110 F.R.D. at 64 (internal quotation marks omitted).

Accordingly, Bullock is ordered to resume the document review protocol previously agreed to by the parties (Doc. No. 55 at 222; *see also* Doc. No. 44) and produce all responsive documents by July 15, 2020. Should Bullock seek to withhold documents based on another privilege – *e.g.*, the attorney-client privilege – she bears the burden of establishing that privilege's applicability on a document-by-document basis. *See In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 384–85 (2d Cir. 2003); *Kingsway Fin. Servs., Inc. v. PricewaterhouseCoopers LLP*, No. 03-cv-5560 (RMB) (HBP), 2008 WL 4452134, at *6 (S.D.N.Y. Oct. 2, 2008) (noting that the party asserting the privilege bears the burden of demonstrating its applicability "to the document in dispute").

## C.   Spoliation Sanctions

At her initial deposition, Bullock testified that she obtained a new laptop in December 2017, after which she disposed of her old laptop. (Feb. Dep. Tr. at 25:9–27:12.) According to Bullock, she "thr[ew] out" her old laptop after it was "deformed" from "sitting on [a] radiator for too long." (*Id.* at 26:8–27:19.) Following the deposition, Gorsoan sought sanctions

for Bullock's allegedly "willful abandonment of her [old] laptop." (Doc. No. 41 at 3.) The Court reserved decision on the issue pending the completion of Bullock's deposition so that Gorsoan could first "inquire as to the circumstances surround[ing]" the laptop's destruction. (Doc. No. 44 at 2.) But upon resuming her deposition on August 8, 2018, Bullock invoked her Fifth Amendment rights in response to every question concerning her old laptop (and every other topic). (Doc. No. 55 at 195, Tr. at 189:17–198:13.) Gorsoan now renews its motion for spoliation sanctions, requesting that: (1) "Bullock be held in contempt for spoliation of evidence;" (2) "Gorsoan be compensated for its costs in pursuing discovery as a result of that spoliation;" and (3) "an adverse inference be drawn in connection with" such spoliation. (*Id.* at 4.)

As the party seeking sanctions, Gorsoan must establish the three elements of a spoliation claim: (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed"; (2) "the records were destroyed with a culpable state of mind"; and (3) "the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotation marks omitted). "If the requisite showing is made, sanctions may be proper under Fed. R. Civ. P. 37(b) when a party spoliates evidence in violation of a court order." *In re Reifler*, No. 18-cv-4711 (KMK), 2019 WL 396525, at *6 (S.D.N.Y. Jan. 31, 2019) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 37(e) (providing remedies for a party's failure to preserve electronically stored information). Even without the violation of an order, however, a court may still impose sanctions for spoliation through its "inherent power to control litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

Gorsoan has met its burden and proved all three elements of a spoliation claim. First, Bullock indisputably had an obligation to preserve her laptop at the time it was destroyed. Bullock

16

admits that she destroyed her laptop in December 2017 (Feb. Dep. Tr. at 25:20–27:12), years after Gorsoan commenced these proceedings.  *See Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 409 (S.D.N.Y. 2010) (stating that a party is on notice of its preservation duty "at least by the time the complaint is served" (internal quotation marks and alterations omitted)).  And even after the laptop was "deformed" – if that is in fact what actually happened – Bullock was under a duty to make reasonable efforts to recover the data it contained.  *See Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 182–83 (S.D.N.Y. 2014) (holding that the duty to preserve evidence applies to computers even after they crash).

Second, although there is little direct evidence of Bullock's state of mind, there is substantial circumstantial evidence that she destroyed her laptop intentionally and in bad faith.  *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 500 (S.D.N.Y. 2016) (acknowledging that "circumstantial evidence may be accorded equal weight with direct evidence and standing alone may be sufficient to support even a determination that requires proof beyond a reasonable doubt" (internal citations omitted)).

To start, the timing of the laptop's destruction could hardly be more damning.  Bullock destroyed her laptop in December 2017 (Feb. Dep. Tr. at 25:20–27:12), just weeks *before* she was deposed in February 2018 and only weeks *after* she had refused to appear at her originally scheduled deposition in November 2017.  This fortuitous timing suggests that once she realized there was no way to avoid her testimonial obligations, Bullock intentionally destroyed her laptop to avoid answering questions about its contents.  *See Malibu Media, LLC v. Tashiro*, No. 13-cv-205 (WTL) (MJD), 2015 WL 2371597, at *16 (S.D. Ind. May 18, 2015), *adopted by* 2015 WL 3649359 (S.D. Ind. June 11, 2015) ("[T]he timing of the destruction of evidence can support a finding of bad faith."); *see also DVComm, LLC v. Hotwire Commc'ns, LLC*, C.A. No. 14-5543

(MAK), 2016 WL 6246824, at *8 (E.D. Pa. Feb. 3, 2016) (finding that the timing of deletion may be "instructive" when considering culpability); *Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, No. 10-cv-1122 (JBM), 2014 WL 201534, at *7 (C.D. Ill. Jan. 17, 2014) (stating that the court may "infer bad intent based upon when the destruction occurred").

In addition, Bullock is not writing on a clean slate:  she has repeatedly engaged in bad faith tactics throughout these proceedings.  Bullock misled the Court about the status of her document production (Sept. 2017 Conf. Tr. at 14:15–20), failed to appear at her initially scheduled deposition (Doc. No. 13), produced relevant documents only after her (rescheduled) deposition (Doc. No. 25 at 1–3), likely withheld other relevant documents (Apr. 2018 Conf. Tr. at 2:18–22, 54:25–55:3), and lied under oath (*id.* at 41:6–7, 47:17–23), to name just a few examples.  Put simply, the record is replete with evidence that Bullock has done everything in her power to evade her discovery obligations.  The Court is therefore not naïve to the likelihood that her laptop's destruction is just another of Bullock's obstructive stratagems.

Lastly, Bullock's repeated invocation of her Fifth Amendment right when offered the opportunity to explain her actions further suggests that she operated in bad faith.  (*See* Doc. No. 55 at 195–98, Tr. at 189:17–192:8.)  To be sure, Bullock's silence alone does not demonstrate that she intentionally destroyed evidence.  But when considered alongside the other signs that the laptop's destruction was intentional, Bullock's decision to remain silent cannot be ignored.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *see also Mirlis v. Greer*, 952 F.3d 36, 47 (2d Cir. 2020) (permitting the jury in a civil action to draw an adverse inference based on the invocation of the

Fifth Amendment where "there was substantial independent evidence to corroborate the inference").

Together, the timing of the laptop's destruction, Bullock's repeated dereliction of her discovery obligations, and her refusal to offer any plausible explanation for her actions, all strongly support a finding of bad faith. Accordingly, the second element of the spoliation analysis is resoundingly answered in Gorsoan's favor.

Third, because Bullock acted in bad faith, the Court may presume her laptop's contents were relevant and favorable to Gorsoan. "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002), *superseded on other grounds by rule*, Fed. R. Civ. P. 37(e), *as recognized in CAT3*, 164 F. Supp. 3d at 495; *see also Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 291 (S.D.N.Y. 2009) (same). Moreover, Bullock's repeated attempts to frustrate Gorsoan, both by refusing to produce documents and by tactically invoking her Fifth Amendment privilege, further suggest that these destroyed materials were likely helpful to Gorsoan. *See Residential Funding*, 306 F.3d at 110 (reasoning that "intentional . . . acts that hinder discovery support such an inference [of relevancy], *even if* those acts are not ultimately responsible for the unavailability of the evidence"); *see also Resnik v. Coulson*, No. 17-cv-676 (PKC) (SMG), 2019 WL 2256762, at *11 (E.D.N.Y. Jan. 4, 2019), *adopted by* 2019 WL 1434051 (E.D.N.Y. Mar. 30, 2019) ("Coulson's destruction of the evidence just as it was about to be seized by the Sheriff, combined with his assertions of his right to silence with respect to questions about his use of spyware and data-wiping software, are strong circumstantial evidence of the relevance of the data he destroyed.").

Accordingly, the Court will grant Gorsoan's motion for spoliation sanctions.  Determining the proper sanctions to impose rests in the sound discretion of the trial court and is assessed on a case-by-case basis.  *Deanda v. Hicks*, 137 F. Supp. 3d 543, 554 (S.D.N.Y. 2015).  At all times, however, a sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  *West*, 167 F.3d at 779 (internal quotation marks omitted).

Here, Bullock's spoliation has severely prejudiced Gorsoan.  Bullock's computer was the sole repository of any locally saved documents (Apr. 2018 Conf. Tr. at 55:17–56:16) and, as a result of its destruction, that universe of electronic evidence has been extinguished.  That prejudice can be corrected only by a substantial sanction.  Unfortunately, as discussed above, the Court's authority to fashion an appropriate remedy is constrained by its inability to draw adverse inferences against Bullock in the Cyprus proceeding.  Accordingly, the Court will order Bullock to pay Gorsoan's reasonable attorney's fees and costs in connection with the spoliation dispute.[5]  *See Dorchester Fin.*, 304 F.R.D. at 185 (awarding "reasonably attorney's fees and costs in connection with the spoliation dispute"); *see also Taylor v. City of New York*, 293 F.R.D. 601, 616 (S.D.N.Y. 2013) ("[A] monetary award is appropriate because it serves the remedial purpose of making Plaintiff whole for the costs he has incurred as a result of Defendants' spoliation.").  Gorsoan is therefore directed to submit to the Court, no later than June 25, 2020, a letter documenting all such fees and costs, including the fees it incurred in drafting its May 21, 2018 and

---

[5] The Court appreciates the irony of ordering Bullock to pay a monetary sanction when she claims to possess no assets.  But Bullock has managed to pay for sanctions in the past, not to mention a parade of attorneys who have appeared on her behalf in these and related proceedings.  (Apr. 2018 Conf. Tr. at 57:1–16.)

September 7, 2018 letters (Doc. Nos. 41, 55).  If Bullock believes that any of Gorsoan's fees are

unreasonable, she may submit a letter explaining her position no later than July 1, 2020.

### D.   Other Sanctions

Apart from spoliation sanctions, Gorsoan more broadly seeks monetary sanctions that

would "compensate Gorsoan's costs [and attorney's fees] in pursuing this action" as a result of

Bullock's "complete frustration of these proceedings."  (Doc. No. 55 at 5–6 (citing *Shawe v. Elting*,

157 A.3d 142 (Del. 2017)).)  Specifically, Gorsoan has submitted an attorney declaration, invoices,

and time sheets, reflecting that it incurred (1) $55,969 in costs and attorney's fees in connection

with Bullock's February 2018 and August 2018 depositions and the related contempt hearings and

document review disputes and (2) more than $350,000 in attorney's fees for work done in the

course of the parties' subpoena disputes between September 2013 and December 2017 and in

preparing for Bullock's aborted November 2017 deposition.[6]  (Doc. No. 55-2 at 2–4.)  In response,

Bullock argues that Gorsoan's claimed fees and costs are excessive, not adequately supported,

and/or largely relate to separate proceedings before Judge Gardephe and the Second Circuit.  (Doc.

No. 57 at 6–7.)

As an initial matter, the Court has already found Bullock in civil contempt for violating the

Court's order to appear for the February 6, 2018 deposition and answer questions truthfully.

(Apr. 2018 Conf. Tr. at 56:20–22; Apr. 17, 2018 Minute Entry.)  That finding was justified under

the Court's inherent authority, Rule 37(b)(2)(A)(vii), and Rule 45(g); the Court need not choose

between these sources of contempt power.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991);

*S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144–45, 144 n.7 (2d Cir. 2010); *see*

---

[6] The Court notes that two of Foley Hoag's time entries, dated November 30, 2016, and December 1, 2017 and totaling $4,982, appear to be duplicate entries.  (Doc. No. 55-2 at 7, 47, 55.)  The Court has therefore counted these fees only once.

*also, e.g.*, *Blum v. Schlegel*, No. 91-cv-633 (WMS), 1996 WL 925921, at *1, *5–6 (W.D.N.Y. May 9, 1996), *aff'd*, 108 F.3d 1369 (2d Cir. 1997).  In each case, contempt is appropriate where a party deliberately violates a clear and unambiguous order to appear for a deposition pursuant to a subpoena.  *See N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989) (describing standard for civil contempt under inherent power); Fed. R. Civ. P. 37(b)(2)(A)(vii) (stating that a court may "treat[] as contempt of court the failure to obey any order [to provide or permit discovery]"); Fed. R. Civ. P. 45(g) (stating that a court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it").  Here, the Court issued just such an order.  (*See, e.g.*, Doc. No. 18 (ordering that "Bullock's deposition shall take place no later than February 6, 2018").)  And, as the Court explained at the April 17, 2018 contempt hearing (Apr. 2018 Conf. Tr. at 56:20–25), Bullock's flagrant and repeated failure to answer questions truthfully at her February 6, 2018 deposition was tantamount to a violation of that order.  *See Andrews v. Holloway*, 256 F.R.D. 136, 141-42 (D.N.J. 2009) (holding that "a party who attends a deposition and answers questions as mandated by a court order can be held in contempt of that order if his [or her] answers are misleading and evasive," and collecting cases).

　　As relevant here, civil contempt may be accompanied by compensatory sanctions.  *See N.Y. State Nat'l Org. for Women*, 886 F.2d at 1352–53.  The Second Circuit has explained that such sanctions "should reimburse the injured party for its actual damages" resulting from the sanctioned party's conduct.  *Id.* at 1353.  In addition, the Court may rely on its inherent authority or on applicable statutes or rules to impose sanctions even without a finding of contempt.  *See* Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi) & (b)(2)(C); *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, No. 12-cv-7311 (JPO), 2016 WL 11483934, at *1 (S.D.N.Y. Aug. 23, 2016); *see also Reilly v. Natwest*

*Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."). Courts may award sanctions pursuant to their inherent authority "only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). Rule 37(b)(2)(C) also provides for "reasonable expenses, including attorney's fees" as a sanction for the failure to obey a discovery order.

The Court has already ruled that, as a result of her contempt, Bullock would be "sanctioned for the cost of the deposition, the cost of the[] [April 17, 2018] proceeding[] . . . , and the correspondence that led up to [that proceeding]." (Apr. 2018 Conf. Tr. at 56:22–25.) As reflected in time sheets prepared by Foley Hoag and invoices prepared by a private court reporting service, Gorsoan incurred $30,752 in attorney's fees and $3,560.80 in costs associated with the February 6, 2018 deposition, April 17, 2018 hearing, and related legal work leading up to that hearing. (Doc. No. 55-2 at 7–17, 19, 21.) However, because the Court at that time declined to hold Bullock in contempt for failing to produce documents pursuant to a subpoena (Apr. 2018 Conf. Tr. at 48:1–7), the Court will not, at this time, impose civil contempt sanctions relating to attorney's fees associated with the parties' document-production issues. While work relating to the failed deposition was often intertwined with work relating to document-production issues during the February 2018–April 2018 period, the Court estimates, based on a review of Foley Hoag's time entries (Doc. No. 55-2 at 7–17), the relevant correspondence and orders (Doc. Nos. 19–30), and the Court's own experience with this matter, that approximately 75% of Foley Hoag's work between February 1, 2018 and April 17, 2018 related to the failed deposition rather than document-production issues. Thus, the Court will apply a 25% reduction to the total

23

attorney's fees incurred during this period, $30,752, resulting in compensable attorney's fees of

$23,604.  Accordingly, Gorsoan is entitled to $26,624.80 in civil contempt sanctions in connection

with the February 2018 deposition and April 2018 hearing, comprising $23,064 in attorney's fees

and $3,560.80 in costs.

In addition, as the Court previously intimated in its June 6, 2018 order, Gorsoan is entitled

to reimbursement for attorney's fees and costs associated with the August 8, 2018 deposition.

(Doc. No. 44 at 2.)  Those fees and costs also fall within the purview of the Court's civil contempt

order; they are not designed to punish Bullock for asserting her Fifth Amendment rights at the

August 8, 2018 deposition, but rather serve to compensate Gorsoan for its time preparing for a

resumed deposition that yielded exactly no substantive testimony because Bullock engaged in

sanctionable misconduct that exposed her to criminal liability.  Although Gorsoan contends that

the amount of time that Foley Hoag attorneys spent preparing for and taking the August 8, 2018

deposition (approximately 24 hours) is unreasonable, the Court disagrees.  Thus, based on a review

of Foley Hoag's time sheets (Doc. No. 55-2 at 10) and an invoice for court-reporter services (*id.*

at 22), the Court will impose additional civil contempt sanctions in the amount of $15,351 for

attorney's fees associated with deposition-related work between August 4 and August 8, 2018, and

costs in the amount of $1,464.57.[7]

The Court will also impose sanctions under Rule 37 and its inherent authority based on

Bullock's failure to attend her deposition scheduled for November 21, 2017.  At the subsequent

show-cause hearing held on December 1, 2017, Bullock's counsel stated that his client did not

attend the deposition because a lawyer in related French litigation advised Bullock not to attend in

---

[7] Even in the absence of a finding of civil contempt, the Court could award the above attorney's fees and costs under
its inherent power in light of Bullock's false testimony at the February 6, 2018 deposition.  *See Mattice v. Conveo
Corp.*, No. 10-cv-2009 (JCH), 2012 WL 10544, at *1 (D. Conn. Jan. 3, 2012).

light of a potential global settlement and stay of proceedings. (Dec. 2017 Conf. Tr. at 8:13–18:24.) The parties, however, never sought to stay this matter in advance of the deposition or to postpone the deposition, and even assuming Bullock relied in good faith on the advice of her counsel in a foreign proceeding (a dubious proposition), such good faith reliance is no defense to a request for sanctions in this context. *See Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 521 (S.D.N.Y. 2018), *aff'd*, 768 F. App'x 139 (2d. Cir.), *cert. denied*, (2019) ("It is well-established . . . that a party applying for sanctions under Rule 37(d) is not required to prove that the party who failed to attend the deposition acted in bad faith." (internal quotation marks omitted)); *cf. SEC v. Musella*, 818 F. Supp. 600, 607 (S.D.N.Y. 1993) (recognizing that "advice of counsel has never been a defense to contempt," and collecting cases). Accordingly, having reviewed Foley Hoag's time sheets (Doc. No. 55-2 at 46–47, 55), the Court will award additional sanctions in the amount of $50,402 to reimburse Gorsoan for attorney's fees incurred between October 16, 2017 and December 1, 2017 in connection with the November 2017 failed deposition and December 1, 2017 hearing.

Finally, the Court denies Gorsoan's motion as to other additional sanctions, without prejudice to renewal. In particular, the question of whether and to what extent Bullock's claim that she produced all responsive documents is "entirely without color and . . . motivated by improper purposes," *Wolters Kluwer Fin. Servs.*, 564 F.3d at 114, will become clearer after the completion of the previously-ordered document review – which should now commence in light of this order – and after the Court's resolution of any disputes over whether certain documents fall within the scope of the subpoena or are subject to (non-Fifth Amendment) privileges. After the resolution of those issues, the Court will also be able to better assess the extent to which Bullock's history of misconduct in this case and Case No. 13-mc-397 warrants additional sanctions. *See*

*Washington Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 8 (D.C. Cir. 2015) (concluding that the district court, when imposing sanctions, "properly took [appellant's] earlier misconduct into account, even though it occurred in a different case and in a different federal court"); *Thibeault v. Square D Co.*, 960 F.2d 239, 246 (1st Cir.1992) ("The totality of the circumstances [when reviewing discovery sanctions] can include events which did not occur in the case proper but occurred in other cases and are, by their nature, relevant to the pending controversy.").

### III.  CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT:  (1) Gorsoan's request that the Court make findings in lieu of discovery is DENIED; (2) Gorsoan's request that the Court compel Bullock to produce documents is GRANTED; (3) Gorsoan's request for spoliation sanctions is GRANTED in part as set out above; and (4) Gorsoan's request for other sanctions is GRANTED in part as set out above.  Accordingly, the Court will impose sanctions against Bullock and in favor of Gorsoan in the total amount of $94,382.37, comprising $89,357 in attorney's fees and $5,025.37 in costs.  IT IS FURTHER ORDERED THAT the parties shall resume the document review protocol previously ordered by the Court, and agreed to by the parties, which shall be completed no later than July 15, 2020.

SO ORDERED.

Dated:     June 15, 2020
           New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation